1   Michael B. Nordlof #V59215 (In Pro. Per)
2   P.O. Box 7100
3   Corcoran, CA. 93212
4
5              In the United States District Court
6            For the Northern District of California.
7
8   Michael B. Nordlof,                    No. C07-4899 MMC (PR)
    Petitioner,
9                                          28 U.S.C. § 2254 (a) (1). 2254 (e)(1)
10        V.
11  Ken Clark, Warden,                     Petition To Amend The
    Respondent.
12                                         Petition for Writ of Habeas Corpus.
13
14
15
16       Petitioner moves to amend Petition for Writ of Habeas Corpus
17  in respects to said Petition No. C07-4899 MMC (PR) with the
18  following said claims:
19       ④ Petitioner's Due Process Rights were Violated by the cross-exam-
20  ination by the Prosecutor of Petitioner's Post-Arrest silence.
21       Upon the two trials by Jury both ending with verdicts and also
22  mistrials. In respects to Petitioner's first trial the Prosecutor clearly
23  made reference to the Petitioner's exculpatory explanation that was offered
24  for the first time at trial. By reference of questions on cross-examination
25  and closing arguments that because Petitioner "knew what the evidence
26  was, so he had to create a story that fit the evidence because they're
27  directory okay." (see "Exhibit A"). It's clear Petitioner received "Miranda"
28  warnings as it's stated in Court (see "Exhibit A"). While it is true that

(1.)

1  THE "MIRANDA" WARNINGS CONTAIN NO ASSURANCE THAT SILENCE WILL CARRY NO

2  PENALTY. SUCH ASSURANCE IS IMPLICIT TO ANY PERSON WHO RECEIVES THE WARN-

3  INGS. IN SUCH CIRCUMSTANCES AS HERE IT IS FUNDAMENTALLY UNFAIR AND A

4  DEPRIVATION OF DUE PROCESS TO ALLOW THE PETITIONER'S SILENCE TO BE USED

5  TO IMPEACH HIS EXPLANATION SUBSEQUENTLY OFFERED AT BOTH HIS TRIALS.

6          FURTHERMORE THE ERROR CAN NOT BE DEEMED AS HARMLESS

7  BEYOND A REASONABLE DOUBT. THIS WAS AN EXTREMELY CLOSE CASE AND THE

8  JURY WAS ABLE TO REACH A VERDICT ON ONLY ONE COUNT AND DEADLOCKED

9  ON ALL OTHER COUNTS AND ENHANCEMENTS. THERE'S A SHARP CONFLICT

10 BETWEEN THE TESTIMONY OF THE PETITIONER AND MR. "BARRERA" ~~WAS~~ WHO

11 WAS THE ONLY PERSON TO TESTIFY IN REGARDS TO OWNERSHIP OF THE FIRE-

12 ARM AND THE PROBABILITY THAT THE REFERENCE OF THE PETITIONER'S

13 " CREAT[ION] OF] A STORY THAT FIT THE EVIDENCE... " TIPPED THE SCALES IN

14 FAVOR OF THE PROSECUTION. THE OBVIOUS PURPOSE OF THE QUESTIONING / REFERENCE

15 WAS TO CONVEY THE IMPRESSION THAT THE PETITIONER'S EXPLANATION WAS FABRICATED

16 FOR THAT IT CAN NOT BE SAID THAT THE CONSTITUTIONAL ERROR WAS HARMLESS

17 BEYOND A REASONABLE DOUBT.

18          IN RESPECTS TO THE SECOND TRIAL FOR THE SAME INCIDENT THE

19 PROSECUTOR VIOLATED PETITIONER'S DUE PROCESS RIGHTS AGAIN BY THE CROSS-

20 EXAMINATION TO HIS POST-ARREST POST-MIRANDA SILENCE TO IMPEACH AN EXCUL-

21 PATORY EXPLANATION SUBSEQUENTLY OFFERED AT TRIAL, BY THE USE OF PETITIONER'S

22 POST-ARREST SILENCE BY QUESTIONING AS WELL AS REFERENCE IN CLOSING

23 ARGUMENT. STARTING BY THE "READ BACK" OF THE FIRST TRIAL TESTIMONY OF

24 THE PETITIONER AND WHILE PETITIONER AGAIN TESTIFIED ON CROSS-EXAMINATION

25 BY THE PROSECUTION. THE PROSECUTION CLEARLY STARTS TO MAKE REFERENCE TO

26 PETITIONER'S POST-ARREST POST-MIRANDA SILENCE BY THE QUESTION OF " WELL

27 YOU NEVER REPORTED THAT, DID YOU? " (SEE "EXHIBIT A") IN RESPONSE TO THE

28 PETITIONER'S EXCULPATORY EXPLANATION OF THE WITNESSES LIES TO PROTECT THE

1  Alleged victim from going to jail for the shooting crime that petitioner
2  was on trial for. Also in the Prosecutors closing remarks reference
3  to the Petitioner's and " If the Defendant didn't do anything wrong, if
4  he was the victim of Marlon Barrera's crime, why doesn't he go to the police
5  (see "Exhibit A") If he did nothing wrong... "

6      Though the first trial was more of an obvious purpose of the
7  questioning was to convey the impression that Petitioner's explanation was
8  fabricated because Petitioner "knew what the evidence was" here in the
9  second trial it was further used as a sword in a way to draw out the
10 fact that Petitioner had remained silent after receiving "Miranda"
11 warnings. As the first trial was close so was the second trial even more
12 so since the jury came back with a "Not Guilty" verdict on the core
13 charge of Burglary but finding on the Attempted Burglary, however
14 deadlocking on all gun enhancements as well as the Assault with a ▬▬▬
15 firearm but a guilty finding on the Vehicle theft so it can not also be
16 said that the Constitutional error was harmless beyond a reasonable
17 doubt.

18              <u>Claim 2.</u>
19     Petitioner's Due Process Rights were Violated based on the
20 Prosecutor's failing to correct false testimony.

21      During both trials the District Attorney's Investigator
22 James Dawson testified as an "Expert Witness" in regards to the
23 distance that the firearm in question was fired from. The first trial
24 he gave his expert opinion of " I would say anywhere from three to six,
25 maybe eight at the most." All in respects to "how close the weapon would
26 have to be to that hole." However in the second trial Mr. Dawson gave a
27 reply of "Fairly close" "Maximum. Three feet" (see "Exhibit B") further he
28 concluded " that's a guess. Nothing more" though it was treated as

(3.)

1 EXPERT TESTIMONY AND THE JURY USED it IN dETERMINING PETITIONERS guilt.
2 THE PROSECUTIONS FAILURE TO CORRECT THIS MISlEADING TESTIMONY UNDER
3 "NAPUE V. Illinois" IN WHICH KNEW AND FAILED TO ACT UPON His
4 RESPONSIblITY ANd duty TO CORRECT WHAT HE KNEW TO bE FAlSE bASED
5 ON THE EXPERT WITNESS TESTIMONY OF DAWSON'S PRIOR TESTIMONY.

6        SINCE THERE WAS A REASONABlE likElihood THAT THE FAlSE TESTIMONY
7 COULD AND did HAVE AFFECT ON THE JUdGMENT OF THE JURY due TO THE JURY'S
8 REQUEST FOR A ~~VAROU~~ "YARdSTICK" AND iN FACT WAS GIVEN TO THEM. (SEE
9 "EXHibit B"). A's well AS THE PETITIONER WAS PERSONAlly told by A CORRECTIONAl
10 OFFICER WHOS FATHER WAS ON THE JURY (BARNEY) THAT due TO THE diSTANCE
11 OF THE GUN SHOT THEY (JURY) did NOT bELIEVE THE PETITIONER'S VERSION OF
12 EVENTS. THEREby dENYING  PETITIONER OF A FAIR TRIAL by THE FAlSE ANd
13 MisLEAdiNG TESTIMONY THAT WENT UNCORRECTED by THE PROSECUTOR.

14
15                    CLAIM 3.

16        PETITIONER'S DUE PROCESS RIGHTS WERE ViolATEd by THE
17 PROSECUTION'S FAILURE TO disclose FAVORAblE EXCULPATORY MATERIAl EVIdENCE,
18 AND OR iMPEACHMENT EVIdENCE.

19        UPON THE PROSECUTORS FAILURE TO FUlFill it oblIGATION TO COMPlETLY
20 PROVIdE THE EXCULPATORY AND OR iMPEACHMENT MATERIAl THAT WAS FAVORAblE TO
21 THE PETITIONER. AlSO FAILED FROM it's duty FROM disclosiNG THE EVidENCE
22 EITHER willEVlly OR iNAdVERTENTly WHICH WAS MATERIAl TO THE PETITIONER.
23 AFTER THE FIRST TRIAL iN THE MIST OF THE SECOND TRIAL ON 7.29.04 THE
24 THE PETITIONER WAS iNFORMEd by THE PROSECUTOR (SEE "EXHibit C") THAT AFTER
25 RECEIVING ANOTHER SOCIAL SECURITY NUMbER (S.S.#), (THAT THE PETITIONER
26 HAd obTAINEd by WAY OF A PRIVATE INVESTIGATOR) THE PROSECUTOR "RECEIVEd
27 A RESPONSE FROM THE F.B.I." (SEE "EXHibit C") iN REGARds TO A CRIMINAl
28 RECORd TO THE AllEGEd VICTIM UNdER THE NAME OF "MARCIAl JOSE TORRES MENdOZA"

(4.)

1 AFTER A REQUEST FOR A "RAP SHEET" THAT ALSO HAD THE VICTIM'S NAME
2 OF "MARLON BARRERA" WITH AT LEAST ONE OTHER NAME OF "MICHAEL
3 CONSIDINE THAT WERE LISTED AS ALIAS NAMES FOR "MARCIAL JOSE
4 TORRES MENDOZA". IN WHICH THE PROSECUTOR HOWEVER STATED" AND
5 I DON'T KNOW THE SIGNIFICANCE OF ANY OF THIS. MY STRONG SUSPICION IS
6 THAT MR. MENDOZA-TORRES WAS USING FUNNY NAMES, AND HE HAPPENED
7 TO PICK MR. BARRERA'S NAME, AND THAT'S WHY IT'S LISTED AS AN A/K/A
8 ON THAT' PERSON'S BUT THERE'S NO RECORD FOR MR. BARRERA." (SEE "EXHIBIT
9 C") WHERE THE COURT RESPONDED BY STATING "OKAY. SO, MR. MASON,
10 [PETITIONER'S TRIAL ATTORNEY] SO THAT'S THE INFORMATION THAT'S BEEN PROVIDED TO
11 YOU. SO, AS IT STANDS, THERE'S A PERSON WITH A DIFFERENT NAME, A
12 DIFFERENT NAME, A DIFFERENT BIRTHDATE, WITH THAT OTHER SOCIAL SECURITY.
13 NUMBER, WITH THE A\K/A.- SO YOU KNOW THAT INFORMATION. SO, FOR WHATEVER
14 THAT'S WORTH, THAT HAS BEEN PROVIDED TO YOU VIA THIS 40 -- -- PRESENTATION
15 OKAY." (SEE "EXHIBIT C"] WHICH WAS FOLLOWED BY PETITIONER'S COUNSEL'S REMARK
16 OF ANOTHER SUBJECT.

17      NOW ON 7·30·04 THE COURT WAS ~~was~~ ADVISED BY THE PROSECUTOR
18 (AFTER BEING "REMINDED" BY PETITIONER) THAT BY WAY OF A PHOTOGRAPH PROVIDED
19 BY THE DEPARTMENT OF JUSTICE FROM THE DEPARTMENT OF MOTOR VEHICLES
20 (D.M.V.) THAT THESE NAME'S BELONG TO THE SAME INDIVIDUAL. THOUGH THERE
21 WAS AN "ARREST IN SAN DIEGO" (SEE "EXHIBIT C") AND IT WAS REQUESTED BY
22 PETITIONER'S COUNSEL "FOR THE PHOTO AND THAT ~~was~~ INFORMATION AS WELL." (SEE
23 "EXHIBIT C") HOWEVER NOTHING FURTHER WAS BROUGHT TO LIGHT IN ATTEMPS
24 TO HAVE "MR. BARRERA" RETURN TO COURT FOR FURTHER INPUT, WHICH WAS DONE ON
25 8·2·04.

26      THEN AND THERE BY WAY OF A "402" HEARING "MR. BARRERA" STATED HE
27 USED HIS "COUSIN'S" NAME (ISIDRO REYES TORRES) NAME OF "MARCIAL JOSE TORRES-
28 MENDOZA" (SEE "EXHIBIT C") UNDER THE CIRCUMSTANCES OF "WHEN I FIRST GOT HERE

1  "I could not get an I.D. because of -- you know, the laws in California
2  made it impossible to get an I.D. under my name." Due to being almost
3  "17 years" of age" because I was a minor at the time, and I needed my
4  -- I needed my parents, you know, to work. I needed a letter from,
5  you know, my parents that I can work. At the time, they needed some-
6  thing from school. So my cousin had that name -- I mean, not a name,
7  just a birth certificate, which he got an I.D. before. And he told me
8  you know, "you can use it so you can work with this" -- you know" with my
9  name"' (see "Exhibit C").

10       However by looking at the dates of when the Identification
11  was obtained by "Mr. Barrera" it clearly ~~shows~~ shows the "Issue date" of
12  5.29.1996 (see "Exhibit C") which would make him an adult of the age of
13  '19' if his real birthday is the one he gave to the court of 3.29.1977
14  (see "Exhibit C"). Also "Mr. Barrera' stated in regards to the arrest
15  record under the name of "Torres-Mendoza" he was "not arrested" but
16  "detained" in which he was given "a ticket" and was currently involved
17  in" going to court ~~arrest~~ to clear" "the case" (see "Exhibit C").

18       Furthermore stating he "was never sent back to Mexico" (see "Exhibit C")
19  and Ms. Longholm (who was a prosecution witness in this case.) was also involved
20  in this incident of "Human Smuggling" (see "Exhibit C").

21       Though it was ruled upon by the court that "Mr. Barrera' could be
22  impeached for the act of fraud in which "Mr. Barrera" obtained an 'I.D.' in
23  in another identity but it was ruled "the circumstances arround the arrest
24  or the detention" (see "Exhibit C") would not be allowed due in part because
25  the court found "he appeared to being truthful to the court" (see "Exhibit C").
26  Even though the Petitioner's lawyer stated "I don't have any discovery in the
27  file to see if the rest of what he testified to is the truth or not." (see "Exhibit C")
28  Though the court concluded that "If anything else had occurred, I believe

(6.)

1. THERE would be SOMETHING AT LEAST in THE F.B.I. TYPE RECORDS SHOWING SOME-
2. THING beyond A CITE And uNder AdmiNiSTRATIVE LAW. And HE'S STill HERE,
3. HAS NOT beEN dePORTEd. THAT Also TEllS YOU SOMETHING HAS-- of A LESSER
4. NATURE HAS OccURRED. RATHER THAN SOME full-blown TYPE CHARGE. So uNder
5. 352. I'd EXERCISE my discRETion ANd NOT Allow THAT AllEGATioN HAVING TO do
6. WiTH THAT PARTiCulAR iSsuE iN THAT." (SEE "ExHibiT C").

7. WHEN THE COURT did AN "In CAMERA REViEW" of THE F.B.I. RAP
8. SHEET uNdER THE NAME "MR. BARRERA" uSEd (TORRES-MENdozA) iN RESPECTS TO
9. THE iNCidENT WHiCH WAS dETERmiNEd THAT "TORRES-MENdozA" HAd "WiTH-
10. dREW APPliCATioN FOR AdmiSSioN TO THE UNiTEd STATES." (SEE "ExHibiT C")
11. ANd THE COURT dEclAiREd "THAT CONFORMS WiTH HiS TESTimoNY THAT HE'S
12. TRYiNG TO clEAR THAT uP SO HE CAN PRESENT THAT." HowEVER THAT MAKES No logiCAl
13. SENSE WHATSOEVER bECAuSE THAT clEARlY MEANS HE "MR. BARRERA" WAS NOT Allowed
14. 'AdmiSSioN TO THE UNiTEd STATES' bECAuSE HE "WiTAdREW APPliCATioN FOR
15. AdmiSSioN" AS THE COURT STATEd.

16. THOugH WHEN PETiTioNER REQUEST THE F.B.I. FilE iN RESPECTS TO THiS
17. KEY WiTNESS iT WAS SAid by THE PROSECUTOR ANd AGREEd uPON WiTH THE COURT "THAT
18. Would bE EQUAlly AVAilAblE TO THE DEFENdANT THOugH THE FREEdom of INFOR-
19. MATioN ACT." (SEE "ExHibiT C") WiTH THE COURT RESPONdiNG WiTH "THAT'S
20. CORRECT WERE NOT AWARE of ANY, buT iF THERE is YOU WANTEd THAT, YOU Could
21. do THAT. -- buT -- OKAY --OR THAT YOU Could'VE bEEN doNE, I GUESS is WHAT I
22. SHOuld SAY (SEE "ExHibiT C".)

23. AS iT CAN bE SEEN FROM THE RECORd THE dETAilS of THE KEY WiTNESS ANd
24. HiS ARREST OR dETENTioN MAY bE THE "Tip of THE IcEbERG" SiNCE NOT ONly ARE
25. THE CiRCumSTANCES uNClEAR buT AlSO THERE is NO REASON A RESolUTioN OF THiS
26. MATTER iS NOT bEST SERVEd by THE LiGHT of All THE EVidENCE THAT SHOuld HAVE
27. AlREAdY bEEN REVEAlEd iN PART bECAuSE THE PROSECuTOR'S OFFiCE WAS iN
28. iN CONTACT WiTH THE F.B.I. SiNCE 4.1.03 AbouT THiS CASE (SEE "ExHibiT C"),

(7.)

1. EVEN THOUGH THE PROSECUTOR (AND COURT) PUT IT OF BY STATING " IF THERE IS AN
2. F.B.I. FILE ON MR. BARRERA THAT WOULD BE EQUALLY AVAILABLE TO THE DEFEN-
3. DANT THROUGH THE FREEDOM OF INFORMATION ACT " BUT THE LAW IS CLEAR
4. ON THIS MATTER BECAUSE THE PROSECUTOR IS IN A UNIQUE POSITION TO OBTAIN
5. INFORMATION KNOWN TO OTHER AGENTS OF THE GOVERNMENT, IT MAY NOT BE
6. EXCUSED FROM DISCLOSING WHAT IT DOES NOT KNOW BUT COULD HAVE LEARNED.
7.     FURTHERMORE THE QUESTION OF AUTHENTICITY OF THE CALIFORNIA
8. DRIVERS LICENSE #D2845857 THAT WAS PROVIDED BY THE PROSECUTOR
9. (SEE "EXHIBIT C") CLEARLY STATES UNDER WHAT TYPE OF "CLASS" THE LICENSE WAS
10. ISSUED UNDER WAS A TYPE "F" CLASS" HOWEVER UPON QUESTIONING THE D.M.V.
11. THEY STATED THEY HAVE NEVER ISSUED A CLASS "F" DRIVERS LICENSE
12. (SEE "EXHIBIT C").
13.     WITHOUT AN EVIDENTARY HEARING AND A FULL DISCLOSER OF "MR. BARRERA'S"
14. CRIMINAL FILE ALONG WITH HIS OTHER KNOWN NAMES USED BY "MR. BARRERA" AS
15. WELL AS THE CIRCUMSTANCES IN WHICH THEY WERE USED, PREJUDICE CAN NOT BE
16. DETERMINED THEREFORE IT WILL BE RESPECTFULLY SUBMITTED UNTIL A FURTHER
17. DETERMINATION CAN BE CALLED FOR THAT THE PREJUDICE PART OF THIS "BRADY"
18. VIOLATION BE HELD ON CONCLUSION OF THE COURT'S SATISFACTION THAT THE GOVERN-
19. MENT'S WITNESS DID NOT LIE AND OR HELPED BY THE GOVERNMENT'S MISCONDUCT
20. AND SHOULD THE COURT ALSO UNCOVER EGREGIOUS WRONGDOING BY THE GOVERNMENT
21. IT CAN MAKE IT'S OPINION FROM THAT POINT ON.
22.                CLAIM 4.
23.     TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHTS BY EXCLUDING
24. EXCULPATORY EVIDENCE FROM THE JURY.
25.     IN RESPECTS OF THE SECOND JURY TRIAL THE TRIAL COURT RULED
26. THAT EVIDENCE PERTAINING TO THE ALLEGED VICTIM'S ("MR. BARRERA") MULTIPLE NAMES
27. AND PAST CRIMINAL ACTIVITY (SEE "CLAIM 3") WOULD NOT ALLOW THE JURY TO HEAR IN
28. IN ABUSE OF THE COURTS DISCRETION.

1. Since the duty of the Court is to make sure the scales of justice are
2. conducted in a fair mannor, however in this case placing a discovery request
3. by the defense in the hands of the defense during mid-trial by stating
4. "That's correct we're not aware of any, but if there is you wanted that,
5. you could do that -- but -- okay -- or that you could've been done. I
6. guess is what I should say." (see "Exhibit C"). Another way of saying
7. to late however a brief continuance would have eliminated the possibility
8. of any prejudice. Instead, the trial court insisted on rigidly adhering
9. to the trial schedule to the detriment of the Defendant's Rights to A
10. fair trial (due maybe in part to the judge's vacation plans that week).
11. Since the trial judge has the responsibility for safegaurding both
12. rights of the accused and the interest of the public in the administration
13. of justice. The adversary nature of the proceedings does not relieve
14. the trial judge of the obligation of raising the initiative, at all appropriate
15. times and in a appropriate mannor, matters which may significantly promote a
16. just determination of the trial. In a close case as here and the question
17. of the alleged victim's giving another alias name waen asked by the 911"
18. operator (Marlon Moreno) in this case which further shows that when "Mr. Barr-
19. era" is committing criminal act's he is more likely to provide an alias name
20. as he has done in this case as well as the "Human Smuggling" along possibly
21. other times which would explain the other names the F.B.I. reply had
22. listed.

23. Refussing to order the Government to respond to Petitioner's discovery
24. request upon showing that there must be an F.B.I. or Criminal reports, file/
25. record for "Mr. Barrera" when an arrest is shown, multiple names used, and a
26. "withdrew Application for Admission to the United States" after an attempt
27. human smuggling charge which would have to show more criminal activity as
28. well. Though the Trial Court used by the Court in the determination the fact

(9.)

1. THAT "HE'S STILL HERE, HAS NOT BEEN DEPORTED. THAT ALSO TELLS YOU SOMETHING HAS--
2. OF A LESSER NATURE HAS OCCURRED" IS CLEAR ERROR, AS IT CAN NOT BE ASSUMED A
3. WITNESS WILL GIVE ACCURATE INFORMATION ESPECIALLY WHEN THE FACTS SHOW OTHER
4. WISE AND A "WITHDREW APPLICATION FOR ADMISSION TO THE UNITED STATES" WHICH
5. WOULD MEAN HE WAS NEVER ALLOWED INTO THE UNITED STATES.

6.        PREJUDICE CAN NOT BE TRUELY SHOWN UNTIL A FULL EVIDENTRY HEARING
7. IS CONDUCTED AND ALL IMPEACHMENT AND OR MATERIAL EVIDENCE OF THIS KEY
8. WITNESS IS MADE AWARE AND ONLY THEN A DETERMINATION OF PREJUDICE
9. CAN BE DECIDED.

10.                    CLAIM 5.

11.      PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED BY THE PROSE-
12. CUTOR'S FAILURE TO DISCLOSE FAVORABLE EXCULPATORY MATERIAL EVIDENCE.

13.         IT IS FURTHER STATED THAT IN REGARDS TO "CLAIM 3" OF THIS PETITION
14. CONCERNING THE INCIDENT INVOLVING "MR. BARRERA" WITH THE FEBRUARY 21, 1999
15. ARREST IN SAN YSIDRO FOR "ALIEN SMUGGLING" AND "ATTEMPTED UNLAWFUL ENTRY
16. INTO THE UNITED STATES" AS "MR. BARRERA" SO CLEARLY STATED IN HIS TESTIMONY
17. THAT MS. LONGHOLM WAS INVOLVED WITH THIS INCIDENT THOUGH NO DISCOVERY
18. WAS GIVEN IN RESPECTS TO THIS ARREST WHICH MAY HAVE BEEN USED TO IMPEACH
19. MS. LONGHOLMS TESTIMONY AND OR PRIOR PARTNERSHIP IN CRIME WITH "MR. BARRERA."
20.          SINCE PREJUDICE CAN NOT BE SHOWN WITHOUT THE KNOWN FACTS OF THIS
21. ARREST INCIDENT IT IS FURTHER ASKED THAT THE PREJUDICE PRONG OF THIS "BRADY"
22. VIOLATION BE HELD AFTER THE FULL DETAILS OF THIS EVIDENCE IS DETERMINED.

23.

24.                    CLAIM 6.

25.      PETITIONER'S DUE PROCESS RIGHT'S WERE VIOLATED BASED ON THE
26. PROSECUTOR'S FAILING TO CORRECT FALSE TESTIMONY.

27.      THE PROSECUTORS FAILING TO CORRECT "MARLON BARRERA'S" FALSE TESTIMONY
28. UPON BEING PLACED ON NOTICE IN REGARDS TO HIS CLAIMS OF NOT HAVING TO USE

1. ANOTHER SOCIAL SECURITY NUMBER TO OBTAIN HIS FALSE IDENTIFICATION OF
2. "MARCIAL JOSE TORRES MENDOZA" BY THE D.M.V. HOWEVER **ONLY** THE
3. SOCIAL SECURITY NUMBER OF 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 WAS PROVIDED TO THE
4. PROSECUTOR WHO THEN RAN A "BACK ROUND" CHECK AND THEN WAS PROVIDED THE
5. NAME OF MR. MENDOZA BY THE F.B.I. ALONG WITH OTHER ALIAS NAMES UNDER
6. THAT SAME NUMBER, SO MAKING THE STATEMENTS BY "MARLON BARRERA" FALSE
7. SINCE THE ONLY WAY THE PROSECUTOR WOULD BE ABLE TO LOCATE THE NAME
8. "MARCIAL JOSE TORRES MENDOZA" BY ONLY A SOCIAL SECURITY NUMBER IS BECAUSE
9. IT WAS USED WHEN OBTAINING THE FALSE IDENTIFICATION BY THE WITNESS.
10.
11. ### Claim 7.
12. PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED BASED ON
13. THE PROSECUTOR'S FAILING TO CORRECT FALSE TESTIMONY.
14. THE "NAPUE V. ILLINOIS" CLAIM IN REGARDS TO "MARLON BARRERA"'S
15. FALSE TESTIMONY ABOUT WHY HE HAD OBTAINED ANOTHER IDENTIFICATION BY
16. THE D.M.V. DUE TO THE FACT THAT THE DATE "MR. BARRERA" RECEIVED
17. THIS FIRST I.D. CARD. IT CLEARLY STATES THE DATE IT WAS ISSUED WAS
18. 5·29·1996 (SEE "EXHIBIT C" I.D. # B5181471.) HOWEVER AS "MR. BARRERA"
19. STATED HIS REAL DATE OF BIRTH IS 3·29·1977 MAKING HIS WHOLE STORY OF
20. BEING A MINOR WHEN HE OBTAINED THIS IDENTIFICATION IN ORDER TO ONLY WORK
21. BECAUSE OF BEING A MINOR COMPLETELY FALSE MISLEADING EVERYBODY TO MAKE
22. HIMSELF DEEMED TRUSTWORTHY AND THE PROSECUTOR'S DUTY TO CORRECT THIS FALSE
23. TESTIMONY UNDER "NAPUE" WHICH DENIED THE PETITIONER OF HIS DUE PROCESS
24. RIGHTS.
25. ### Claim 8.
26. PETITIONER'S DUE PROCESS RIGHT'S WERE VIOLATED BY THE
27. INEFFECTIVE ASSISTANCE OF COUNSEL BY DEPRIVING PETITIONER OF
28. AN REASONABLE DEFENCE BY FAILING TO FILE A SUPPRESSION MOTION FOR ILLEGAL

1.  Collection of Evidence.

2.        Petitioner's name was recovered from legal documents that were

3.  found in an "Inventory Search" thas was conducted on the vehical that

4.  was found at the alleged victims home. From these legal papers the

5.  Petitioner's name was received and the officer(s) then placed the

6.  Petitioner's picture in a "six pack" photo line up in which the alleged

7.  victim identified the Petitioner. Petitioner's Counsel Failed to file

8.  the proper motion to suppress based on the illegal inspection conducted

9.  on Petitioner's legal personal paperwork with a search warrent because

10. the "Vehicle Inventory" that was conducted is not legal probable

11. cause to inspect paper by paper in hopes to collect evidence much less

12. Petitioner's personal legal paperwork.

13.     Trial Counsel's performance fell below an objective standard of

14. reasonable due to his failure to exercise his professional discretion with a reason-

15. able informed preparation and investigation to satisfy a significant decision in

16. the exercise of reasonable professional judgement. Thereby his strategic

17. choices that were made to not file a supression motion after less than a

18. complete investigation are unreasonable. For trial Counsel was incompeteant

19. in his failing to take any steps to keep from the Jury Identification

20. evidence that was critical to the Prosecutions case but of a most questionable

21. admissibility (Re: "six pack" photo line up).

22.     More than the set standard can be seen than the "Reasonable Probability"

23. that, but for Trial Counsel's unprofessional errors, the results of the proceeding(s)

24. would have been different since it's been determined a "Vehicle Inventory" search

25. is not probable cause to rifle through papers or the contents within hopefully

26. looking to find evidence much less legal paperwork. After the Prosecutor's closing

27. of the "case in chief" Petitioner made a motion to dismiss pursuant to California

28. Penal Code 1118.1 on the grounds of the elements of the offenses have not been

1  MET. THE TRIAL JUDGE DENIED THE MOTION AND RULED THERE WAS AN IDENTIFICATION

2  OF PETITIONER HOWEVER AS THE TRIAL RECORDS INDICATE "MR. BARRERA" THE ALLEGED

3  VICTIM AND ONLY WITNESS IN RESPECTS TO IDENTIFICATION TESTIFIED WHEN QUESTIONED

4  "DO YOU SEE HIM IN COURT?" HE STATED "I DON'T SEE HIM IN COURT." (SEE

5  "EXHIBIT d ") WITH THE ONLY IDENTIFICATION BASED ON THE HEARSAY OF AN

6  OFFICER CONDUCTING THE PHOTO LINE UP STATING "MR. BARRERA" PICKED THE

7  PETITIONER AS THE SUSPECT, MAKING THAT THE ONLY IDENTIFICATION AT THE TIME

8  THE RULED ON THE MOTION TO DISMISS PURSUANT TO CAL. P.C. 1118.1.

9     THEREBY MAKING THE RESULTS OF THE PROCEEDINGS DIFFERENT BASED ON

10  COUNSELS INEFFECTIVNESS BASED ON HIS FAILING TO FILE A MOTION TO SUPRESS

11  THE PHOTO LINE UP DUE TO THE ILLEGAL ACTIVITY OF THE POLICE DURING THE

12  "VEHICLE INVENTORY SEARCH."

13               CLAIM 9.

14     PETITIONERS RIGHT TO PRESENT A DEFENSE AND WITNESSES ON HIS

15  BEHALF BY THE PROSECUTOR'S VIOLATION OF PETITIONERS DUE PROCESS RIGHTS.

16     PROSECUTORS THREATING IMPLIES TWO TOWARDS WITNESS DAVID W. GRAY

17  STATING "... IF HE [GRAY] DOESN'T COMPLY WITH THE COURTS DIRECTIVE THEN

18  HE CAN BE FOUND IN COMTEMPT AND SINCE MR. GRAY IS ON A GRANT OF FELONY

19  PROBATION, IF HES FOUND IN COMTEMPT, THAT CONSTITUTES A VIOLATION OF TERMS

20  PROBATION. AND HE COULD BE SENTENCED TO STATE PRISON FOR UP TO EIGHT YEARS."

21  (SEE "EXHIBIT E"). ALSO LATER STATED AT THE '402' HEARING" AT THIS TIME, GIVEN

22  MR. GRAYS RESPONSES, I DO NOT. IT IS GOING TO BE MY INTENTION BASED UPON

23  MR. GRAYS RESPONSES TO MY QUESTIONS [OF NOT RECALLING] HERE AT THIS HEARING TO

24  FILE A MOTION TO REVOKE HIS FELONY PROBATION BECAUSE I THINK MR. GRAY IS

25  BEING WILLING FALSE." SEE "EXHIBIT E" . THE PROSECUTOR WENT ON TO STATE

26  THAT HE FELT MR. GRAY WAS LYING BECAUSE HE DOESN'T WANT TO GET PETITIONER

27  IN TROUBLE HOWEVER IT COULD BE VERY WELL THAT MR. GRAY WAS ATTEMPTING

28  TO ASSERT THE 5TH AMENDMENT RIGHT TO REMAIN SILENT OR "FORGET" IN ORDER

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
85 34769

1  TO PREVENT THAT HE WAS IN FACT GUILTY OF BRINGING PETITIONER TO THE ALLEGED
2  VICTIM'S HOUSE WITH THE INTENT OF HAVING PETITIONER ASSUALTED OR HARMED
3  BY "MR. BARRERA THEREBY MR. GRAY would be PLACED IN WAY OF FURTHER
4  PROSECUTION FOR THESE ACTIONS. BUT FOR THESE ACTIONS OF THREATS OF GETTING
5  HIS PROBATION REVOKED WITH A POTENTIAL SENTENCE OF 8 YEARS OR ADMITT EVEN
6  MORE CHARGES THAT could RETURN Additional CHARGES WITH No UNDERSTANDING THAT
7  HE WOULD BE FREE FROM PROSECUTION CLEARLY SHOWS THE PROSECUTOR'S THREATS,
8  PREVENTED PETITIONERS RIGHT TO PRESENT A DEFENSE AND EXTRACT MATERIAL
9  TESTIMONY EVIDENCE FROM THE WITNESS WHO WAS IN A POSITION TO PROVIDE RELEVANT
10 EVIDENCE AS A DIRECT EYEWITNESS / PARTICIPATE IN THE ALLEGED CRIME PETITIONER
11 WAS FOUND GUILTY OF.

12               ## Claim 10.

13  PETITIONER'S DUE PROCESS RIGHT WERE VIOLATED BY THE JUDICIAL Misconduct
14 BY ALLOWING THE MATERIAL AND PREJUDICIAL TESTIMONIAL EVIDENCE THAT WAS INTRO-
15 DUCED AGAINST PETITIONER WITHOUT AN OPPORTUNITY FOR CROSS-EXAMINATION OF THE
16 ALLEGED CO-DEFENDANT DAVID W. GRAY, BECAUSE OF THE TRIAL COURT'S ACTIONS.

17  TRIAL COURT'S FORCED QUESTIONING OF DAVID W. GRAY IN REGARDS OF THE
18 REASON(S) HE WAS PLEADING THE FIFTH AMENDMENT EVEN THOUGH TRIAL COURT
19 HAD BY REQUEST ON 5·26·04 "ORDERS" OF A TRANSCRIPT OF MR. GRAYS COURT
20 "IN-CAMARA" HEARING IN RESPECTS OF HIS FIFTH AMENDMENT RIGHT. THEREFORE
21 IF MR. GRAYS RIGHTS WERE STILL VALID WHEN THE TRIAL COURT'S QUESTIONING OF
22 MR. GRAY WITHOUT COUNSEL IN REGARDS TO HIS FIFTH AMENDMENT RIGHTS KNOWING
23 ALL ALONG WHAT THE REASONS FOR PLEADING THEM WAS FOR BUT STILL ATTEMPTED
24 TO FORCE MR. GRAY TO STATE IN OPEN COURT THE REASON(S) OR GIVE STATMENT'S
25 IS CLEAR ABUSE OF THE COURT'S POWERS OR DISCRETION IN WHICH FORCED MR. GRAY
26 TO "FORGET". THEN RULING THAT THE MEMORY LAPSE WAS ON PURPOSE AND THEREBY
27 ALLOWING HIM TO BE DEEMED A LIAR AS WELL AS MAKING HIM BY THE COURT'S ACTIONS
28 AN UNAVAILABLE WITNESS WITH NO OPPORTUNITY FOR ANY TYPE OF EXAMINATION BY THE

1  PETITIONER (SEE "EXHIBIT F").

2  As it has been set in order to establish a Violation of Due Process of Law

3  A Petitioner must show a Government Agent performed Act's entirely

4  unnecessary to the proper performance of his/her duties which were of such a

5  nature as to persuade a witness not to testify, By Trial Court's performed

6  Act's unnecessary by having the witness attempt to state why or what was

7  the reason(s) for his assertion of the Fifth Amendment when the Court had

8  the "in-camara" transcript from prior hearing in which his Fifth Amendment

9  Right was accepted which was a substantial cause for this witness' change

10  of mind that made him not "recall" when he stated before that he still had

11  his Fifth Amendment Rights.

12  Due to the direct participantion in the alleged crime and thus was in

13  a position to provide relevant evidence in the Petitioner's Defense

14  thereby making it Material and a Violation of Petitioner's Due Process Rights.

15  ## Claim 11.

16

17  Petitioner's Right to Counsel was violated by the Ineffective Assis-

18  tance of Counsel.

19  Trial Counsels Act's of errors and omissions in regard of when he

20  was placed on notice regarding Alternate Juror #44764 knowledge she had

21  obtained from witness "Mr. Marcelli" that "Specifically what came out of his

22  mouth was how a girl [Ms. Claybon] has gone in [his Gunstore] there and gotten

23  a gun in her name because the boyfriend "Mr. Barrera" didn't want a gun in

24  his name." (see "Exhibit G") Also continuing with other impeachment material

25  of Mrs. Claybon, Mr. Marcelli, and "Mr. Barrera" however the facts were never brought

26  in front of the Jury and even the Trial Judge made it clear of the impeachment

27  evidence at one time stating "I think thats clearly impeachment evidence." (see

28  "Exhibit G") in refurance to Ms. Claybon's credibility though Trial counsel never

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

1 CALLED THE ALTERNATE JUROR TO TESTIFY OF WHY MS. CLAYHON BOUGHT THIS GUN.

2 NOR SO THE GUN SHOP OWNER MR. MARCELLI COULD BE IMPEACHED WITH IF ANYTHING

3 THE FACT THAT HE COMMITTED AN ACT OF "MORAL TURPITUDE" OF SELLING A FIRE-

4 ARM TO SOMEBODY (MS. CLAYHON) WHO HE KNEW WAS FOR ANOTHER PERSON (MR. BARRE-

5 RA") WHICH IS A FELONY OFFENCE AND THEN BE IMPEACHED BY HIS TESTIMONY IN

6 RESPECTS OF WHY MS. CLAYHON PURCHASED THE 45. CALIBER FIREARE ON THE FACT

7 SINCE HE STATED IN COURT THAT MS. CLAYHON PICKED THAT PARTICULAR WEAPON BE-

8 CAUSE "SHE THOUGHT THE GUN WAS PRETTY" SEE "EXHIBIT G" NOT THE REASON THAT

9 IT WAS FOR "MR. BARRERA" AS THE GUN SHOP OWNER FIRST STATED.

10 NOR WAS THE FACT THAT OBTAINED DURING THIS EVENT ABOUT GUN OWNERSHIP

11 THOUGH BOTH "MR. BARRERA" AND MS. CLAYHON WHO BOTH DID NOT LIKE FIREARMS

12 BECAUSE OF THEIR CHILD THOUGH THEY BOUGHT AND "LOST" THIS SAME .45 CALIBER

13 GUN IN QUESTION WHILE CAMPING WITH THE CHILDERN.

14 THE DIRECT EFFECT OF THIS IMPEACHMENT EVIDENCE WHEN PUT INTO A WHOLE

15 CLEARLY SHOWS THAT A CLOSE CASE AS THIS ONE CAN ONLY SHOW PREJUDICAL ERROR DUE

16 TO TRIAL COUNSEL'S ERROR'S AND OMISSIONS AS WELL AS THIS JUROR IN QUESTION MADE

17 IT CLEAR THAT THIS INFORMATION HAD A DIRECT IMPACT ON THE RELIABILITY OF THE

18 CHARGES AGAINST THE PETITIONER PLUS EVEN THE JUDGE STATED IT WAS "CLEARLY

19 IMPEACHMENT EVIDENCE."

20 ## CLAIM 12.

21 TRIAL COURT VIOLATED PETITIONER'S (DUE PROCESS RIGHTS) BY THE

22 MODIFICATION OF THE VERDICT AND THEREBY CONVICTING PETITIONER OF A CRIME NOT

23 CHARGED OF OR PROVED BY THE JURY.

24 TRIAL COURT'S ERROR AT SENTENCING BY CONCLUDING THAT PETITIONER WAS

25 GUILTY OF TAKING A CAR OWNED BY THE BROTHER OF THE ALLEGED VICTIM WHICH WAS

26 NEVER PROVEN BY A JURY HOWEVER THE COURT SENTENCED PETITIONER AN ADDITIONAL

27 CONSECUTIVE SIX YEARS (TOTAL ONE THIRD THE MIDDLE TERM EQUAL TO 16 MONTHS.) DUE TO

28 DUE TO THE PROSECUTOR'S STATEMENT(S) AT SENTENCING THAT THE CAR WAS ACTUALLY

1  OWNED BY THE ~~BROTHE~~ BROTHER OF "MR. BARRERA" BY THE NAME OF "MR. VELASQUEZ"
2  AND NOT HOW IT WAS CHARGED AS "MR. BARRERAS" VEHICLE (SEE "EXHIBIT H")
3  THEREBY MAKING PETITIONER INELIGIBLE FOR CONCURRENT SENTENCING BECAUSE
4  OF "MULTIPLE VICTIMS" IN WHICH SENTENCING JUDGE AGREED IN VIOLATION OF
5  OF PETITIONER'S DUE PROCESS RIGHT'S (SEE "EXHIBIT H".) AS IT MAY BE
6  SHOWN BY THE "INFORMATION" THAT WAS FILED THAT ALL ALLEGED CRIMES WERE
7  AGAINST THE SAME ALLEGED VICTIM, "MR. BARRERA" (SEE "EXHIBIT H").

8  ## CLAIM 13.

9      TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHTS BY
10  IMPOSING THE UPPER TERM BECAUSE OF AGGRAVATING FACTORS USED THAT WERE
11  NEITHER KNOW NOR WERE PROVEN TO A JURY.

12      TRIAL COURT BY IMPOSING THE UPPER TERM OF FOUR YEARS VIOLATED
13  PETITIONER'S RIGHTS UNDER AN UNPROVEN FACTOR IN RESPECTS TO THE CALIFORNIA
14  PENAL CODE 245 CHARGE WHICH WAS USED AS THE BASE TERM, HOWEVER WAS NEVER
15  PLEAD TO OR PROVEN THEREFORE THE COURT SHOULD HAVE IMPOSED THE MIDDLE TERM
16  OF THREE YEARS. AS IT STATES FROM THE ATTACHED "EXHIBIT I" WHEN TALKED
17  ABOUT THAT ISSUE A "PETITION FOR WRIT OF HABEAS" COULD BE USED WHEN THE
18  ISSUE OF "BLAKELY V. WASHINGTON" WAS AT HAND HOWEVER NOW THAT THE LAW
19  IS IN AGREEMENT THAT THE PETITIONER SHOULD NOT RECEIVE THE AGGRAVATED
20  UPPER TERM BASED ON FACT'S NEVER PLEAD TO OR PROVEN, THE MIDDLE TERM OF
21  THREE YEARS SHOULD NOW BE SENTENCED UNDER THE CAL. P.C. 245.

22  ## CLAIM 14.

23      TRIAL COURT'S ERROR BY THE VERIOUS INSTRUCTIONS AT BOTH TRIALS WERE
24  NOT SUFFICIENTLY CLEAR WHICH HAD AN EFFECT ON THE DELIBERATIONS OF THE JURY VIOLATING
25  PETITIONERS RIGHT TO A FAIR TRIAL.

26      THE JURY'S VERDICTS AND QUESTIONS CLEARLY INDICATE THAT THE JUROR'S
27  WERE CONFUSED. AT THE FIRST TRIAL PETITIONER WAS CONVICTED OF POSSESSION OF A
28  FIREARM AND "HUNG" ON ALL OTHER CHARGES HOWEVER THE FIREARM WAS UNQUESTIONALLY

COURT PAPER
STATE OF CALIFORNIA
STD 113 (REV 8-72)

JB 34769

1  FiRed WHICH SHOWS THE JURY did NOT UNDERSTANd WHAT WAS GOING ON bY NOT MAKING

2  A FiNdING ON THE dischARGING OF THE FiREARM AllEGATIONS. FURTHERMORE iN THE

3  SECONd TRiAl THERE WAS NO EVidENCE OF AN ATTEMPTEd bURGlARY HOWEVER THE JURY

4  THE JURY ACQUiTEd PETiTiONER OF BURGlARY but FOUNd HiM GUilTY OF ATTEMPTEd

5  bURGlARY. Also WITH NUMEROUS QUESTIONS EVEN ONE OF "Do WE HAVE TO REACH A

6  VERdicT?" ClEARly SHOWS THEY WERE MislEAd ANd THE VARiOUS iNSTRUCTIONS

7  THAT WERE GiVEN could bE CONSidEREd AS AN EFFECT ON THOSE dElibERATIONS.

8                    ClAiM 15.

9      PETiTiONER'S RiGHT TO CounSEl WAS ViolATEd bY THE INEFFECTIVE

10  ASSiSTANCE OF CounSEl.

11      TRiAl CounSEl FAilEd TO ACT iN A MANNER TO bE EXPECTEd OF A

12  REASONARly COMPETENT ATTORNEY ACTiNG AS A dilIGENT AdVOCATE bY FAilING

13  TO PROVidE THE JURY MATERiAl EVidENCE OF THE "911 dispATCH loG" PRiNTOUT

14  THAT SHOWS THAT THE NEiGHbOR CAllEd 911 FiRST THEN ONly AFTER MulTiPlE

15  PolicE VEHiclES WERE AROUNd THE AllEGE VicTiM'S HOME GOiNG TO THE NEiGH-

16  bOR'S 911 CAll did "MR. BARRERA" THEN iN FACT CAll 911. GiVEN ▬▬ THE

17  FACTS OF THIS WouLd SHOW THE AllEGE VicTiM HAd TiME TO CONCEAl EVidENCE

18  OR EVEN SHOW THAT HE WAS NOT EVEN GOiNG TO REPORT ANY ACTiViTY duE TO

19  His illEGAl doiNGS OF HAViNG THE GUN THAT WAS FiREd.

20                    ClAiM 16.

21      PETiTiONER'S RiGHT TO CounSEl WAS ViolATEd bY THE INEFFECTIVE

22  ▬▬▬ ASSiSTANCE OF CounSEl.

23      TRiAl CounSEl FAilEd TO ACT iN A MANNER TO bE EXPECTEd OF A

24  REASONARly COMPETENT ATTORNEY ACTiNG AS A dilIGENT AdVOCATE bY FAiliNG

25  TO ObTAiN A COMPlETE TRANSCRiPT OF THE PRElimiNARY HEARiNG THAT WAS

26  THE MAiN "EVidENCE" OF THE PRiOR STRiKE TO CONTEST THE TRUTH OF THE

27  MATTER WHICH WouLd OF iN FACT SHOWN PETiTiONER illEGAlly PlEAd "No CoN-

28  TEST" duE TO THE WRONGdoiNGS THAT OCCURREd AS WEll AS THE ACTuAl

1 CONFLICT PETITIONER HAS WITH THE Humboldt County Public Defenders
2 Office WHO REPRESENTED THE PETITIONER AT TRIAL. All THIS WAS IN THE
3 SECOND PART OF THE PRIOR STRIKE PRELIMINARY TRANSCRIPT THE District
4 ATTORNEY FAILED TO INTRODUCE WHICH CLEARLY SHOWS THE illegal doing OF
5 TRIAL COUNSEL'S CO-WORKER WHO MADE A PLEA AGREEMENT <u>AGAINST</u> THE
6 PETITIONER WHILE HIS OFFICE REPRESENTED THE PETITIONER FOR THE ONLY
7 WITNESS WHO TESTIFIED. WHICH WAS All BEING KEPT SECRET BY THE
8 District ATTORNEYS OFFICE. HOWEVER TRIAL Counsel FAILED TO conduct
9 AN Addiquit INVESTIGATION INTO THIS MATTER WHICH WOULD SHOW A "divided
10 loyelities" BETWEEN HIS OFFICE CO-WORKER AND PETITIONER THEREFORE
11 ADVERSELY AFFECTED HIS PERFORMANCE. THEREFORE TRIAL Counsel's ERRORS
12 AND OMISSIONS BY FAILING TO OBTAIN THE COMPLETE PRELIMINARY HEARING
13 TRANSCRIPT TO CONTEST PETITIONER'S PRIOR STRIKE CAUSING A LOSS OF A
14 DEFENCE WHICH HE (PETITIONER) IS INTITLED TO. (SEE "EXHIBIT J").
15                          <u>CLAIM 17.</u>

16    PETITIONER'S Due PROCESS RIGHTS WERE VIOLATED BY THE COURT'S ERROR.
17    AT PETITIONER'S "MARSDEN(S)" HEARING(S) THE COURT COMMITTED
18 ERROR BY STATING THAT PETITIONER'S ATTORNEY WHO THE PETITIONER HAD
19 ATTEMPTED TO SHOW THE COURT THERE WAS AN ACTUAL CONFLICT OF INTEREST
20 THE COURT HAD THE ATTORNEY INVESTIGATE INTO THIS CLAIM, HOWEVER IT'S
21 THE EXISTENCE OF AN ACTUAL CONFLICT CANNOT BE GOVERNED SOLEY BY THE
22 PERCEPTIONS OF THE ATTORNEY; RATHER THE COURT ITSELF MUST EXAMINE THE
23 RECORD TO DISCERN WHETHER THE ATTORNEY'S BEHAVIOR SEEMS TO HAVE BEEN
24 INFLUENCED BY THE CONFLICT.
25    UNTIL THE COURT REVIEWS THE RECORD LIKE IT SHOULD HAVE BEEN CONDUC-
26 TED WHEN THE ISSUE WAS BROUGHT UP PREJUDICAL ERROR CAN NOT NOW BE
27 SHOWN WITHOUT A FULL AND RIGHTOUS HEARING ON THE MATTER AND FROM THERE
28 ON IF THE COURT DETERMINES AN ACTUAL CONFLICT PREJUDICE IS PRESUMED

COURT PAPER
STATE OF CALIFORNIA
STD 113 (REV 8-72)

85 34769

1  WHEN COUNSEL IS BURDENED BY AN ACTUAL CONFLICT OF INTEREST (SEE "EXHIBIT K")

2                                          CLAIM 18.

3        , PETITIONER'S DUE PROCESS RIGHT'S WERE VIOLATED BECAUSE OF THE

4  PROSECUTOR'S INTENTIONAL MISREPRESENTATION OF FACTS KNOW TO BE FALSE.

5        ON 5·25·04 BEFORE THE FIRST TRIAL STARTED WHILE ALL PARTIES

6  WERE PRESENT, THE ISSUE OF PETITIONER RECEIVING A HAIRCUT WAS IN

7  DISCUSSION DUE TO THE FACILITY WHICH PETITIONER WAS BEING HELD

8  REFUSSED TO PROVIDE A HAIRCUT. IT WAS ORDERED BY THE COURT IN FRONT

9  OF THE PROSECUTOR THAT PETITIONER WOULD RECEIVE A HAIRCUT HOWEVER ONE

10 WAS NEVER GIVEN TO THE PETITIONER DUE TO LACK OF CORROBORATION FROM

11 THE GOVERNMENT WHO WAS HOUSING THE PETITIONER. WITH THESE KNOW FACTS

12 THE PROSECUTOR KNOWING ALL OF THIS STATED TO THE JURY IN CLOSING ARGU-

13 MENTS THAT THE ONLY REASON THE PETITIONER WAS NOT IDENTIFIED BY THE

14 ALLEGED VICTIM WAS BECAUSE HE GREW HIS HAIR OUT GIVING THE FALSE IMPRES-

15 SION THAT THE PETITIONER WAS ATTEMPTING TO DISGUISE HIMSELF HOWEVER

16 HE WAS NEVER PROVIDED ANY MEANS TO OBTAIN A HAIRCUT THEN IT WAS USED

17 AGAINST PETITIONER WHEN THE COURT AND PROSECUTOR WAS WELL AWARE

18 OF THESE FACTS. (SEE "EXHIBIT L").

19                                          CLAIM 19.

20        PETITIONER'S DUE PROCESS RIGHT'S WERE VIOLATED BE THE

21 INEFFECTIVE ASSISTANCE OF COUNSEL.

22        TRIAL COUNSEL FAILED TO ACT IN A MANNER TO BE EXPECTED OF A

23 REASONABLY COMPETENT ATTORNEY ACTING AS A DILIGENT ADVOCATE BY

24 FAILING TO OBJECT, ERRORS AND OR OMISSION(S) OR PROPERLY ADVOCATE TO

25 THE COURT IN RESPECTS TO THE CLAIMS 1.2.3.4.5.6.7.9.

26 10.12.14.17. AND 18 AND BUT FOR COUNSEL'S INCOMPETENCE

27 THE RESULTS OF THE PROCEEDINGS WOULD HAVE BEEN DIFFERENT CAUSING

28 PREJUDICE TO THE PETITIONER.

COURT PAPER
STATE OF CALIFORNIA
STD 113 (REV 8-72)

85 34760

Claim 20

1        Petitioner further claims he received Ineffective Assis-
2 tance of Counsel on Appeal.

3       . Petitioner would Also state Ineffective Assistance of
4 Appellate Counsel who although may have filed a merit type
5 Brief, he failed to raise the particular claim(s) stated within
6 this said Petition to Amend that are clearly stronger than those
7 presented to the State Court(s). Since Petitioner never received
8 Relief on Appeal, the presumption of IN EFFECTIVE Assistance of
9 Counsel is overcome due to if Petitioner's claim(s) Allow Relief
10 that were presented to the State Court(s) Relief would be issued
11 had Appellate Counsel raised them.

12            Claim 21
13       Cumulative Due Process Error.

14       For the reasons heretofore stated, the individual
15 error's complained of were cumulatively prejudicial to Petitioner's
16 Right to a fair trial even if they did not Amount to a Due
17 Process Violation in isolation.

18

19      dated: 7.18.2008.

20                       Respectfully Submitted,

21                       Michael B. Nordlof,

22                        Petitioner.

23

24

25

26

27

28

(Pg. 21)





1    around the hole?  It doesn't in that scenario, but he has to
2    do that way.  And the reason he has to do it, remember he
3    knew about Mr. Gray's probation.  He knew about the police
4    reports in this.  He had access to the photographs.  He knew
5    what the evidence was, so he had to create a story that fit
6    the evidence because they're directory.  Okay.  These are
7    back in place.  Because the trajectory of the bullet is up,
8    it's got to go up.  So even though logic and physics tell you
9    it's got to go down, he's got to concoct a scene, scenario
10   where it goes up and gets close enough to that board that it
11   can lead to powder burn.  It doesn't listen because it goes
12   contrary to common sense.  He knows that he ran away.  He
13   voted with his feet and stayed gone for some eight months.
14   So that's not good.  So he's got to concoct this story as to
15   why he did it.  And why did he do it?  Because Tamara Hanson
16   put a warrant out for me.  It was in the Times Standard.
17   There it was.  This occurred March 26, 2003, Wednesday.  And
18   I think he said he saw this over the weekend.  Tamara Hanson
19   came in here, and the Court took judicial notice of the fact
20   that she did not seek a warrant and a warrant was not issued
21   until April the first, 2003, which is a Tuesday.  Doesn't
22   listen.

23            Now, one doesn't have to call all witnesses or
24   present all items that are suggested by the evidence; but
25   under our system, each side possesses the subpoena power, the
26   power to order somebody to come in to court.  And we can
27   bring in whatever witnesses we want.  And as long as Judge
28   Watson finds that their testimony is relevant to the

1    Q    And does that depict his appearance in

2   December of 2003, does that photograph?

3    A    Yes.

4    Q    Did you actually meet with Mr. Nordlof?

5    A    Yes.

6    Q    And that was when?

7    A    That was the day that he turned himself in.

8    Q    Okay.  Did you meet with him on December the

9   7th of the year 2003?

10        (Witness examines documents)

11   A    Was that the date he -- actually, he was

12  booked in on the 2nd of December.

13   Q    Okay.

14   A    And then I believe he sent me -- I met with

15  him the day that he was booked in.  And then, he sent me

16  a kite asking me to come see him.

17   Q    And a kite is a note.

18   A    Yes.

19   Q    It's not something you fly on a rainy day.

20   A    No.

21   Q    And that was on December 7th?

22   A    I believe so.

23   Q    And at that time, did you advise him of his

24  rights under Miranda versus Arizona?

25   A    Yes, I did.

26   Q    Told him he had a right to remain silent?

27   A    Yes.

28   Q    That anything he said could and would be used

395

1    Longholm's testimony this morning?

2        A.    Correct.

3        Q.    She lied?

4        A.    Yeah, definitely.

5        Q.    Definitely lied?

6        A.    Yeah.

7        Q.    And Mr. Barrera, you heard his testimony?

8        A.    Correct.

9        Q.    And he definitely lied?

10       A.    I'm pretty sure that can be proven.

11       Q.    And William Velasquez, you heard his

12   testimony?

13       A.    Correct.

14       Q.    And he definitely lied?

15       A.    Definitely.

16       Q.    And you heard Elmary Claybon's testimony?

17       A.    Correct.

18       Q.    And since nothing happened, she must have

19   lied, too?

20       A.    I'm pretty sure they had to stick up for him

21   so he doesn't end up in jail.

22       Q.    Jail for what?

23       A.    For almost shooting me.

24       Q.    Well, you never reported that, did you?

25       A.    I tried to after I turned myself in, but I

26   didn't know what to do.  I -- that's when I tried to get

27   my probation officer -- but she would like -- she didn't

28   really know what to do.

520

1   Everything's cool. You don't need to come after me with
2   that gun." But instead, he takes off. That's the first
3   thing he does, is he boogies with his feet. Why would
4   he tell Mr. Parton (sic), "Please let me go. I just did
5   something I wasn't supposed to"? Why wouldn't Mr. Gray
6   be glad to see the police? Because Mr. Gray, according
7   to the defendant's version, has just had a gun displayed
8   in his presence in a menacing manner. Why wouldn't he
9   be glad to see the police? These people are his
10  protectors. Why would he tell them that he was just
11  walking by the house when he heard shots and jumped over
12  the fence and ran down in the swamp to get away? And
13  why would he lie down there until Officer Howden
14  threatened to send the dog in? And why would he plead
15  guilty to the first-degree burglary of Marlon Barrera's
16  house and run the risk that he'll go to prison for six
17  years if he violates any term and condition of his
18  probation? If the defendant and Mr. Gray had done
19  nothing wrong, why wouldn't Mr. Gray come in here and
20  provide you with testimony that would exonerate his
21  friend?

22          On the other hand, we can understand Mr.
23  Gray's convenient forgetfulness if what he remembers and
24  what he saw and what he heard does not exonerate the
25  defendant, his friend, but condemns him. If the
26  defendant didn't do anything wrong, if he was the victim
27  of Marlon Barrera's crime, why doesn't he go to the
28  police? If he did nothing wrong and he's the victim of

Exhibit "B"

1   that would mean that the gun is pointed also up?

2       A.   Yes, sir.

3       Q.   Okay.  Showing you here placard which has been
4   marked as People's Exhibit number 16, shows three photographs
5   marked A, B and C, the photograph marked C has a -- has a
6   yellow marker in it on the ground.  And then, in the
7   left-hand side of the photograph there's a gate.  That gate
8   also appears in the photograph marked B and marked C.  Now,
9   assuming for a moment that that yellow marker in the
10  photograph marked C represents the position of, of rest for
11  the weapon or, excuse me, for the cartridge -- 45 caliber
12  cartridge, would that mean generally assuming a right-handed
13  discharge or right-hand weapon that would be pointed towards
14  the fence or towards the gate?

15      A.   Generally.

16      Q.   That's consistent with that theory at least?

17      A.   Yes, sir.

18      Q.   Okay.  The photographs there, assuming for a moment
19  that the gate is closed and that a person is approaching the
20  gate attempting to either get through it or get over it, that
21  they have their hand on the 45 that depressed the rear, the
22  rear safety, the left side safety is off, and they have their
23  finger on the trigger, if they're approaching that fence and
24  they go to get open or over and the weapon is pointed up and
25  discharged, very close to the fence three to eight inches,
26  would that account for what you see in those photographs?

27      A.   Yes, sir.

28      Q.   Have you received any sort of training as a police

308

1    Q.    When a weapon -- .45 caliber pistol, let us

2    say -- if you grab the weapon by the top of the weapon,

3    what's gonna happen?

4    A.    Same thing.    You're gonna get -- probably your

5    hand's probably gonna get pinched, and you're probably

6    going to get burned.

7    Q.    And assuming for a minute that -- that the --

8    the photograph there that shows the entrance of the

9    projectile into the wood comes from a .45 caliber

10   pistol, can we say anything because of the nature of the

11   hole and the pattern of soot about how close that weapon

12   may have been?

13   A.    Not without doing a comparison.    All I can

14   say, it looked fairly close.

15   Q.    And when you say "fairly close," what range

16   are you talking about?

17   A.    I'd say probably around -- in the maximum,

18   three feet, if not closer.

19   Q.    And the closest?

20   A.    Sir?

21   Q.    Maximum, that would be -- would be three feet

22   away?

23   A.    I'm guessing, because I don't -- I haven't

24   done this with this particular gun, and I'm just looking

25   at this burn pattern, and it's very close to me.    It

26   looks very close.    And I'm saying maybe three feet.

27   That's nothing more than a guess, frankly, without doing

28   a more scientific examination of it like I just depicted

312

1   trigger and causing the weapon to fire?

2        A.   That's a possibility.

3             MR. DIKEMAN:   Thank you.

4             THE COURT:   Let's go ahead and take our break

5   at this time.

6             It is your duty to not discuss any subject

7   connected with this case among yourselves or with anyone

8   else.   Don't allow anyone to discuss it with you or form

9   or express any opinion on the matter at all until it is

10  submitted to the jury for decision.

11            So we'll take our 15-minute break at this

12  time, and then we'll resume the testimony.   Thank you.

13                    (A recess was taken.)

14            THE COURT:   For the record, all members and

15  alternate members of the jury are present.   Both counsel

16  and the defendant.

17            Mr. Mason.

18

19                    CROSS-EXAMINATION

20       Q.   BY MR. MASON:   Mr. Dawson, you said that the

21  weapon could've been fired from up to three feet away

22  from the fence based on looking at the photos?

23       A.   That's a guess.   Nothing more.

24       Q.   Okay.   And it's also a possibility that a

25  struggle could've occurred that close to the fence,

26  isn't it?

27       A.   Yes.

28       Q.   That's how the weapon went off?

1  during the trial regarding that.

2       So, the testimony during the trial was given

3  -- was taken by Ms. Shaha, who was the reporter.

4  Counsel had previously stipulated that Ms. Shaha could

5  read for Ms. Ball, her portion.  Would you stipulate

6  that Belle may read Ms. Shaha's portion?

7       MR. MASON:  Yes, Your Honor.

8       MR. WADE:  Yes.

9       THE COURT:  Okay, we do have that in written

10  transcript, anyhow, from yesterday.

11       MR. WADE:  And the People would stipulate.

12       THE COURT:  Okay.  So as long as we're sure,

13  Belle, that we do not read Mr. Barrera's testimony, just

14  Mr. Nordlof's testimony on this issue.

15       And again, Counsel, do you stipulate in that

16  regard, that neither the Court, Counsel, nor Defendant

17  need to be present in the jury room when Madam Reporter

18  is reading back testimony?

19       MR. WADE:  So stipulated.

20       MR. MASON:  So stipulated.

21       THE COURT:  Okay.  And then, of course, if

22  you will just make sure that you just read the testimony

23  and not any objections, anything that was stricken or

24  any sidebars.

25       All right.  The next question is, "2, Can we

26  have a yardstick?"  So it sounds like they want to do

27  experiments on their own, as opposed to relying on the

28  evidence presented during the trial.  So, Counsel?

Exhibit "C"

ATTACHMENT A



# OFFICE OF THE
# DISTRICT ATTORNEY
## HUMBOLDT COUNTY

PAUL V. GALLEGOS
DISTRICT ATTORNEY

April 1, 2003

Special Agent [ ]
Federal Bureau of Investigation
P.O. Box 3
Eureka, CA 95501

b7C

Re.    Nordloff, Michael Benjamin, HCSO#200302007

Dear Agent [ ]

This is to request your assistance in apprehending Michael Benjamin Nordloff, born 8/23/1977 (FBI# 754739HB2).

We have filed a new felony complaint in Humboldt Superior Court alleging residential burglary with use of a firearm, assault with a firearm and felon in possession of a firearm. We intend to prosecute the matter to the fullest extent and expect that the outcome will be a lengthy prison sentence. Nordloff is also wanted for violation of probation in a felonious assault case in which he inflicted great bodily injury.

b7C     Humboldt County Sheriff's Lieutenant [ ] has received information that Nordloff has fled to Arizona for the purpose of avoiding prosecution on these offenses. Nordloff fired a gun in the last encounter; he has a history of violence, including resisting officers.

The Humboldt County District Attorney's Office will pursue extradition of this subject from any jurisdiction in which he is located.

Very truly yours,

PAUL V. GALLEGOS
DISTRICT ATTORNEY

By:    Wesley L. Keat, Jr.
Chief Deputy District Attorney

WLK/dr

b7C    cc:  HCSO [ ]

CRIMINAL DIVISION
825 5th Street
Eureka, CA 95501
(707) 445-7411
(707) 445-7416 Fax

VICTIM WITNESS ASSISTANCE
714 4th Street
Eureka, CA 95501
(707) 445-7417
(707) 445-7490 Fax

Pg 24

1

```
 1                      JULY 29, 2004
 2                      *  *  *  *  *  *
 3              (The following proceedings were held in open
 4              court outside the presence of the jury:)
 5              THE COURT:  People of the State of California
 6    versus Michael Benjamin Nordlof, CR041104S.  Counsel's
 7    appearances, please.
 8              MR. DIKEMAN:  Worth Dikeman for the People,
 9    Your Honor.
10              MR. MASON:  Alan Mason for Mr. Nordlof, who's
11    present.
12              THE COURT:  Okay.
13              MR. DIKEMAN:  Your Honor, we ran this morning
14    a request for a rap sheet, an FBI record, and also a DMV
15    printout on Mr. Barrera.
16              THE COURT:  Okay.
17              MR. DIKEMAN:  And the information that we
18    received back contains one of the two Social Security
19    numbers that Mr. Mason provided us with.  It doesn't
20    indicate any record.
21              THE COURT:  Uh-huh.
22              MR. DIKEMAN:  When we ran the second one,
23    where we ran that name and the second one also, we
24    received a response from the FBI, but it's in another
25    gentleman's name.  It appears to be Marcial Jose
26    Torres-Mendoza, also known as Michael Considine, also
27    known as Marlon Barrera.  It's a different date of
28    birth.
```

Pu. 25

```
 1              THE COURT:  Okay.
 2              MR. DIKEMAN:  Different -- a different Social
 3  Security number, but it does come back that
 4  Mr. Mendoza-Torres had been arrested in 1999.
 5              THE COURT:  Uh-huh.
 6              MR. DIKEMAN:  And I don't know the
 7  significance of any of this.  My strong suspicion is
 8  that Mr. Mendoza-Torres was using funny names, and he
 9  happened to pick Mr. Barrera's name, and that's why it's
10  listed as an A/K/A on that person's, but there's no
11  record for Mr. Barrera.
12              THE COURT:  Okay.  So, Mr. Mason, so that's
13  the information that's been provided to you.  So, as it
14  stands, there's a person with a different name, a
15  different birthdate, with that other Social Security
16  number, with the A/K/A.
17              So, you know that information, so, for
18  whatever that's worth, that has been provided to you via
19  this 40- -- presentation.  Okay.
20              MR. MASON:  I was also going to have Marlon
21  Barrera draw a diagram of his house and yard.  I did
22  that at the first trial.
23              MR. DIKEMAN:  It is Defense Exhibit A, and
24  it's up there.
25              THE COURT:  Sure, or you can have him draw it
26  again this time, it is up to you to use the same one or
27  do it again, that's fine if during the trial you want
28  him to do some drawings.
```

0.26

```
 1            MR. DIKEMAN:  I asked my investigator to do
 2  that.  He was able to do that.
 3            THE COURT:  Uh-huh.
 4            MR. DIKEMAN:  It appears to me that it's the
 5  same person, albeit different dates of birth are
 6  indicated on the photographs, and different Social
 7  Security numbers.  The individual using the A/K/A of
 8  Marlon Barrera, I've advised Mr. Mason, does show an
 9  arrest in San Diego, in I believe February of 1999 for
10  attempted alien smuggling and attempted illegal entry
11  into the United States.
12            THE COURT:  Uh-huh.
13            MR. DIKEMAN:  So we're trying to contact
14  Mr. Barrera now and arrange for his return on Monday.
15            THE COURT:  Yeah, okay.  All right, that will
16  be fine, then.  Okay.
17            MR. DIKEMAN:  I'm not necessarily agreeing
18  that that information is admissible, but we are trying
19  to contact him to get him to return.
20            THE COURT:  Okay.
21            MR. MASON:  I would make a request for the
22  photo and that information as well, Your Honor, if I
23  could see it.
24            MR. DIKEMAN:  Yeah, we will Xerox it and give
25  it to him.
26            THE COURT:  Okay, very good, then.  Okay, so
27  let's go ahead and have [Juror No. 4] come in first.
28  Just one minute, too, now, the Deputy had also indicated
```

247

1   so --

2                  THE COURT:  Okay.  Okay.

3                      (Pause in proceedings.)

4                  THE COURT:  Take a seat.  Good morning.

5                  THE WITNESS:  Good morning.

6                  THE COURT:  And Mr.Barrera, you had previously

7   been sworn in to answer all questions truthfully, and

8   you are still under oath then.

9                  THE WITNESS:  Yes.

10                 MR. DIKEMAN:  Thank you.

11

12                      MARLON BARRERA,

13     having been previously sworn, testified as follows:

14

15                         402 HEARING

16

17                     DIRECT EXAMINATION

18      Q.   BY MR. DIKEMAN:  Mr. Barrera, do you know

19   somebody named Marcial Jose Torres Mendoza?

20      A.   Yes.  That's my cousin.

21                 THE COURT:  How do you spell that, please?

22      Q.   BY MR. DIKEMAN:  M-A-R-C-I-A-L, J-O-S-E,

23   T-O-R-R-E-S, M-E-N-D-O-Z-A?

24      A.   Uh-huh.

25      Q.   And this is your cousin?

26      A.   Yes.

27      Q.   And is your cousin known by any other name

28   locally?

248

1      A.    Yes.  He's also known as Isidro.

2      Q.    And Isidro's last name?

3      A.    Is Torres Reyes -- Reyes Torres.

4      Q.    And have you --

5            THE COURT:  And Isidro is spelled I-S-I-D-R-O?

6            THE WITNESS:  Yes, Isidro.

7      Q.    BY MR. DIKEMAN:  And have you ever used your

8  cousin's name?

9      A.    Yes, I have.

10     Q.    And under what circumstances?

11     A.    When I first got here, I could not get an ID

12  because of -- you know, the laws in California made it

13  impossible to get an ID under my name.

14     Q.    And why -- when -- how old were you when you

15  first got here?

16     A.    Seventeen.  Almost -- you know, almost 17.

17     Q.    Okay.  And why was it difficult or impossible

18  to get the --

19     A.    Because I was a minor at the time, and I

20  needed my -- I needed my parents, you know, to work.  I

21  needed a letter from, you know, my parents that I can

22  work.  At the time, they needed something from school.

23  So my cousin had that name -- I mean, not a name, just a

24  birth certificate, which he got an ID before.  And he

25  told me, you know, "You can use it so you can work with

26  this" -- you know, "with my name."

27     Q.    And you did that?

28     A.    And I did that.

249

1      Q.    And approximately when was that?

2      A.    '94, '95.

3      Q.    Okay.  In that realm or that area?

4      A.    Yeah.

5      Q.    About ten years ago or so?

6      A.    Yeah, about ten years ago.

7      Q.    Okay.  And at some point in time, while you

8  were known as -- as Marcial Jose Torres Mendoza, were

9  you ever arrested?

10     A.    I was not arrested.  I was detained, you know,

11  for something that happened in San Diego.

12     Q.    Could you tell us about that incident?

13     A.    I had a -- I had a family member -- you know,

14  a cousin -- you know, my cousin, and then he didn't have

15  an ID, so we got detained, you know, by the immigration.

16  And then, well, he didn't have any ID, and so they --

17  you know, they -- they detained us.  They didn't arrest

18  us.  They just pulled us over and detained and asked,

19  you know, why -- you know, because you're supposed to

20  not be taking somebody who didn't have any

21  identification -- you don't know if he's illegal to take

22  it through a checkpoint.

23     Q.    Were you coming through a checkpoint at that

24  juncture?

25     A.    Yeah, I was going to the checkpoint, yeah.

26     Q.    From Mexico into the United States?

27     A.    No, from San Diego into -- into -- into pat

28  (phon.) San Diego.

250

1    Q. From San Diego into -- what's "pat" (phon.)?

2    A. It's in San Diego.  It's at the border of San

3 Diego and Mexico.  But I was in San Diego, right inside

4 San Diego County.

5    Q. So were you actually in the United States and

6 you were going through a different checkpoint?

7    A. I was going through LA, but you have to go

8 through that checkpoint.

9    Q. And they detained you at that juncture?

10    A. And they detained us at --

11    Q. And because your cousin was undocumented?

12    A. Yeah.  But I wasn't driving, you know.  I

13 wasn't driving, but they detained us, you know, and

14 they -- I was the only one that speak English, you know,

15 there.  They asked us, "Why are you going with this

16 person?  Do you know he's illegal and doesn't have any

17 ID or anything?"  And then I -- so I got -- you know,

18 they gave me -- it's a ticket, but it's not -- I wasn't

19 formally charged, you know.

20    Q. You never had to go to court on that?

21    A. I never had -- I never had to go on -- to

22 court on that at all.

23    Q. Okay.  And are you currently involved at all

24 in any sort of -- of litigation --

25    A. Yes, I am involved in that.  I'm trying to --

26 I'm going to court to clear up -- to clear up the case,

27 you know.

28      THE COURT:  Mr. Barrera, I'm gonna ask you to

251

```
 1   wait until the attorney finishes his question --
 2            THE WITNESS:  Okay.
 3            THE COURT:  -- before you answer.  Because I
 4   don't know what your question was.
 5            MR. DIKEMAN:  Okay.
 6       Q.   And you're involved in some sort of litigation
 7   about your status here in the United States?
 8       A.   Yes.
 9       Q.   Okay.  And you're seeking the opportunity to
10   become a naturalized citizen?
11       A.   Yeah, that's correct.  And I cannot -- you
12   know, until I clear that, I cannot become a citizen, you
13   know, because I need to clear -- clarify that.  So I
14   already hired a lawyer, and then I'm in the process of
15   doing that as we speak.
16       Q.   Okay.  And that's going to be handled through
17   which --
18       A.   To the INS.
19       Q.   Okay.  So it's like an administrative hearing,
20   as opposed to a trial of some --
21       A.   Yeah, it's an administrative hearing, you
22   know, because it's not -- I was never charged, is
23   basically -- you know, when they do that, what they do
24   is they -- they take your rights as a -- you know, if
25   you're legal, they take your rights as a legal, and then
26   you have to appeal them in court.
27       Q.   And is this going to be done here locally, or
28   is it San Francisco or down --
```

252

1          A.    This is gonna be down -- oh, this is gonna be
2     down in San Francisco.
3               MR. DIKEMAN:   Thank you, sir.  I don't have
4     any --
5               THE COURT:   Mr. Mason will have some
6     questions.  And again, wait for the attorney to finish,
7     because Sabrina has to take everything down, and you're
8     going to go --
9               THE WITNESS:   Sorry about that.
10              THE COURT:   I just had one clarification.   You
11    were not trying to leave the United States to go to
12    Mexico, but you were moving from one part of a county to
13    another part of the county?
14              THE WITNESS:   Yes.
15              THE COURT:   Okay.
16
17                        CROSS-EXAMINATION
18         Q.    BY MR. MASON:   So it is true that you used
19    somebody else's name to acquire a California driver's
20    license?
21         A.    Yes.
22         Q.    And you knew that you were using somebody's
23    else's name?
24         A.    Yes.
25         Q.    And you were detained when you were trying to
26    come across the border -- I'm not sure I follow this
27    correctly.   There was somebody whom was undocumented in
28    that vehicle?

253

1          A.    That was -- I was not -- not trying to come

2     across the border.  I was already in the United States.

3                THE COURT:    There are checkpoints apparently

4     farther away from the border?

5                THE WITNESS:    In San Diego County, they have

6     checkpoints.

7                THE COURT:    Okay.    That's what I was

8     clarifying was -- okay.

9          Q.    BY MR. MASON:    So this was on either Highway 5

10    or Highway 15 somewhere?

11         A.    Yes.

12         Q.    And you were all sent back to Mexico?

13         A.    No, I was never sent back to Mexico.

14         Q.    But the undocumented person was sent back to

15    Mexico?

16         A.    He was detained.    I don't know if he was --

17    yeah, I'm guessing he was sent back to Mexico.

18         Q.    And you knew who he was?

19         A.    Yeah.

20         Q.    Who was he?

21         A.    He's a relative of mine.

22         Q.    Has he since made it into the United States?

23         A.    No.

24         Q.    Were you responsible for helping your relative

25    first get across the border?

26         A.    No.

27         Q.    Was Lisa (sic) Longholm with you at the time

28    when he was detained?

254

1      A.    Yes.

2                  (Reporter interruption.)

3      Q.    BY MR. MASON:   What is your Social Security

4   number?

5      A.    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.

6      Q.    Did you ever try to use another Social

7   Security number?

8      A.    No.

9      Q.    You did not need to use a Social Security

10   number to get the driver's license?

11     A.    No.   At the time, you didn't.

12     Q.    Do you know who Jeffrey Larson is?

13     A.    No.

14                 (Attorney-client conference.)

15     Q.    BY MR. MASON:   Have you ever gone by any other

16   names other than Marcial Mendoza?

17     A.    No.

18                 MR. MASON:   I have no more questions, your

19   Honor.

20                 THE COURT:   Okay.   Anything else?

21                 MR. DIKEMAN:   I don't have any further

22   questions for Mr. Barrera, your Honor.

23                 THE COURT:   Okay.   All right.   We'll have him

24   step out, and I'll have counsel --

25                 MR. DIKEMAN:   Okay.   Mr. Barrera, you can just

26   wait outside for a second.   Thank you very much.

27                 (Witness Barrera exited the courtroom.)

28                 THE COURT:   Mr. Mason, and so what I'm a

1    little unclear was the thought of having Mr. Barrera

2    called back to testify for this?  Because he's already

3    done his testimony.  He wasn't being recalled for any --

4            MR. DIKEMAN:  He wasn't being recalled for any

5    other purpose.

6            THE COURT:  Okay.

7            MR. DIKEMAN:  I might ask -- I might ask him

8    some other questions when he comes back based upon Mr.

9    Nordlof's information or testimony.

10           THE COURT:  Mr. Mason?

11           MR. MASON:  If nothing else, I think if he

12   knew he was using another person's identity to gain a

13   driver's license, that that is an act of fraud, which

14   would be an act of moral turpitude, so I would argue

15   that is relevant for credibility purposes.

16           THE COURT:  Okay.  Mr. Dikeman, any comment

17   there?

18           MR. DIKEMAN:  Well, my only response would be

19   352.

20           THE COURT:  Yeah, okay.  Although I think it

21   looks like he's not gonna be here denying it, so it

22   wouldn't take you having to put on a big case, so I'll

23   allow that -- that area of questioning there.  You went

24   further on asking about different names and Social

25   Security, things like that.  I didn't see any reason to

26   do that, but I wasn't sure where you were going with all

27   of that.  But in any event -- but on the issue of what

28   you -- now, he, of course, will have an opportunity to

256

1   explain why he did it.  That's a different matter than
2   getting to be allowed to do that.  Okay.  That'll be
3   fine.

4           MR. DIKEMAN:  I take it from that we're not
5   gonna get into the circumstances surrounding the arrest
6   or the detention?  I don't think that necessarily
7   involves moral turpitude.

8           THE COURT:  No.  I understood the -- the --
9   what would be offered to impeach him is the fact that he
10  used his cousin's name knowingly to get a California
11  driver's license or identification card in 19- -- I
12  don't know if it was '94, '95, '99, but in the nineties.
13  So that's what I understood is what's being offered,
14  so --

15          MR. MASON:  And I don't have any discovery in
16  the file to see if the rest of what he testified to is
17  the truth or not, so at this point, that's true.  I
18  don't know whether he's telling the truth about the
19  incident regarding the detention with the undocumented
20  alien, but I don't have a file, either, so I can't do
21  follow-up at this time.

22          THE COURT:  Sure.  Okay.  Well, let me
23  indicate that under 352 and that, one, I think that that
24  would -- its probative value in terms of impeachment
25  would be outweighed by concerns of confusing the jury.
26  Also about undo consumption of time, trying to put on as
27  to what was the -- he appeared to be being truthful to
28  the Court, but that's, you know, a credibility call just

1  as to -- to get a sense for making a 402 type

2  determination.  But in any event, I think that under 352

3  the probative value would be outweighed by consumption

4  of time that it would take to see if, in fact, this stop

5  occurred as it did.  If anything else had occurred, I

6  believe there would be, you know -- if he'd actually

7  been charged in federal court or anything of that

8  nature, there would be something at least in the FBI

9  type records showing something beyond a cite and under

10  administrative law.  And he's still here, has not been

11  deported.  That also tells you that something has -- of

12  a lesser nature has occurred, rather than some

13  full-blown type charge.  So under 352, I'd exercise my

14  discretion and not allow that allegation having to do

15  with that particular issue in that.  Anything else then?

16            MR. MASON:  No, your Honor.

17            THE COURT:  Okay.  Okay.

18            MR. DIKEMAN:  If I could just have a minute to

19  explain the Court's ruling to Mr. --

20            THE COURT:  And then did you anticipate

21  calling him first then?

22            MR. DIKEMAN:  Yeah.  And -- well, actually,

23  Elmary Claybon is here, and she has a class this

24  morning, so I did indicate I would call her first.

25            THE COURT:  That's fine.  In whatever order.

26  Just trying to get a sense then.  Okay.

27            And Counsel, just before I forget, now,

28  because this is a retrial, obviously, you folks had

STATE OF CALIFORNIA - BUSINESS, TRANSPORTATION AND HOUSING AGENCY                                      ARNOLD SCHWARZENEGGER, *Governor*

**DEPARTMENT OF MOTOR VEHICLES**
P.O. BOX 932345
SACRAMENTO, CA 94232-3450



December 9, 2005

Mr. Michael B. Nordlof, #V59215
San Quentin State Prison
C4-225
P.O. Box 5246
San Quentin, California 94974

Dear Mr. Nordlof:

This responds to your recent letter dated November 22, 2005, regarding your second
inquiry about a class "F" driver license.

Our department has never issued a class "F" driver license.

Thank you for allowing us to respond to you. If you have any further questions you may
contact us at the above address.

Sincerely,

Customer Communications Section

California Relay Telephone Service for the deaf or hearing impaired from TDD Phones: 1-800-735-2929; from Voice Phones: 1-800-735-2922

EXEC 100 (REV. 11/2003) EF                         *A Public Service Agency*

# CALIFORNIA DEPARTMENT OF MOTOR VEHICLES IMAGE

## MARLON J BARRERA

D2845857        EXPIRES: 03/29/2006        CLASS: F        SEX: M

HAIR: BLK        EYES: BRN        HEIGHT: 506        WEIGHT: 180

DATE OF BIRTH: 03/29/1977

ADDRESS: PO BX 6401, EUREKA, CA 95502

PHOTO DATE:        PHOTO OFFICE:        APPLICATION DATE:        APPLICATION OFFICE:
06/19/2001        526        06/19/2001        526

ISSUE DATE:        ISSUE OFFICE:        RESTRICTIONS:
N/A        N/A

SIGNATURE:





FINGERPRINT:

This photograph is a true copy of the photograph that is contained on the Department of Motor Vehicles photo database and delivered over the Department of Justice communications network.

Date: _____ /s/ _____

Department of Motor Vehicles Image - CA.IMATOLS

# CALIFORNIA DEPARTMENT OF MOTOR VEHICLES IMAGE
## MARCIAL JOSE TORRES MENDOZA

| | | | |
|---|---|---|---|
| B5181471 | EXPIRES: 06/05/2001 | CLASS: | SEX: M |
| HAIR: BLK | EYES: BRN | HEIGHT: 506 | WEIGHT: 160 |

DATE OF BIRTH: 06/05/66

ADDRESS: PO BX 8222, EUREKA, CA 95502

| | | | |
|---|---|---|---|
| PHOTO DATE: N/A | PHOTO OFFICE: N/A | APPLICATION DATE: N/A | APPLICATION OFFICE: N/A |
| ISSUE DATE: 05/29/1996 | ISSUE OFFICE: 526 | RESTRICTIONS: | |



SIGNATURE:



FINGERPRINT:



This photograph is a true copy of the photograph that is contained on the Department of Motor Vehicles photo database and delivered over the Department of Justice communications network.

Date: _____ /s/ _____

339

1              MR. DIKEMAN:  Yeah.

2              THE COURT:  And I think that was the only

3    entry, if I recall right.

4                   (Pause in proceedings.)

5              MR. DIKEMAN:  This is Mr. Barrera's DMV

6    printout, his California rap sheet and the FBI on Mr.

7    Mendoza Torres.

8              THE COURT:  Okay.  As to Marcial Jose Torres

9    Mendoza, the only entry is the San Ysidro San Diego

10   arrest or stop from February 21st, 1999, in which it

11   appears that when Mr. Torres Mendoza withdrew his

12   application for admission to the United States, this

13   occurred.  Seems to be that that's what -- how it was

14   handled administratively.  There's no sentence, no

15   conviction, other than an indication that "withdrew

16   application for admission to the United States."  That

17   conforms with his testimony that he's trying to clear

18   that up so he can present with that.  So having reviewed

19   the criminal record, the CLETS for Mr. Torres Mendoza,

20   that appears to be the only entry for that gentleman

21   under that name.

22             And as to Mr. Marlon Javier Barrera, the only

23   entry is a 22350, which is a Vehicle Code infraction.  I

24   believe it's speeding, or I'd have to look at that.

25             MR. DIKEMAN:  Speeding.

26             THE COURT:  Is it speeding?  Yes, that's

27   all -- either his DMV record or his CLETS record.  So

28   having reviewed them, that's all there is.

340

1        MR. MASON:  And Mr. Nordlof also wishes me to

2    point out we did not get the FBI file to see if there's

3    any type of similar MO's for Marlon Barrera regarding

4    this past arrest, too.  If there's allegation of

5    accusing other people of criminal offense that was

6    unfounded.

7        THE COURT:  There is clearly no indication of

8    any other incident -- now, we can all speculate as to --

9    because someone may be an alien here, that they're doing

10   all sorts of nefarious things throughout their lifetime.

11   There is simply no indication for that.  And I don't

12   know how you're gonna get an FBI when there's nothing to

13   look into.  Clearly, if nothing even came of this

14   incident, other than withdrawal of the application for

15   admission to the United States -- no federal charges, no

16   state charges were filed of any kind.  So I think you've

17   done your part as defense counsel of getting the

18   information.  I think the People have provided the -- as

19   discovery, all the information there is.  So I think

20   that part we can proceed.  I'm gonna return the, quote,

21   "rap sheets" to the district attorney's office then.

22       MR. DIKEMAN:  Thank you.  If there is an FBI

23   file on Mr. Barrera, that would be equally available to

24   the defendant through the Freedom of Information Act.

25       THE COURT:  That's correct.  We're not aware

26   of any, but if there is, you wanted to do that, you

27   could do that.  But -- okay.  Or that could've been

28   done, I guess is what I should say.

EXHibit
"d"

| | | |
|---|---|---|
| 1 | A. | I was still outside. |
| 2 | Q. | You didn't stop and look around? |
| 3 | A. | I didn't stop and look around or nothing. |
| 4 | Q. | Did you -- what did you do once you got |
| 5 | inside? | |
| 6 | A. | Once I got inside I called 911. |
| 7 | Q. | And did the police respond? |
| 8 | A. | The police responded and said come down where |
| 9 | you are and so I gave them my address and that's when I |
| 10 | seen -- that's when I seen the car take off. |
| 11 | Q. | Which way did the car go? |
| 12 | A. | Back out of the driveway. |
| 13 | Q. | Back down towards Humboldt Hill Road? |
| 14 | A. | Back down towards Humboldt Hill Road. |
| 15 | Q. | When it got to Humboldt Hill Road did he go |
| 16 | left or right? | |
| 17 | A. | He went left. |
| 18 | Q. | Do you think that you'd recognize this man if |
| 19 | you saw him again? | |
| 20 | A. | Yes. |
| 21 | Q. | Do you see him in court today? |
| 22 | A. | I don't see him in court. |
| 23 | Q. | Now shortly after this incident occurred did |
| 24 | the officers come back and show you some pictures? | |
| 25 | A. | Yes. |
| 26 | Q. | Do you remember was it the same day that this |
| 27 | incident had occurred? | |
| 28 | A. | Yes. |



```
 1              THE WITNESS:  The last time I spoke with him, I
 2  told him that I really couldn't afford to keep him or still
 3  had my Fifth Amendment right.  I still have my Fifth
 4  Amendment right.
 5              THE COURT:  Okay.  Well, do you want to call
 6  Mr. Sanders' office and see if he intends to appear?
 7              Take just a minute.
 8              MR. DIKEMAN:  442-4200.
 9              THE COURT:  And well, apparently Mr. Sanders isn't
10  in at this time.  Mr. Dikeman, what your request would be is
11  to call Mr. Gray regarding surrounding this matter?
12              MR. DIKEMAN:  Yes.
13              THE COURT:  Well --
14              MR. DIKEMAN:  As I understand the process, Mr. Gray
15  having now been sworn, if I ask him a question, and he
16  asserts the Fifth Amendment privilege, then the Court has to
17  make a determination as to whether or not the answer intends
18  to incriminate him.  If the Court makes such a finding, then
19  Mr. Gray doesn't have to answer the question.  If the Court
20  doesn't make such a finding, then the Court orders Mr. Gray
21  to answer that question.
22              THE COURT:  Answer that question.
23              MR. DIKEMAN:  Yes.  And if he doesn't comply with
24  the Court's directive, then he can be found in contempt.  And
25  since Mr. Gray is on a grant of felony probation, if he's
26  found in contempt, that constitutes a violation of terms of
27  probation; and he could be sentenced to state prison for up
28  to eight years.
```

```
 1   not.
 2        Q.   Do you know if Nicky Shaw has a car?
 3        A.   Not to my knowledge.
 4        Q.   Did you go with Mr. Nordlof to the Humboldt Hill
 5   residence in Nicky Shaw's car?
 6        A.   I can't recall.
 7        Q.   Did you tell officers the morning that you were
 8   arrested that you had gotten to the residence in the car over
 9   where the shots were fired?
10        A.   I really don't remember what I told them.
11             MR. DIKEMAN:  My intention is to call Mr. Gray as a
12   witness, then to impeach him with one of the officers.  I
13   think that his statements are again to -- well, I think that
14   the Court can make a finding that he's being willfully
15   evasive in his answers.
16             MR. MASON:  May I respond, your Honor?
17             THE COURT:  Just one second though.  Do you -- do
18   you have other questions at this time?
19             MR. DIKEMAN:  At this time, given Mr. Gray's
20   responses, I do not.  It is going to be my intention based
21   upon Mr. Gray's responses to my questions here in this
22   hearing to file a motion to revoke his felony probation
23   because I think Mr. Gray is being willfully false.  I think
24   he does recall the events of March 23rd.  And I think he's
25   lying about that because he doesn't want to get Mr. Nordlof
26   in trouble, so I just want to put ducks on the pond here.
27             THE COURT:  Mr. Mason, let me ask two things first:
28   One would be do you wish to question Mr. Gray at this time?
```

EXHIBIT "F"

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF HUMBOLDT

Date: May 26, 2004 (Wednesday)

Courtroom #1

Hon. W. Bruce Watson

Clerk: Janice Sousa

Court Reporter: Stacey Schoenhofer

THE PEOPLE OF THE STATE OF CALIFORNIA

Counsel for the People:
Worth Dikeman

v.s.

Michael B. Nordlof

Counsel for the Defense:
Allan Mason

NATURE OF PROCEEDINGS: Jury Trial - Day two          CASE #CR041104S

9:50 a.m. All parties present; Defendant not present; Outside of presence of prospective jurors; Court addresses the issue of the Probation case. Court finds at the Preliminary Hearing defendant was found in violation but reserved the right to provided more evidence; Court and counsel discuss witnesses; **Court orders a transcript or proceedings of 3/23/04 with David Gray (defendant) Neal Sanders, (Attorney) of sealed hearing held in chambers be provided to this court. (Reporter Jan Walling).**
**Court Exhibit #1 - Note from prospective Juror Y. Gower marked.**
10:00 a.m. All parties present; Defendant present; Prospective jurors present; Court reads statement of the case; Clerk gives oath to prospective jurors; Clerk calls 12 prospective jurors to be seated in the box #007613 Geraldine Carlson to fill seat #1; #108272 to fill seat #2; #0091920 to fill seat #3; #075800 Margaret Wolff to fill seat #4; #100037 to fill seat #5; #073791 Sheilla Salinger to fill seat #6; #092476 Michelle Adams to fill seat #7; #052848 to fill seat #8; #074830 to fill seat #9; #023082 Clayton Horner to fill seat #10; #028600 Marvin East to fill seat #11; #112665 to fills seat #12; Court voir dire prospective jurors; Court excuses for hardship prospective juror #1 Geraldine Carlson; Court calls #101905 to fill seat #1; Court voir dire prospective jurors; Court excuses for hardship prospective juror #6 Sheilla Salinger; Court calls prospective juror Jesse Middaugh to fill seat #6; Court voir dire prospective jurors; Court excuses for hardship Jesse Middaugh; Court calls #127475 to fill seat #6; Court voir dire prospective jurors; Attorney Mason voir dire 12 seated prospective jurors; D.A Dikeman voir dire 12 seated prospective jurors.

11:45 p.m. Court adjourned; Jury admonished and excused until 5/27/04 at 8:30 a.m



 1   away to Field's Landing, before he abandoned it there.

 2        So, I think there was time to reflect before

 3   committing the additional auto theft, and that the

 4   taking of the vehicle was not incidental to being a

 5   felon in possession of a firearm, nor was it necessarily

 6   part of committing the burglary, or I should say, the

 7   attempted burglary.

 8        I would again note that the victim to the

 9   auto theft was a separate person from the victim of the

10   attempted residential burglary.  I know the Probation

11   Officer indicated that he is recommending that the auto

12   theft be run concurrent with the -- be run concurrent,

13   apparently because the burglary was a theft and the auto

14   theft was a theft, but I don't think that that's a fact

15   that the Court has to accept in order -- for doing

16   concurrent or consecutive sentence.

17        So, the Court's prepared, for the reasons

18   I've put forth -- and I'll hear from Counsel as well,

19   obviously, as to what -- this is my tentative decision,

20   to exercise my discretion.

21        And although I am dealing with two strike

22   felonies, two convictions, there is 667(d) -- I'm sorry,

23   667 -- I guess it's (d) and (e) that talk about having

24   to do consecutive sentences, unless it's different

25   alternate facts or -- even if I -- it may be that I have

26   mandatorily to do that, but even if I did not, I am

27   looking at that in terms of having the discretion to

28   choose between consecutive or concurrent sentencing, and

1 selected at that time, he was placed on probation. He
2 now has violated probation, probation has been revoked.
3 And then what the Court is required to do is to impose
4 the previously suspended term. And that's what I'm
5 doing in this matter.

6 And again, if the courts decide that that's
7 not what a court is supposed to do when there is a
8 violation of probation -- there is no authority yet that
9 tells me that that's not exactly what I have to do.

10 In fact, if he had gotten a lesser term I
11 couldn't go now and say "Oh, I think it should be the
12 middle term," or "I think it should be the upper term,"
13 or we would hold a jury on what should the term be.

14 So, it's a little bit different when we are
15 revoking probation and imposing a previously-suspended
16 term. So, that's what I'm doing, and that's present
17 California law as I understand it. It may change in the
18 future, but that's not what I have before me.

19 With regards to the consecutive term for the
20 vehicle theft and the attempted first-degree burglary,
21 which seems to be the only issue here, relative to the
22 term being imposed, it was -- I'll again stress that
23 you're right, it was a separate victim altogether, and I
24 do think separate punishment for the auto theft, taking
25 the car to a different area, abandoning it there, should
26 be sentenced separately than from attempting to enter
27 into the home of Mr. Barrera, the residential burglary,
28 attempted there.



1              SPECIAL ALLEGATION

2         It is further alleged that in the commission or attempted commission of the above offense, the

3    said defendant used a firearm, to wit, a handgun, within the meaning of Penal Code section

4    12022.5(a)(1), also causing the above offense to become a serious felony pursuant to Penal Code section

5    1192.7(c)(8) and a violent felony within the meaning of Penal Code section 667.5(c)(8).

6                 COUNT TWO

7         The said defendant, MICHAEL BENJAMIN NORDLOF, is further accused by the District

8    Attorney of and for the County of Humboldt, State of California, by this Information, of the crime of

9    ASSAULT WITH A FIREARM, a violation of section 245(a)(2) of the Penal Code of the State of

10   California, a felony, committed as follows:

11        That the said defendant on or about the 26th day of March, 2003, at and in the said County of

12   Humboldt did willfully, unlawfully and feloniously commit an assault on Marlon Barrera with a firearm.

13                COUNT THREE

14        The said defendant, MICHAEL BENJAMIN NORDLOF, is further accused by the District

15   Attorney of and for the County of Humboldt, State of California, by this Information, of the crime of

16   POSSESSION OF A FIREARM BY A FELON, a violation of section 12021(a)(1) of the Penal Code

17   of the State of California, a felony, committed as follows:

18        That the said defendant on or about the 26th day of March, 2003, at and in the said County of

19   Humboldt did willfully, unlawfully and feloniously own, possess, or have custody or control of a

20   firearm, to wit, a handgun, the said defendant having theretofore been duly and legally convicted of a

21   felony, to wit, the crime of assault with a deadly weapon or by force likely to cause great bodily harm,

22   a violation of section 245(a)(1) of the Penal Code, on 4/21/99, by and before the Superior Court of

23   Humboldt County.

24                COUNT FOUR

25        The said defendant, MICHAEL BENJAMIN NORDLOF, is further accused by the District

26   Attorney of and for the County of Humboldt, State of California, by this Information, of the crime of

27   VEHICLE THEFT, a violation of section 10851(a) of the Vehicle Code of the State of California, a

28   felony, committed as follows:

INFORMATION                    2                        0024

1    That the said defendant on or about the 26th day of March, 2003, at and in the said County of

2    Humboldt did willfully, unlawfully and feloniously drive or take a certain vehicle, to wit, a 1993 Toyota

3    Corolla, then and there the personal property of Marlon Barrera, without the consent of and with intent,

4    either permanently or temporarily, to deprive the said owner of title to or possession of said vehicle.

5                                    SPECIAL ALLEGATION

6    It is further alleged that in the commission or attempted commission of the above offense, the

7    said defendant used a firearm, to wit, a handgun, within the meaning of Penal Code section

8    12022.5(a)(1), also causing the above offense to become a serious felony pursuant to Penal Code section

9    1192.7(c)(8) and a violent felony within the meaning of Penal Code section 667.5(c)(8).

10

11

12

13                                              PAUL V. GALLEGOS    Timothy O. Stoen

14                                    Ast    DISTRICT ATTORNEY

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

INFORMATION                                    3                              0025

```
 1              THE COURT:  Okay.  Mr. Dikeman?
 2              MR. DIKEMAN:  I would just briefly -- I don't
 3   know that Blakely applies here.  Probation report
 4   indicates that that was a stipulated term.  I don't
 5   know, I haven't seen the transcript.  I don't think that
 6   Blakely is retroactive.  I think that there was a
 7   waiver, there was no objection to that sentence.
 8              If he wants to attack that sentence, the way
 9   of doing it is by way of petition, by writ of habeas
10   corpus.  And insofar as the concurrent or consecutive,
11   we certainly agree with the Court's reasoning that
12   "additionally" would suggest that when you have separate
13   victims, the punishment should be also separate.
14              THE COURT:  Okay.  With regards to the
15   Blakely versus Washington -- and I'm sorry, kind of
16   passed my mind, I have been fairly busy in terms of I
17   did read your sentencing memorandum.  Obviously that's
18   an area of law that's in flux.
19              But what I have here is a sentence imposed
20   back on April 21, 1999 for seven years, four years, the
21   upper, and plus three, may or may not have been
22   stipulated, I saw that in the probation report, too.  I
23   was not the Judge who sentenced him.
24              But where we are now is probation has been
25   revoked, and what the Court is doing is imposing the
26   sentence that had been previously suspended.  And so,
27   that's how the Court is proceeding at this time.
28              Findings were made then, the sentence was
```



Exhibit "I"

436

1          (ALTERNATE JUROR 44764):  I work for the

2   Marcellis.  And listening to the case and everything, I

3   want to learn how, you know, to shoot guns, and that's

4   what they have, is the shootery.  And I went over there

5   to see if Mr. Marcelli would teach me how to shoot a gun

6   so I would know, you know, how to shoot a gun.  And I

7   started asking the other women, you know, "Am I just

8   like the only woman that's gonna be in here being taught

9   how to shoot a gun?"  And -- you know, and he said no.

10  He goes that there's other women that come in and -- and

11  buy a -- I can't even --

12          THE COURT:  Yeah, let me just interrupt just a

13  minute then.  Counsel, just so that I'm sure that I'm

14  treading where I feel you shouldn't be (sic), I think

15  it's important to find out what the information is.  Do

16  counsel agree with that?

17          MR. DIKEMAN:  People agree.

18          MR. MASON:  Yes, your Honor.

19          THE COURT:  Okay.  Go ahead.  Okay.

20          (ALTERNATE JUROR 44764):  He ended up telling

21  me that other girls have gone in there.  And

22  specifically what came out of his mouth was how a girl

23  has gone in there and gotten a gun in her name because

24  the boyfriend didn't want a gun in his name.  And it

25  ended up being the Clay- -- the girlfriend of your guy.

26          MR. DIKEMAN:  Okay.

27          (ALTERNATE JUROR 44764):  And I just have a

28  hard time --

1    it.  I think that's clearly impeachment evidence.

2            MR. DIKEMAN:  Okay.

3            THE COURT:  Goes to her credibility here in

4    Court, not facts as to what happened in -- you know,

5    back in the incident date, 2003, because that's clearly

6    a different matter.  The second question -- so I'm gonna

7    allow him to testify relative to that.  And you had also

8    offered him relative to -- now, whether -- you then,

9    obviously, on cross can bring out why she's done that.

10   I don't have any idea what you'll do with it, but I

11   think it's clearly relevant evidence on the credibility

12   of these witnesses, rather than on the facts of what

13   occurred back then necessarily.  So I don't need a 402

14   on that.  So I'm prepared to proceed in that regard.

15   Whether or not then you're gonna want to put on rebuttal

16   evidence and ask to reopen is a different issue.  So

17   let's go ahead and get Mr. Marcelli on.  You're asking

18   to reopen to put him on?

19           MR. MASON:  Yes, your Honor.

20           THE COURT:  You'll ask your questions and keep

21   it to what's relevant.

22           MR. MASON:  Yes, your Honor.

23           THE COURT:  Okay.  So let's go ahead and move

24   on.  Have the jury come in.

25           With regards -- I'm assuming, Mr. Dikeman,

26   that you won't know if you want to reopen for rebuttal

27   as to --

28           MR. DIKEMAN:  I'm reasonably certain I will.

471

1    That's as far as I ever go with that.

2              (Attorney-client conference.)

3        Q.    BY MR. MASON:  You said that Elmary Claybon

4    purchased the .45 caliber firearm from you.  Do you know

5    why she picked that particular weapon?

6        A.    No.  I don't really ask people.  She thought

7    the gun was pretty.  Stainless steel.

8              MR. MASON:  Nothing further, your Honor.

9              THE COURT:  Okay.  Mr. Dikeman.

10

11                   REDIRECT EXAMINATION

12       Q.    BY MR. DIKEMAN:  The day she purchased the

13   firearm was August 22nd, 2003?

14       A.    Yes, sir.

15       Q.    And that was a Springfield Armory .45 caliber

16   pistol?

17       A.    Yes, sir.

18       Q.    How would you -- you're familiar with

19   firearms?

20       A.    Yes, sir.

21       Q.    How would you describe the Springfield Armory?

22   Is that a good .45 or a bad .45?

23       A.    Excellent .45.

24       Q.    And the dealer's record of the sale of

25   firearm, this information is -- is provided by you to

26   the California Department of Justice?

27       A.    Yes, sir.

28       Q.    And also to the Department of Treasury, the



AUGUST 11, 2004                        634

```
 1   witnesses with regards to the -- the nature of the
 2   wounds, that -- the depth of the wounds and the need for
 3   significant medical attention.  And we would offer --
 4             THE COURT:   What was the number of that
 5   exhibit?
 6             MR. WADE:   24, Your Honor.
 7             THE COURT:   24, okay.  So you would be
 8   offering 8, 9, 10 and 24?
 9             MR. WADE:   Yes.
10             THE COURT:   As part of trial.  Okay, go
11   ahead, Mr. Wade.
12             MR. WADE:   All right, and we would offer
13   those at this time.
14             THE COURT:   Sure, okay.  Mr. Mason?
15             MR. MASON:   With regard to No. 8, that is
16   just the charging document.  It's not part of the record
17   of conviction.  It just says what he's been charged
18   with.  I would object to No. 8 coming in.
19             I would object to 9 and 10 as hearsay.  And I
20   believe that there were two volumes of the preliminary
21   hearing transcript, and only one has been presented to
22   the Court.
23             I would submit with those objections.
24             THE COURT:   Sure, okay.  All those objections
25   will be overruled.  So, People's 8, 9, 10 and 24 are
26   admissible documents.  The Court will admit them into
27   evidence.
28             There are various ways of them coming in, so
```



14-2

1   trial if that's not an issue in the jury trial.  That would

2   cure any issue relative to gang membership.

3         I would direct, as well, that Public Defender's

4   office evaluate the presence or potential presence of a

5   conflict based upon their representation and testimony in

6   the conviction underlying CR983664, and that that issue

7   should be evaluated, and report back to the Court by January

8   5th, which is his date for arraignment.

9         The Marsden motion is denied at this point without

10  prejudice.  What that means is if there's some further issue

11  relative to investigate -- in other words, I think your

12  Marsden motion is a little premature.  So if there's some

13  further issue relative to investigation, then I'll allow you

14  to re-raise the Marsden issue.  Okay?  But at this point,

15  I'm going to deny that motion without prejudice.

16        The matter remains set for arraignment on January

17  5th at 1:30 -- pardon me -- 1:29.  Okay?

18              (Proceedings adjourned at 4:37 p.m.)

19                       .  .  .

20

21        (NO TEXT OMITTED.  PLEASE GO TO PAGE 15.)

22

23

24

25

26

27

28



1    found at the scene.

2           Property from the 459, the burglary -- sometimes

3    prosecutors speak in numbers. 459 refers to the section of

4    the Penal Code in which burglary is defined. I apologize for

5    that. Foreign language. That's not recovered. And the

6    defendant himself is concealed for approximately eight

7    months. This event occurs on March 26, 2003, and we don't

8    see him again until December the second of the year 2003.

9    And if you take a look at some of the things, you see a

10    photograph here which has been marked as Peoples number 3,

11    series of photographs. This is a photo line-up containing a

12    photograph of Mr. Nordlof as he looked in March of 2003

13    according to his probation officer, Tamara Hanson. And he's

14    the fellow in the middle up here. He has a mustache and bald

15    head, a bald head.

16           I think Mr. Barrera came in and said the guy -- it

17    was a bald guy. I think he said he was wearing a dark sweat

18    shirt or something. Here's the booking photograph of the

19    defendant, which is taken on December the second, 2003. He's

20    no longer bald. He doesn't have a lot of hair. But for some

21    of us who suffer from that, this looks like a good deal of

22    hair. Certainly looks like a good deal more hair than he has

23    here in People's Exhibit 3. And that mustache has been

24    joined. It's joined by a beard. So by the time he turns

25    himself in, he's altered his appearance from what appeared on

26    March 26. And of course, when we get to court, his hair now

27    is even longer and the mustache back then is gone. And of

28    course, although Mr. Barrera was able to identify the

1   defendant's photograph on March the 26, 2003, shortly after
2   this occurred because he still remembered his face and he was
3   positive that's the guy, when he came in here in May, I guess
4   of 2004, well over a year or somewhat over a year after this
5   incident occurred, and he thought he would recognize this guy
6   if he saw him again, he took a look at Mr. Nordlof, he looks
7   around this room and couldn't identify anybody.  Couldn't
8   identify anybody.  Thought he was able to because it was a
9   pretty significant event.  Somebody said I'm going to fucking
10  kill you, Carlos.  That's the sort of thing you remember.
11  That's sort of defining moment in someone's existence when
12  someone points a gun at you and tells you you're going to
13  die, but he couldn't do it.  He could do it then.  And you
14  can consider the identification that he made on March 26,
15  2003, and that's all the identification you would need.
16  That's just like hearing that's the guy from a witness in
17  court.  It's a prior inconsistent statement or a prior
18  statement of identification because you notice the law, that
19  people change over time.  They don't change -- into parents,
20  sometimes accidentally, sometimes on purpose.  Certainly be
21  dressed differently than the incident occurred.  So you can
22  use that earlier identification to establish the identity of
23  the perpetrator even if you find that concealment or
24  suppression of evidence that all by itself would not be a
25  reason to return a verdict of guilty.  Why do you run away?
26  You run away because you don't want to be caught after you
27  have done something, as Mr. Gray told Mr. Porter, you're not
28  supposed to or you want to run away.

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF HUMBOLDT

Date: May 25, 2004 (Tuesday)                    Courtroom #8

Hon. W. Bruce Watson                            Clerk: Janice Sousa

Court Reporter: Stacey Schoenhofer

THE PEOPLE OF THE STATE OF CALIFORNIA          Counsel for the People:
                                               Worth Dikeman

v.s.

Michael B. Nordlof                             Counsel for the Defense:
                                               Allan Mason

| NATURE OF PROCEEDINGS: Jury Trial  - Day one | CASE #CR041104S |
| --- | --- |

10:10 a.m. All parties present; Defendant present; Outside presence of any prospective jurors; Court and counsel discuss issues of settlement and defendant wanting a haircut; Attorney Mason to prepare order for haircut.

10:45 a.m. All parties present; Defendant present; Prospective jurors present; Court excuses prospective jurors until 5/26/04 at 9:30 a.m.

10:50 a.m. Court adjourned.

0050

Pg. 109

## PROOF OF SERVICE BY MAIL

I declare that:

I am (resident of / employed in) the county of ___Kings___ California. I am over the age of eighteen years, my (business / residence) address is:

___P.O. Box 7100, Corcoran, Ca. 93212___

On ___7-20-2008___, I served the attached

Re: ___Petition for Writ of Habeas Corpus case # CO7-4899 MMC (PR)___
___Petition to Amend the Petition for Writ of Habeas Corpus.___

on the ___7.20.2008___ in said case, by placing a true copy there of enclosed in a sealed envelope with postage thereon fully paid, in the United States mail at ___Corcoran, California (SATF) State Prison___ addressed as follows

___Attorney General, California, 455 Golden Gate Ave. San Francisco, California, 94102___

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on (date) ___7/20/08___, at ___Corcoran___ California.

Type or print name ___Michael B. Nordlof___

Signature ___Michael B. Nordlof___

Michael B. Nordlof
#V59215. CI-228
P.O. Box 7-100
CORCORAN. CA. 93212

LEGAL Mail

OFFICE OF THE CLERK. U.S. DISTRICT Court.
NORTHERN DISTRICT of CALIFORNIA.
450 Golden Gate Avenue
SAN FRANCISCO, CAL. 94102.



UNITED STATES POSTAGE
$ 04.80°
MAILED FROM ZIP CODE 93212



7-20-08