12/8/2005

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT, DIVISION THREE

PEOPLE OF THE STATE OF CALIFORNIA

Plaintiff and Respondent

—vs—

MICHAEL BENJAMIN NORDLOFF,

Defendant and Appellant

No. A108464

Humboldt County
Superior Court
No. CR0411048

CR983664

Appeal from a Judgement of the Superior Court
in and for the County of Humboldt
Hon. Marilyn B. Miles, Judge

## APPELLANT'S OPENING BRIEF

KIERAN D. C. MANJARREZ
Post Office Box 602
Middletown, CA 95461
Tel. 415 / 520 0440
[CBN: 62000]

1096455  BOX

DOCKETED
SAN FRANCISCO

DEC 12 2005

By     P. MONTOYA
No. SF2005DA0168

By Appointment of the Court
under the First District Appellate Project
Independent Case System

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT, DIVISION THREE

PEOPLE OF THE STATE OF CALIFORNIA

Plaintiff and Respondent

*vs*

MICHAEL BENJAMIN NORDLOFF,

Defendant and Appellant

No. A108464

Humboldt County
Superior Court
No. CR0411048

Appeal from a Judgement of the Superior Court
in and for the County of Humboldt
Hon. Marilyn R. Miles, Judge

## APPELLANT'S OPENING BRIEF

KIERAN D. C. MANJARREZ
Post Office Box 602
Middletown, CA 95461
Tel: 415 / 520 0440
[CBN: 62000]

By Appointment of the Court
under the First District Appellate Project
Independent Case System

# TABLE OF CONTENTS

Page

STATEMENT OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Violation of Probation (Case No. CR983664S0) . . . . . . . . . . . . . . . . 1

    B.    Current Charges (Case No. CR041104S) . . . . . . . . . . . . . . . . . . . . . . 2

    C.    Consolidated Judgement & Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    FIRST TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    Prosecution Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.    Marlon Barrera. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.    Deputy Justin Braud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3.    Sergeant Wayne Hanson . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        4.    Tamara Hansen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        5.    Dana Porter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        6.    David Gray . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        7.    Judy Taylor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        8.    Deputy Justin Braud (recalled) . . . . . . . . . . . . . . . . . . . . 15

        9.    Stipulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        10.    Deputy Dick Clark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

B.    Defense Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    1.    Michael Nordloff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

C.    Prosecution Rebuttal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    1.    Larissa Longholm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    2.    Tamara Hansen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    3.    James Dawson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

D.    Bifurcated Proceedings on Prior Conviction Allegation. . . . . . . . 24

E.    Revocation of Probation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II.    SECOND TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    1.    Marlon Barrera . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    2.    William Velasquez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    3.    Deputy Dick Clark . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    4.    Deputy Justin Braud . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    5.    Judy Taylor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    6.    David Gray . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    7.    Dana Porter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    8.    Sgt. Wayne Hanson . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    9.    Tamara Hansen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    10.    Deputy Matthew Helm . . . . . . . . . . . . . . . . . . . . . . . . . 34

11.  Sgt. Marvin Kirkpatrick  ................................. 34

12.  Appellant's  June 2nd  Testimony  ......................... 35

13.  Elmary Claybon  ..................................... 35

14.  Marlon Barrera.  .................................... 36

15.  Eric Carr  ......................................... 36

16.  Janet Brisker  ...................................... 36

17.  James Dawson  ..................................... 36

18.  Deputy Justin Braud (recalled)  ......................... 38

19.  Larissa Longholm.  .................................. 38

20.  Dave Rybarczyk  .................................... 38

21.  Det. Steven Raymond Quenell  ........................... 39

B.  Defense Case.  ......................................... 39

    1.  Michael Nordloff.  .................................. 39

C.  Prosecution Case Re-Opened.  .............................. 43

    1.  Marlon Barrera.  ................................... 43

    2.  Mike Marcelli  .................................... 44

D.  Bifurcated Proceedings on Prior Conviction Allegations.  ....... 45


ARGUMENT ........................................................ 46

iii

I.  THE PROSECUTION'S SUPPRESSION OF FAVORABLE & MATERIAL EVIDENCE PREJUDICED APPELLANT'S DUE PROCESS RIGHTS TO A FAIR TRIAL AND TO EFFECTIVE COLLABORATION & ASSISTANCE OF COUNSEL. ................................... 46

    A.  Relevant Facts. ................................................ 46

    B.  General Rule & Standard of Review. ........................... 48

    C.  Prosecution Suppression of Evidence. ......................... 49

        1.  Favorable Corroborative Evidence. ...................... 49

        2.  Undermining of Effective Assistance of Counsel. ............ 50

    D.  Materiality & Prejudice. ..................................... 52

        1.  First Trial. ............................................ 54

        2.  Second Trial. ......................................... 56

        3.  Summation. .......................................... 58

II. THE COURT'S INSTRUCTION THAT THE JURY COULD CONSIDER APPELLANT'S SUPPRESSION OF EVIDENCE AS CONSCIOUSNESS OF GUILT WAS ERROR UNDER STATE LAW, LIGHTENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED APPELLANT'S FEDERAL DUE PROCESS RIGHTS; AND THE FAILURE OF DEFENSE COUNSEL TO OBJECT THERETO DEPRIVED APPELLANT OF HIS RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL. ..... 60

    A.  Procedural & Relevant Facts. ................................ 60

    B.  General Rules & Standards of Review. ........................ 60

        1.  Court's Duty to Correctly Instruct. ....................... 60

        2.  Instructions in Violation of Due Process. ................... 61

3.      Deprivation of Effective Assistance of Counsel  .............. 61

C.      The Trial Court Erred in Instructing per CALJIC No. 2.06 because there was no Foundational and Predicate Evidence that Appellant had sought to Suppress Anything.  .......................... 62

1.      No Connection of Appellant to Any Act of Suppression. ..  62

2.      Implicit Presumption as to Fact/Element of Possession. ...... 65

D.      Counsel was Ineffective for Failing to Object to the Suppression Instruction at the First Trial. ................................. 67

E.      This Court Should Reach the Issue Notwithstanding Lack of Objection at the First Trial and independent of Any Ineffective Assistance of Counsel Claim.  .............................. 68

F.      Prejudice.  ................................................ 69

1.      First Trial.  ........................................... 69

2.      Second Trial.  ......................................... 74

III.    THE COURT ERRED IN FAILING TO GIVE APPROPRIATE ACCOMP-LICE INSTRUCTIONS.  ........................................ 76

A.      Procedural & Relevant Facts.  .................................. 76

1.      First Trial.  ........................................... 76

2.      Second Trial.  ......................................... 77

B.      General Rule & Standard of Review.  .......................... 78

C.      The Court Erred in Failing to Instruct Sua Sponte that the Jury should distrust an Accomplice's testimony and not base Conviction thereon unless it was corroborated.  .......................... 79

**D.**    **The Error was Prejudicial.** .................................... 81

    **1.**    **First Trial** .......................................... 81

    **2.**    **Second Trial.** .......................................... 83

**IV.**    **THE COURT COMMITTED PREJUDICIAL ERROR BY INSTRUCTING THE JURY ON ATTEMPTED BURGLARY AND IN FAILING TO INSTRUCT THE JURY ON THE LAW OF INVITED PUBLIC ACCESS.** ......... 86

   **A.**    **Procedural & Relevant Facts.** ................................. 86

   **B.**    **General Rule & Standard of Review.** ......................... 86

   **C.**    **The Instructions related to Burglary erroneously included Offenses not supported by Substantial Evidence, omitted the Full Range of Lesser Offense Options supported by the Evidence and failed to Instruct on the Defense Theory of the Case.** ......... 88

     **1.**    **The Court Erred in Giving an Instruction on Attempted Burglary.** ................................................. 89

     **2.**    **The Court Erred in Failing to Instruct *Sua Sponte* on the Lesser Related Offense of Trespass.** ..................... 93

     **3.**    **Failure to Instruct on Appellant's Defense of Being an Implied Invitee on the Premises.** ....................... 97

   **D.**    **Prejudice and Federal Due Process Error.** .................... 103

     **1.**    **Reversible Error under State Law** ...................... 103

     **2.**    **Reversible Denial of Federal Due Process.** .............. 105

     **3.**    **Summation.** ......................................... 106

V.     THE COURT ERRED IN DENYING APPELLANT'S MOTION FOR A
       NEW TRIAL AS IT RELATED TO HIS CONVICTION ON COUNT III
       AND DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING TO
       REQUEST RETRIAL ON COUNT III AT THE START OF THE SECOND
       TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   108

       A.     Procedural & Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . .   108

       B.     General Rule & Standard of Review. . . . . . . . . . . . . . . . . . . .   111

       C.     The Discovered Impeachment Evidence was Favorable, Non
              Cumulative and Critical in a Case dependent on the Alleged
              Victim's Credibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   112

       D.     Materiality and Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . .   114

       E.     Defense Counsel Was Ineffective in Failing to Request a
              Re-Trial on Count III at the start of the Second Trial. . . . . . . .   117

VI.    THERE WAS INSUFFICIENT EVIDENCE OF AN ATTEMPTED
       BURGLARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   119

       A.     Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   119

       B.     General Rule & Standard of Review. . . . . . . . . . . . . . . . . . . .   119

       C.     There was Insufficient Evidence of an Attempted Burglary. . . . .   120

VII.   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT
       APPELLANT'S VIOLATION OF PROBATION. . . . . . . . . . . . . . . . . .   121

VIII.  CUMULATIVE DUE PROCESS ERROR. . . . . . . . . . . . . . . . . . . . . . .   121

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   122

# TABLE OF AUTHORITIES

Citation                                                                 Page

## SUPREME COURT CASES

*Brady v. Maryland* (1963) 373 U.S. 83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 56

*Kyles v. Whitley* (1995) 514 U.S. 419 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Strickler v Greene* (1999) 527 U.S. 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Francis v. Franklin* (1985) 471 U.S. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 66

*Strickland v. Washington* (1984) 466 U.S. 668 . . . . . . . . . . . . . . . . . . 61, 68, 69, 119

*Rose v. Clark* (1986) 478 U.S. 570 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Yates v. Evatt* (1991) 500 U.S. 391 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 76, 106

*Estelle v. McGuire* (1991) 502 U.S. 62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 106

*In re Winship* (1970) 397 U.S. 358; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Crane v. Kentucky* (1986) 476 U.S. 683 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*Jackson v. Virginia* (1979) 443 U.S. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 121

*Thompson v. Louisville* (1960) 362 U.S. 199 . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 121

## FEDERAL CASES

*United States v. Bagley* (1985) 473 U.S. 667 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*U.S. v. Payne* (2d Cir. 1995) 63 F.3d 1200, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Brubaker v. Dickson* (9th Cir. 1962) 310 F.2d 30 . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Unitest States v Jojayan* (9th Cir 1995) 8 F3d 1315 . . . . . . . . . . . . . . . . . . . . . . . 56

viii

*United States v. Stein* (9th Cir. 1994) 37 F.3d 1407  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Roy v. Gomez* (9th Cir. 1996) 81 F.3d 863  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Mason,* (9th Cir. 1990) 902 F.2d 1434  . . . . . . . . . . . . . . . . . . . . . . . . . 87

*United States v. Lopez,* (9th Cir. 1989) 885 F.2d 1428  . . . . . . . . . . . . . . . . . . . . . . . . . 87

*United States v. Zuniga* (9th Cir. 1993) 6 F.3d 569;  . . . . . . . . . . . . . . . . . . . . . . . . 87, 105

*United States v. Escobar de Bright,* (9th Cir. 1984) 742 F.2d 1196  . . . . . . . . 87, 102, 105

*U.S. v. Morton* (9 th Cir. 1993) 999 F.2d 435  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*U.S. v. Rodriguez* (9th Cir. 1995) 45 F.3d 302  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Conde v. Henry* (9 th Cir. 1999) 198 F.3d 734  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

## CALIFORNIA CASES

*People v. Marsden* (1970) 2 Cal.3d 118  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 51

*In re Brown* (1998) 17 Cal.4th 873  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*In re Ferguson* (1971) 5 Cal.3d 525  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 51

*In re Sassounian* (1995) 9 Cal.4th 535  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 113

*People v. Kasim* (1997) 56 Cal.App.4th 1360  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*People v. St. Martin* (1970) 1 Cal.3d 524  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*People v. Enriquez* (1996) 42 Cal.App.4th 661  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*People v. Alvarez* (1996) 14 Cal.4th 155  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 79

*People v. Pope,* (1979) 23 Cal.3d 412  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*People v. Ledesma* (1987) 43 Cal.3d 171 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 68, 119

*People v. Carmen* (1951) 36 Cal.2d 768 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*People v. Saddler* (1979) 24 Cal.3d 671 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*People v. Hannon* (1977) 19 Cal.3d 588 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63, 70

*People v. Wilson* (2005) 36 Cal.4th 309 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 64

*People v Echevarria* (1992) 11 Cal.App.4th 444 . . . . . . . . . . . . . . . . . . . . . . . . 63

*People v. Huston* (1989) 210 Cal.App.3d 192 . . . . . . . . . . . . . . . . . . . . . . . . . 63

*People v. Johnson* (1992) 3 Cal.4th 1183 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 80

*People v. Cooper* (1991) 53 Cal.3d 771, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285 . . . . . . . . . . . . . . . . . . . . . . . . 63

*People v. Rodrigues* (1994) 8 Cal.4th 1060 . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*People v. Terry* (1962) 57 Cal.2d 538 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*People v. Williams* (1997) 16 Cal.4th 153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*People v. Williams* (1998) 17 Cal.4th 148 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*People v. Harris* (1981) 28 Cal.3d 935 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*People v. Satchell* (1971) 6 Cal.3d 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*People v. Graham* (1969) 71 Cal.2d 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*People v. Watson* (1956) 46 Cal.2d 818 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 75, 81, 102

*People v. Barton* (1995) 12 Cal.4th 186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 87, 93, 96, 104

x

*People v. Gordon* (1973) 10 Cal.3d 460 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*People v. Garrison* (1989) 47 Cal.3d 746 . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 80

*People v. Zapien* (1993) 4 Cal.4th 929 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*People v. Beeman* (1984) 35 Cal.3d 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*People v. Mincey* (1992) 2 Cal.4th 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*People v. Stewart* (1976) 16 Cal.3d 133 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*People v. Moses* (1996) 43 Cal.App.4th 462 . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*People v. Wickersham* (1982) 32 Cal.3d 307 . . . . . . . . . . . . . . . . . . . . . . . 89, 96, 97

*People v. Webster* [(1991) 54 Cal.3d 411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*People v. Melton* (1988) 44 Cal.3d 713 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*People v. Pham* (1993) 15 Cal.App.4th 61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*People v. Daniels* (1991) 52 Cal.3d 815, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*People v. Bunyard* (1988) 45 Cal.3d 1189 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*People v. Leach* (1985) 41 Cal.3d 92 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*People v. Valencia* (2002) 28 Cal.4th 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90 , 92

*People v. Kipp* (1998) 18 Cal.4th 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*People v. Aguilar* (1989) 214 Cal.App.3d 1434 . . . . . . . . . . . . . . . . . . . . . . . . . 92

*People v. Crawford* (1968) 259 Cal.App.2d 874 . . . . . . . . . . . . . . . . . . . . . . . . . 92

*People v. Bright* (1996) 12 Cal.4th 652 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*People v. Morris* (1988) 46 Cal.3d 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 121

*People v. Sedeno* (1974) 10 Cal.3d 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*People v. Hood* (1969) 1 Cal.3d 444 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*People v. Flannel* (1979) 25 Cal.3d 668 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 96

*People v. Wetmore* (1978) 22 Cal.3d 318 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*People v. Lohbauer* (1981) 29 Cal.3d 364 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*People v. Geiger* (1984) 35 Cal.3d 510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*People v. Birks* (1998) 19 Cal.4th 108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94, 95, 96

*People v. Breverman* (1998) 19 Cal.4th 142 . . . . . . . . . . . . . . . . . . . . . . . . 94, 95, 97, 102

*People v. Waidla* (2000) 22 Cal.4th 690 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*People v. Carr* (1972) 8 Cal.3d 287 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*People v. Barry* (1892) 94 Cal. 481 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*People v. Davis* (1998) 18 Cal.4th 712 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Diamond v. Bland* (1970) 3 Cal.3d 653 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Popejoy v. Hannon* (1951) 37 Cal.2d 159 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Oettinger v. Stewart* (1944) 24 Cal.2d 133 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*O'Keefe v. South End Rowing Club* (1966) 64 Cal.2d 729 . . . . . . . . . . . . . . . . . . . . . 99

*Clawson v Stockton Golf etc. Club* (1963) 220 Cal.App.2nd 886, . . . . . . . . . . . . . . . 100

*Lorenzana v Superior Court* (1973) 9 Cal. 3d 626 . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*People v. Winters* (1983) 149 Cal.App.3d 705 .................................. 100

*People v. Bradley* (1969) 1 Cal.3d 80 ....................................... 100

*People v. Lovelace* (1981) 116 Cal.App.3d 541 ............................... 100

*North v. Superior Court* (1972) 8 Cal.3d 301 ............................... 100

*People v. Sneed* (1973) 32 Cal.App.3d 535 ................................. 101

*People v. Daya* (1994) 29 Cal.App.4th 697 ................................. 101

*People v. Wilson* (1967) 66 Cal.2d 749 ..................................... 101

*People v. Bevins* (1960) 54 Cal.2d 71 ...................................... 101

*People v. Wade* (1959) 53 Cal.2d 322 ....................................... 101

*People v. Putnam* (1942) 20 Cal.2d 885 ..................................... 101

*People v. Mathews* (1994) 25 Cal.App.4th 89 ............................... 102

*People v. Flood* (1998) 18 Cal.4th 470 .................................... 104

*People v. Rodriguez* (1997) 53 Cal.App.4th 1250 ........................... 106

*People v. Serrato* (1973) 9 Cal.3d 753 .................................... 112

*People v. Davis* (1995) 10 Cal.4th 463 .................................... 112

*People v. Sutton* (1887) 73 Cal. 243, ............................... 112, 115

*People v. Delgado* (1993) 5 Cal.4th 312 ................................... 112

*People v. Beeler* (1995) 9 Cal.4th 953 .................................... 112

*People v. Molina* (1992) 5 Cal.App.4th 221 ............................... 113

xiii

*People v. Sapp* (2003) 31 Cal.4th 240, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 113

*People v. Ayala* (2000) 23 Cal.4th 225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*People v. Wheeler* (1992) 4 Cal.4th 284 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*People v. Beagle* (1972) 6 Cal.3d 441 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*People v. Coleman* (1904) 145 Cal. 609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*People v. Rodriguez* (1999) 20 Cal.4th 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*People v Hatch* (2000) 22 Cal.4th 260 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*People v. Johnson* (1980) 26 Cal.3d 557 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*People v. Bunyard* (1988) 45 Cal.3d 1189 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

**STATUTES**

Pen. Code, § 21a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

Pen. Code, § 118, subd. (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

Pen. Code, § 245, subd. (a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Pen. Code, § 245, subd. (a)(2)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Pen. Code, § 459 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Pen. Code, § 460, subd. (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Pen. Code, § 667.5, subd. (c)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Pen. Code, § 667, subd.(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Pen. Code, § 664 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

xiv

Pen. Code, § 602, subd. (m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Pen. Code, § 1093, subd. (f), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 78, 87

Pen. Code, § 1181 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Pen. Code, § 1181, subds. (5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Pen. Code, § 1181, subd. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 111

Pen. Code, § 1127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 87

Pen. Code, § 1192.7, subd. (c)(8), (c)(18) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Pen. Code, § 1201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Pen. Code, § 1202.4 subd (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pen. Code, § 1237, subd. (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Pen. Code, § 1259 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Pen. Code, § 2933.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pen. Code, § 12021, subd. (a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Pen. Code, § 12022.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Pen. Code, § 12022.5, subd. (a)(1)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Evid. Code, § 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Evid. Code, § 413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Evid. Code, § 770 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Veh. Code, § 10851, subd. (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Veh. Code, § 12802  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  113

Veh. Code, § 14610, subd. (a)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  113

## OTHER AUTHORITIES

CALJIC No. 2.06  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60, 62, 63, 67, 71

CALJIC No. 6.00  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71, 86

Witkin & Epstein, Cal. Criminal Law (2d ed. 1988)  . . . . . . . . . . . . . . . . . . . . . . . .  68, 91

## RECORD INDEX

CT-VOP refers to the Clerk's Transcript of the violation of probation in Case No. CR983664S0

CT refers to the Clerk's Transcript in the instant Case No. CR041104S. Augmented portions of the Clerk's Transcript which are indicated by CT [*date*].

The Reporter's Transcripts have been designated as follows:

| RT-A (pp 1-58) | RT-B (pp. 25-203) | RT-C (pp. 11-314) |
|---|---|---|
| 5/24/04 | 5/27/04 | 5/28/04 |
| 5/25/04 | 6/01/04 | 6/03/04 |
| 5/26/04 | 6/04/04 | 6/07/04 |
| & | & | 9/23/04 |
| 6/07/04 | 6/07/04 | 9/27/04 |
| (partial) | (partial) | 11/10/04 |

| RT-I (pp.1-239) | RT-II (pp. 240-453) | RT-III (pp 454-674) |
|---|---|---|
| 7/29/04 | 8/02/04 | 8/05/04 |
| 7/30/04 | 8/03/04 | 8/06/04 |
|  | 8/04/04 | 8/09/04 |
|  |  | 8/10/04 |
|  |  | 8/11/04 |
|  |  | 8/31/04 |
|  |  | 9/27/04 |
|  |  | 11/10/04 |

RT-Supp (pp 2-58)
3/03/04
3/04/04
5/10/04
7/26/04
7/28/04

In addition there are reporter's transcripts for *Marsden* hearings on, 12/19/03. 12/29/03, 4/29/04 and 9/27/04, as well as reporters' transcripts for 8/11/98, 8/12/98, 3/12/99 and 4/21/99 relative to appellant's change of plea and prior conviction.

## STATEMENT OF APPEALABILITY

This is an appeal from a judgement and sentence following a jury trial, as authorized by Penal Code section 1237, subdivision (a).

## STATEMENT OF CASE

### A.    Violation of Probation (Case No. CR983664S0)

On 12 March 1999, appellant pleaded nolo contendere to a charge of aggravated assault (Pen. Code, § 245, subd. (a)(1)) with infliction of great bodily injury (Pen. Code, § 12022.7, subd. (a).) (CT-[VOP] 06; Augmented Minute Order for 3/12/99 (also People's Exhibit 9 & 10); RT-[3/23/99] 2-8)

At judgement, on 21 April 1999, the court imposed a suspended seven year term and placed appellant on five years formal probation on various terms and conditions, including a 340 day jail term with even credits. (RT-[4/21/99] 29)

On 1 April 2003, a petition was filed alleging, inter alia, that appellant had violated his probation by being in possession of a firearm  (Pen. Code, § 12021, subd. (a)(1)), as subsequently alleged in  Case No. CR041104S, infra.  (CT-I 2-3)

Preliminary Hearing in Case No. CR041104S, was held on 16 December 2003, at which time appellant was held to answer on current charges and found to be in violation of probation.  (CT-I 9)

Judgement and sentence thereafter trailed proceedings on the instant charges in Case No. CR041104S. (CT-I 80-81.)

1

### B.    Current Charges (Case No. CR041104S)

By information amended at trial, on 2 June 2004, in Humboldt County Superior Court, appellant was charged with:  **Count I**, burglary (Pen. Code, §§ 459/460, subd. (a)) with personal use of a handgun (Pen. Code,§ 12022.5, subd. (a)(1)) and serious and violent felony allegations (Pen. Code, §§ 1192.7, subd. (c)(8), (c)(18) / 667.5, subd. (c)(8)); **Count II**, assault with a firearm (Pen. Code, § 245, subd. (a)(2)) with a serious felony enhancement allegation (Pen.Code § 667, subd.(a)); **Count III**, felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1)); **Count IV**, vehicular theft, (Veh. Code,§ 10851, subd. (a)) with the personal use of a handgun (Pen. Code,§ 12022.5, subd. (a)(1) and with serious and violent felony allegations (Pen. Code, §§ 1192.7, subd. (c)(8) / 667.5, subd. (c)(8).)  With respect to all counts, the information alleged a prior strike conviction of aggravated assault with personal infliction of great bodily injury.  (Pen. Code, § 245, subd. (a)(1),  Pen.Code, §§ 1192, subd. (c)(8) / (c)(23), 667.5, subd. (c)(8).) (CT-II 63-65)

Upon trial, the jury was unable to reach a verdict on counts I, II and IV and the court declared a mistrial as to those counts. (CT 142) The jury returned a guilty verdict on Count III (felon in possession) and found true the prior conviction of aggravated assault with personal infliction of great bodily injury. (CT-II 85-86, 142-144)

2

By second amended information, filed 27 July 2004, in Humboldt County Superior Court, appellant was charged with: **Count I**, burglary (Pen. Code, §§ 459/460, subd. (a) with serious felony allegation (Pen. Code, §§ 1192.7, subd.(c)(18)); **Count II**, assault with a firearm (Pen. Code, § 245, subd. (a)(2)) with a serious felony enhancement (Pen.Code § 667, subd.(a)); **Count III** felon possession of a firearm (Pen. Code, § 12021, subd. (a)(1)); and **Count IV**, vehicular theft, (Veh. Code,§ 10851, subd. (a))    With respect to counts I, II and IV the information alleged personal use of a firearm (Pen.Code, § 12022.5, subd. (a)(1) and a prior strike conviction of aggravated assault with personal infliction of great bodily injury. (Pen. Code, § 245, subd. (a)(1), Pen.Code, §§ 1192, subd. (c)(8) / (c)(23), 667.5, subd. (c)(8).) (CT 152-155)[1]

Following re-trial by jury, appellant was found guilty of: **Count I**, attempted burglary, a lesser included offense and **Count IV**, vehicular theft. The jury returned no findings on the personal use of a firearm allegation (Pen. Code, § 12022.5, subd. (a)(1)) with respect to either count and deadlocked entirely on

---

1    At the conclusion of trial, the court stated for the record that Count IV (vehicular theft) had been renumbered as Count III for the limited purpose of not disclosing to the jury that appellant "had another count." (RT-III 638) The court's minutes state that the [original] information was read to the jury on 26 July 2004. (CT 151) A second amended information was filed the following day, and explicitly recites the firearm charge in Count III (CT 152-153) The court minutes for that date state that this second amended information was "filed" that date. (CT 157)   On the strength of the trial judge's representation at the conclusion of trial it is assumed that the allegations in Count III in either the first or second amended information were not read to the jury.

3

Count II. (CT-II 257)  In a bifurcated trial, the court found true the prior strike allegation. (RT 630-638)

### C.    Consolidated Judgement & Sentence.

In consolidated sentencing, on 10 November 2004, the court executed the previously imposed sentence, designating the assault count as the principal term.  The court added consecutive,  doubled, one-third middle terms on the current convictions and a consecutive five-year serious felony enhancment. Appellant was awarded 634 days presentence credits (Pen. Code, § 2933.1) and was ordered to pay a combined $1,600.00 restitution fine (Pen. Code, § 1202.4, subd.(b)) and a stayed parole revocation fine in the same amount.  (CT-II 281-282, 317)

Timely notices of appeal in both matters were filed on 19 November 2004. (CT I 85; CT II 284)

### STATEMENT OF FACTS

Marlon Barrera, the prosecution's principal witness testified that he arrived home to find his house allegedly ransacked and two men fleeing through his back yard. He gave chase and, when the second man was unable to jump the fence, he turned around, brandished a .45 and threatened to shoot Barrera who ran for cover as a shot rang out.  According to Barrera, a .22 caliber pistol and $150.00 were later discovered as missing.

4

Appellant testified that a friend had taken him to Barrera's house to see if the latter was interested in purchasing appellant's girlfriend's car. While waiting for Barrera to return home, appellant played with a dog in the back yard until he noticed his friend running away, pursued by Barrera who was armed with a gun. Appellant surrendered but when Barrera was momentarily distracted he tried to wrestle the gun away at which time it fired and jammed. Appellant ran around front and escaped in Barrera's car which had pulled in behind his own.

The forensics were either non-existent or inconclusive, and various witnesses either impeached and/or corroborated various aspects of the principal protagonists' testimony.

## I.    FIRST TRIAL

### A.    Prosecution Case.

#### 1.    Marlon Barrera.

Marlon Barrera testified that was involved in a restaurant business, owned a stereo shop and on March 26, 2003[2] was living at 5971 Humboldt Hill Drive with his current girlfriend and two children. Sometime around 11:00 a.m., he and his brother William Velasquez returned home to drop off some stereo equipment they had picked up. (RT-C 5-6)

Barrera's house was not located directly on Humboldt Hill Drive but off a

---

2 All dates hereafter are in 2003 unless otherwise noted.

shared access road leading off Humboldt Hill Drive. Barrera's private driveway leads to an attached garage situated to the right of the house.[3] A wood fence borders the property enclosing the back yard and connecting up to a wood gate at the left of the house and a metal gate to the right of the garage. (RT-C 6-7, 8) A door at the back of the house opens onto a colonnaded patio which adjoins the yard. The garage can also be accessed from the back yard through a separate doorway. (RT-C 6-8,13)

As Barrera pulled into the driveway he noticed an unknown car parked there. Since his driveway is not big enough for two cars he pulled in behind the visitor's car. (RT-C 6) Barrera did not notice anything untoward and the presence of another car did not concern him as he had a man who did landscape work and thought it might be him. (RT-C 7)

As Barrera got out of his car, he noticed that the gate next to the garage was open and so, leaving his keys in the ignition, he proceeded into his back yard. (RT-C 7) According to Barrera, his brother, spotted someone peeking out of the gate and so he and his brother began to approach the gate. Barrera entered through the rear door to the garage and proceeded inside his house, which he noticed had been "torn apart". (RT-C 8)

---

3 All references in this brief to "left" or "right" of the house are referenced from the vantage point of looking toward the front of the house. Appellant will file a motion to transmit exhibits.

Barrera ran out the back door, and saw a black man jumping off the neighbor's fence and a bald, six foot tall, white man attempting to do the same. The white man was unable to make it over. He thereupon turned around toward Barrera, pointed a .45 caliber gun and said "I'm going t fucking kill you." (RT-C 9)

Barrera ran for cover and hid behind one of his back patio posts. The white man made a run for the fence again while Barrera ran back inside the house. As he ran, he heard two gun shots, but he did not stop to look around. Once inside he called 911. As he was speaking to the dispatcher he saw the white man head out the right side gate and drive off in his brother's car. (RT-C 9)

Shortly after the incident the police showed him a photo lineup and Barrera identified appellant as the man who had pointed a gun at him. Barrera stated that he would recognize the white man if he saw him again, but was unable to identify him in court. (RT-C 10-11)

On cross-examination, Barrera stated that he approached "close" to appellant as the latter tried to jump over the fence. Without explaining why he suddenly turned around, Barrera stated, "I didn't know he had a gun until I turned around and he started chasing me with a gun." (RT-C 14) According to Barrera, he told "them" to stop and appellant began to chase after him yelling obscenities (RT-C 15, 20) As he ran back into his house or garage storage area he heard a shot. Barrera then stated, "I didn't see him shooting at me. I seen him

7

pulling the gun and I started running and it was at my back." (RT-C 15, 20)

On further cross-examination, Barrera denied that there had ever been any struggle with appellant over a gun. He stated that when appellant had pulled the gun, he began to run toward the garage at the right side of his house and that it was then that he heard a shot. When asked if it wasn't true that there was a bullet hole in the fence on the left side of his house, Barrera stated that he could not remember. (RT-C 29)

Barrera stated that this was the first time a gun had been pointed at him and (RT-C 22) denied telling the 911 dispatcher that appellant had pulled a .45 on him. All he had reported, without mentioning the calibre, was that there was someone with a gun. Barrera denied any familiarity or training with firearms, stating he had children and did not like guns or read gun magazines. (RT-C 22 27)   Thus, he did not recognize the gun appellant had as a .45. What he told the dispatcher was that he "thought" it was .45 and "later the sheriff came by and showed me that there was a .45 caliber bullet." (RT-C 21-22) Barrera did admit, however, to having an unlicensed .22, which he stated he received "as a gift" four years previous. (RT-C 22)   The tape of the 911 was played to the jury. On it Barrera was heard to state "It was like a .45 I don't know." (RT-C 23, 27)[4]

---

[4] The tape was not transcribed. A motion to transmit the exhibit will be filed at close of briefing.

Barrera testified that he had been into his house and knew that he had been robbed before he called 911. (RT-C 15) He denied telling the dispatcher that two men were "trying" to break into his house. (RT-C 23) Barrera explained that he was panicked and had meant to say that they had already been in his house. (RT-C 26)

Barrera also testified that the dispatcher did not ask him for his name. He stated that if they had asked he would have said it was "Barrera" and he denied telling the dispatcher that his name was "Murano". What he said was "Barrera". (RT-C 24-25)

Barrera also explained that the man who was doing yard work at his home was a Darren Gallagher who owned Fortuna Home Repair. Gallagher didn't have a regular schedule but was helping Barrera fix up the yard in his spare time. Gallagher came when he had time and would call the week before so that Barrera could leave the gate open for him. (RT-C 18-19) According to Barrera, he had left the gate unlocked because he was expecting Gallagher to show up, although he never did. (Ibid)

Barrera denied ever having seen appellant before. (RT-C 17) He admitted to having seen David Gray at a club in town (and recognized him when he emerged from the swamp) but stated that Gray had never been to his house. Barrera also stated that he had  not been expecting Gray to show up and there

9

had been no deal to try to buy appellant's car  (RT-C 27 44)

Barrera stated that, at the time of the incident, his alleged brother was living with Barrera's business partner in Blue Lake.  However, he had never been over to that house and did not know the address.  (RT-C 29-30)  His brother has since moved to Oregon and Barrera doesn't see him much.  (Ibid)

On redirect examination, Barrera stated that he had determined that $150.00 was missing from his girlfriend's purse and that the .22 pistol was missing from his bedroom drawer were it had been kept. (RT-C 31)

### 2.    Deputy Sheriff Justin Braud.

Deputy Sheriff Justin Braud testified that he was dispatched to Barrera's residence on a report of  a "burglary in progress with shots fired."  While en route he was advised that a neighbor, Dana Porter, had also called 911 stating that he had heard shots fired and saw someone running through his yard.  (RT-C 47)

On arrival at the scene, Braud contacted Porter who told him about seeing a person [David Gray] flee through his property.  Braud was unable to locate the suspect but when the arrival of the K9 unit was announced, David Gray emerged from a nearby swamp and was identified by Porter as the person he had seen fleeing. (RT-C 48-52)

Braud then spoke with Barrera who appeared "shook up" and who stated

that the other man had pointed a gun at him and said "I'm going to fucking kill you, Carlos." (RT-C 54).

Braud inspected Barrera's house which appeared to him to be "ransacked" (RT-C 54) After receiving information that the other suspect could be appellant, Braud prepared a photo-line up which he showed to Barrera and out of which Barrera identified appellant. (RT-C 55)

On cross-examination, Braud testified to various statements made to him by Barrera which were inconsistent with Barrera's trial testimony. Barrera first told Braud that on arrival he noticed his back gate was open and walked through it into his back yard. (RT-C 60) Barrera stated that the white suspect tried to scale the fence two times as he (Barrera) approached him and before turning to chase him. (RT-C 57-58) Barrera never mentioned anything about taking cover behind the back porch pillars. (RT-C 58) Nor did Barrera state that he entered his house prior to calling 911; on the contrary, Barrera told Braud he had called 911 from his garage..(RT-C 60) Braud also stated that at the time he took these statements Gray had been arrested and was sitting in a police patrol vehicle; however, Barrera was not able to recognize him. (RT-C 59)

### 3.    Sergeant Wayne Hanson

Sergeant Wayne Hanson testified that he was on duty when he heard a radio report of a vehicle theft following an assault with a deadly weapon. After

11

being told that the vehicle had driven east toward the PGE sub station, he was able to located Barrera's by then abandoned car. During an area check, he located a suitcase [belonging to Barrera's brother] hidden in some bushes with the car keys placed on top. (RT-C 67)    On cross-examination, Hanson acknowledged that he did not see any firearms in the vehicle. (RT-C 70)

### 4.    Tamara Hansen

Tamara Hansen testified that she was appellant's probation officer. At the time of the alleged incident appellant was on formal probation and living with his girlfriend, Nickee Shaw. (RT-C 72)  Shortly after the incident, Hansen was contacted by Officer Kirkpatrick who was trying to locate appellant. On March 28th [5] Hansen received a call from Shaw advising that appellant was trying to contact her. Through Shaw, Hansen recommended that appellant turn himself in. The following Monday, Hansen put out a warrant for appellant arrest. (RT-C 72-75) Thereafter, Hansen unsuccessfully attempted to contact Nordloff in Arizona. She did not seem him again until he surrendered in December 2003 (RT-C 75)

### 5.    Dana Porter

Dana Porter, a neighbor of Barrera's, testified that on March 26th he was at home alone when he heard gunshots. (RT-B 62) He grabbed his rifle and went to see what was going on whereupon he saw a black man in his front yard

---

[5]  March 28th was a Friday.

coming toward him frantically. (RT-B 63)

Porter stated that he'd "had a fair amount of training" and it seemed to him that Gray was running away from somebody and "frantically trying to see where he could get out of harm's way." (RT-B 64) Gray was "trying to pull up his pants" and Porter was unsure if he was trying to grab a weapon, so he detained Gray and ordered him to the ground. (RT-B 64-65)

Gray begged Porter to let him go. Porter replied that Grey had stumbled into the wrong place and Gray promised not to run through Porter's yard again. Porter said he wanted to know what was going on and Gray replied that "somebody owed him some money or them some money." (RT-B 65)

Keeping his rifle trained on Gray, Porter used his cell phone to call 911. As he did so, Gray began to move "trying to pull up his pants" or "what not" and Porter put his phone back into his pocket and retrained his rifle on Gray. (RT-B 66) Porter heard the voice of the 911 dispatcher and said he was being robbed. (Ibid). Gray broke away and ran down into some ponds and marshes 150 yards off. (RT-B 67). The police arrived accompanied by a dog named Kay. The police bellowed out that Gray had 10 seconds to surrender "and he immediately stood up with the dog barking." (RT-B 69).

### 6.    David Gray

David Gray identified appellant whom he said he knew appellant having

13

met him "at parties and stuff. (RT-B-70)  Gray could not recall if he was with appellant on March 26th.  He could not recall if he had gone to the Humboldt Hill area.    Gray stated that he "apparently" got arrested that day, although he had no personal recollection of that fact.    He could not recall how he got to the Humboldt Hill area and he did not remember telling the police that he had been walking by the house when he heard shots .  Gray could not recall 1 jumping over a fence to get away and could not recall running into a swamp or speaking to the police. (RT-B 70-72)  Gray admitted knowing Nickee Shaw through partying but was unable to identify or recall if he was ridden in her car on March 26th. (RT-B 73)

Gray admitted[6] to pleading guilty to burglary of Barrera's house in exchange for a grant of felony probation in lieu of going to prison, execution of sentence suspended.  (RT-B 73-74)

### 7.   Judy Taylor

Sheriff technician Judy Taylor was called to identify various exhibits and photographs prior to admission in evidence. (RT-B 77-83)   Over defense objection she testified that in her opinion the interior of Barrera's house was in "disarray" (RT-B 78)

On cross-examination Taylor testified that there no signs of any forced

---

6  The court overruled appellant's objection per Evid. Code § 352.

14

entry into the house. (RT-B 88-89)  She identified a .45 casing that was found and a bullet hole in the fence on the left side of the house (facing the front) on the side of the property opposite the garage.  It seemed to her that the weapon was fired from inside the back yard at an upward angle. (RT-B 88)

### 8.    Deputy Justin Braud (recalled)

Recalled to the stand, Deputy Braud testified that he and Deputy Steven Quinnel took Gray into custody on March 26th.  (RT-B 98)  At that time, Braud heard Gray tell Quinnel that he did not have a gun; that he was not involved "in anything like that" and that he had just been walking by in the neighborhood when, upon hearing gun shots, he jumped over a fence and started running. (RT-B  99)  Braud was also told by Quinnel that Gray had stated he had gotten to the area in "a vehicle" pointing to the area of Barrera's garage. (RT-B 99)

On  cross-examination,  Braud  testified  that  the  police  he  never  received any  phone-call  report  that  $150.00   was   missing  from  Barrera's   house. (RT-B 101)

### 9.    Stipulation

It was stipulated between the parties that on March 26th Deputy Marvin Kirkpatrick searched  a Toyota Corolla (Lic. No. 3DHK017) located to the right of Barrera's garage, that he removed from the vehicle the materials and documents contained in People's Exhibit No. 2, and that he did not find any guns,

ammunition or burglar tools in the car. (RT-B 101-102)  It was also stipulated that appellant voluntarily surrendered on December 2, 2003. (RT-B 102)

### 10.   Deputy Dick Clark

Deputy Dick Clark testified that on March 26th, upon being dispatched to Barrera's house, he spoke to William Velasquez.   Later in the day, he was advised that Velasquez's car had been located in the King Salmon area.   He reported to that location and identified photographs taken of the vehicle, of video equipment in the back seat and of a set of keys located on top of a piece of luggage. (RT-B 105-106)

On cross examination, Clark stated that he had never received a call or report of $150.00 being taken from Barrera's house. (RT-B 107)7

### B.    Defense Case.

### 1.    Appellant Michael Nordloff

After admitting a prior conviction for moral turpitude. (RT-C 99), appellant testified that on March 26th, he met up with David Gray because Gray knew someone who was interested in buying his girlfriend's  Toyota Corolla. Since Gray knew where the person lived, he drove to the Humboldt Hill address, arriving at approximately 11.00 a.m. (RT-C 100)

On arrival, Gray went to knock and yell out at the front door. No one answered and as there were no other cars parked in the driveway, they

concluded that no one was home. However, Gray say that the occupant was probably delayed coming from the stereo shop, and so they decided to wait a while. They waited for about 5 or 10 minutes during which time Nordloff played with a little pit bull that was in a dog-cage in the backyard. (RT-B 101)

Suddenly appellant heard a door slam. As he turned around, he saw Gray peeking through the fence and then take off running. Nordloff stood up to see what was going on and noticed Barrera walking fast toward the gate holding a gun in his hand. (RT-C 102) Nordloff turned and ran toward the back gate to catch up with Gray but wasn't able to get over the fence. Barrera caught up with him and, not wanting to get shot in the back, appellant "kind of gave up" turning around, putting his hands up and stepping backwards. (RT-C 102-103) Appellant heard Barrera say something to his brother in Spanish, after which [Velasquez] headed back out the front gate. (RT-C 103) Keeping the gun pointed in appellant's direction, Barrera began speaking to him, but appellant "wasn't really paying attention to what he was saying." (RT-C 103.)

Appellant testified that he knew Barrera, had bought a stereo at his shop and had often eaten at a restaurant owned by Barrera's cousin, Cedro. (RT-C 109) However, he and Barrera avoided personal contact because they didn't t really get along. Appellant explained that they shared an ex-girl friend and there was some "discrepancy" concerning Barrera's child by this woman in that people

17

around town had spread rumors that the child was really appellant's because he looked white. (RT-C 103, 109)

As Barrera kept the gun trained on appellant, Barrera's brother yelled something in Spanish from the other side of the [front/driveway] fence. As Barrera turned around appellant grabbed Barrera's hand and the top of the gun, at which moment the gun went off. However, the top part of the gun did not slide forward, leading appellant to conclude that the gun was either out of bullets or had jammed. At that point, appellant, escaped running through the gate on the left side of the house (RT-C 104).

Appellant ran around back toward the passenger side of his girlfriend's car at which point he realized that Gray still had the keys. So he ducked down and tried to see where Barrera's brother was. At that point, he noticed that the keys were still in the ignition of Velasquez's car. Not seeing that there was any other way to escape safely, appellant he took off in Velasquez's car. (RT-C 105)

Appellant drove down to the King Salmon area. Appellant felt it would be better to have his brother come and pick him up rather than to be driving around in another person's car, but at that point he realized that he had left his phone in his girlfriend's car. So he looked around in Velasquez's car for a phone he could use which is why he started to look into a suitcase that was there. However, at that moment he noticed Barrera's cousin, Cedro, drive by in his Cadillac, and so

18

he took off and hid in some bushes near the railroad tracks. After a while, appellant jogged down the tracks back to Eureka. (RT 106)

Appellant stated that, being on probation, he was sacred to contract his probation officer directly but did attempted to do so through his girlfriend. (RT-C 106) He then heard that the police had come looking at him at his apartment and so he figured he had been violated. (RT-C 107) He left the area because he heard that the officers who were looking for him said they were going to shoot first and ask question later because he was allegedly armed. (RT-C 107)

Appellant stated that between March and December he attempted to call Attorney Cisco at the Conflict Defenders Officer; however, Cisco said he could not speak to appellant because he was then representing Gray. (RT-C 108). Tired of living on the run, appellant returned and turned himself in December. (Ibid) However, he did not burglarize Barrera's house, did not possesses, point or shoot a gun at Barrera and only took the vehicle to get away. (RT-C 109)

On cross-examination, appellant stated that he became acquainted with Gray in 1997 through partying with friends. He stated that at the time of the alleged incident he was living with his girl-friend, Nickee Shaw. She worked in a salon while he left Big Louie's Pizza in order to manage a start-up hobby shop. At the time of the incident, the hobby shop business had gotten a three day notice. (RT-C 111-112)

19

About this time, appellant had gotten a new Mazda. Now with three cars, he and Nickee decided to sell her Toyota. They parked the car at Henderson Center and two people contacted them but did not want to pay the asking price. (RT-C 112-113)

Appellant testified that before Gray moved to Redding, he'd chat with him about every other day. (RT-C 113). Appellant could not explain why Gray did not remember anything on the stand, but stated that he had seen Gray's probation report which indicated that Gray was using drugs. (RT-C 113) Appellant said that Gray used to sweat a lot and he used to think it was just high blood pressure (RT-C 115)

Appellant stated that he had known Barrera since 2000. He was aware that Barrera and his former girlfriend, Larissa Longholm, had bought a house together somewhere on Humboldt Hill but he wasn't sure exactly where. (RT-C 114)

Appellant testified that he got along well with his probation officer, Tamara Hansen. (RT-C 115) He stated that he did not call the police after Barrera had pulled a gun on him because he (appellant) was on probation and he figured he'd get into trouble. (RT-116) When asked if he was aware that he was entitled to a revocation hearing, appellant explained, "Yeah but they're not very fair." (RT-C 116)

20

Appellant related that, on the morning of the incident, Gray had called him at 10.30 a.m. and said that "one of his dudes" was interested in buying Shaw's Toyota. (RT-C 122)    All Gray said was that it was someone who lived on Humboldt Hill and it did not occur to appellant that it might be Barrera and appellant didn't make the connection. (RT-C 122, 124)    As he had stated on direct examination, appellant had heard that Barrera was getting teased about his son Seth possibly not being his own and appellant did not think Gray would take him to the home of someone he didn't get along with. (RT-C 121,124)

Upon arriving at the Humboldt Hill address, Gray went up to the front door.  Since appellant did not know the occupants he remained seated in the car. After Gray returned to the car and stated that no one appeared to be home, they decided to wait a while to see if Gray's contact returned.  (RT-C 122-123)  Gray and appellant walked towards the back yard.   When appellant noticed a pit-bull puppy in its kennel he went over to play with it, as he had a friend who raised the breed. (RT-C 123)

As he played with the dog, appellant noticed Gray standing by the front gate.  Suddenly Gray took off running.    Appellant looked up and saw Barrera through the gate's opening, walking from his car and holding a gun in his hand. (RT-133)

When appellant saw the gun, he turned and tried to catch up with Gray;

21

but when he couldn't make it over the fence he figured he should stop, turn around and throw up his hands. (RT-C 125)  Appellant began to step backwards and as he reached the left fence area, he decided to grab the gun and push it away from Barrera.  He grabbed the gun with both hands, a struggle ensued and the gun fired. (RT-C 128-130)  Appellant stated he did not try to push the gun downward because "I didn't really want to risk getting shot anywhere down" (RT-C 130)

Appellant denied knowing that Grey had done anything wrong.  All he knew at the time was that Gray had taken off running.  As for Gray's subsequent plea, appellant stated that, two days in county jail coupled with a no-time offer "can pretty much get anyone to plead to anything." (RT-C 118)

Appellant testified that after ditching Velasquez's car, he had left the keys on the suitcase because he hadn't been trying to steal anything. (RT-C 119). After fleeing the scene he was debating whether to turn himself in because his probation officer, Tamara Hansen, said she would not violate him if he gave himself up.  However the next morning he saw in the paper that he was already wanted on a charge of burglary and assault.  So he sold his car and went to Nevada. (RT-C 120-121)

Concluding, appellant denied committing any burglary, theft or threat to kill Barrera. (RT-C 135)

### C.    Prosecution Rebuttal.

#### 1.    Larissa Longholm

Larissa Longholm testified that she bore a child by Barrera four years ago and that a year later she and Barrera split up, although Barrera continues to visit his son every weekend.   (RT-C 149-150)    Longholm admitted to knowing appellant but denied any intimacy with him. (RT-C 151)

#### 2.    Tamara Hansen

Recalled, Tamara Hansen stated that, though Nickee Shaw, she had given appellant an ultimatum to surrender or she would seek a warrant for his arrest. As he did not surrender by Monday, she revoked his probation and sought a warrant which issued on Tuesday, April 1st. (RT-C 153-156) [7]   Hansen had no idea how the *Times-Standard* had found out about the warrants.

#### 3.    James Dawson

James Dawson, the prosecution's chief investigator (RT-C   157)  testified as to the mechanics of the 1911 Colt .45.  He also explained the dispersion of gunpowder soot upon firing.  He stated that, in the absence of the actual gun used, it was impossible to accurately replicate the forensics of what had happened.   He stated that from looking at the photographs of the fence,

---

[7] Judicial notice was taken that March 26th fell on a Wednesday and April 1st on the following Tuesday.

assuming the "soot" marks were on the inside, the safety was off and that the person had his finger on the trigger, it was possible that the hole in the fence was caused when the gun discharged 3-8 inches from the fence as the person attempted to jump over. (RT-C 169)   However, Dawson, could not rule out that the bullet hole was caused by a discharge during a struggle at the gate. (RT-C 172).

Dawson testified that he taught gun-safety and training classes and that in his experience, a person without prior familiarity with weapons would not be able to identify a .45 and would require some training in order to be able to identify the make and model of a gun being held at a distance of 25 feet. (RT-C 172-173)

### D.    Bifurcated Proceedings on Prior Conviction Allegation.

Upon proof of appellant's 1999 conviction for assault with a deadly weapon with infliction of great bodily injury (Pen. Code, §§ 245, subd.(a)(1)/12022.7), the jury found true the serious/violent prior conviction allegation.. (RT-A 53-54; CT 65, 85))

### E.    Revocation of Probation.

Based on the jury's guilty verdict on Count III (felon in possession of a firearm), the court found that appellant had violated the terms of his probation, which was thereupon revoked. (RT-C 226)

24

## II.    SECOND TRIAL

### 1.    Marlon Barrera

Marlon Barrera testified that, at the time of the alleged incident, he lived at the Humboldt Hill address with his girlfriend, Elmary Claybon, and his children Nathan and Seth.  Barrera stated he owned a restaurant, a stereo shop and was also doing a low-income housing development. (RT-I 6).

On March 26th, he and his brother, William Velasquez were returning home to drop off some stereo speakers they had picked up.  As they pulled into the driveway Barrera noticed a Toyota Corolla, he had never seen before, parked in front of his garage. (RT-I 7-8)  At the time, Barrera was having landscape work done on his property, but he did not expect the landscaper to be there that day. (RT-I 9).

As Barrera got out of the car, his brother said he saw someone peeking through the gate to the right of the garage. (RT-I 10)  Barrera and his brother ran toward the gate and saw two men running away and one of them jump over the fence.  The second man, whom Barrera had never seen before, tried to jump the fence but couldn't make it. (RT-I 10, 20)

Describing the layout of his property, Barrera explained that both the house and the attached garage had separate exits into the backyard so that from the backyard one can enter the house either directly though its backdoor (next to

the chimney) or through an entrance into a storage alcove within the garage and from there into the house. (RT-I 13-15)

Barrera could not recall if he ran through the garage or not, but he did recall running into the yard and seeing a black man jump over the right side of the fence. (RT-I 17)  As Barrera continued to approach the other man, cursing him out, he pulled a gun on him and said, "I'm going to kill you Carlos." The second man then "followed" Barrera as he tried to hide behind a post that held up his awning at the back of the house. (RT-I 17)

According to Barrera, he then ran into his garage in order to call 911. "I was trying to call into my house to call 911" (RT-I 18)  As he was running into his garage he heard two shots. Once he got inside he called 911 from his cell phone because he had it with him and that was quickest thing to do. (Ibid) Barrera could not recall if he saw the man who pointed gun at him after that.(RT-I 19)

Barrera testified that he had unconsciously left the keys in his brother's car. Through the kitchen window he saw his brother's car being driven away by the man who had pointed the gun at him.

The police arrived about five minutes later.  Barrera recalled one of the officers saying that they had caught one of the suspect in the swamp.  (RT-I 20) Barrera got a look at Gray as he was led out and placed into a patrol vehicle. (RT-

26

I  20, 21)   Barrera stated that he did not know Gray at the time although he had

seen him in clubs around town. (RT-I 24)

Barrera stated that he and the officers  went through the house which was

turned "upside down" (RT-I 22) He could not recall anything missing, although a

.22 pistol was stolen, which he reported to the police. (RT-I 23)

Later in the day Barrera went with the officers to inspect his brother's car.

He saw the suitcase with the keys on top; however nothing was stolen from the

car. (RT-I 25)  Still later, Barrera identified appellant from a photo-lineup. (RT-I 26)

On cross-examination, Barrera stated that, as was his habit, he had left the

doors to his house unlocked and that he was not expecting Darren Gallagher to

come and do yard-work for him.  Barrera was impeached with his prior testimony

that he left his doors unlocked on days when his landscaper was scheduled to

show up. (RT-I 32)

Barrera testified that  Gallagher drove a pickup and so Barrera did not

think the car parked in his driveway belonged to Gallagher. (RT-I 28-29)  Barrera

was impeached with his prior testimony to the effect that he had at first thought

that the car parked in his driveway belonged to Gallagher. (RT-I 30)

Barrera testified that he believed he entered through the gate. Before he

called 911; although he hadn't been inside his house yet,  he was certain his

house had been burglarized because the two suspects were running away.

Barrera stated had not entered his house through the garage prior to seeing the Gray climb over the fence because he did not have the remote to get into his garage (RT-I 34-35) Barrera was impeached with his prior testimony that after peeking through the gate with his brother he entered the garage through the storage area door and then proceeded through into his house and out the back door. (RT-I 36)

Barrera testified that the living room and kitchen had been turned upside down, but that not much was disturbed in the bedroom where everything was built in. Barrera was impeached with his prior testimony that everything in his house had been turned upside down. (RT-I 38-39)

Barrera stated that, although he had never seen appellant before, he noticed his shaved head. Appellant was trying to jump over the fence and Barrera was half-way toward him when appellant turned around pointing a gun at his chest. (RT-I 41-42) Barrera was impeached with his prior testimony that he was close to appellant and had not been aware that appellant had a gun "until I turned around and started running and I heard the shots." (RT-I 43)

After the audiotape of the 911 call was played, Barrera admitted that he had said that the man with the gun had shot at him but missed and he the weapon was like a .45 Barrera stated that he had no training in firearms and simply said "the first thing that came into his head." (RT-I 48).

28

Although on the tape, Barrera is heard to say that he believed he had seen one of the men before, at trial Barrera said he did not recognize Gray until he had emerged from the swamp and was placed in the patrol unit. (RT-I 48-49, 51.) Barrera explained that he "was just trying to get them [the police] to come as fast as they could." (RT-I 51)

Barrera admitted previously testifying that $150.00 had been taken from his girlfriend's purse. He explained, however, that he was unsure how much may have been taken. His girlfriend was the one who called in to the Sheriff's Office, after the police arrived, and he could not presently remember how much she said had been taken. (RT-I 45, 59)

### 2.    William Velasquez.

William Velasquez, 24 years old, testified that he was Barrera half brother and that when his brother pulled into the driveway he noticed a car parked at the side of the house. (RT-I 61) At the same time he saw a black man inside gate where the doghouse was. He saw the black man peeking out and then leave. (RT-I 62.) Barrera ran after him and Velasquez followed his brother. His brother proceeded to the patio in the back with Velasquez trailing by about five feet. (RT-I 62)

On entering the back yard, Velasquez saw a white man with a pistol, "standing in the patio" and aiming at Barrera. (RT-I 62) The man pointed the gun

29

at Velasquez and told him "to stand next to my brother." (RT-I 63)

Instead, Velasquez went into the house through the back door and headed into the kitchen to see if he could call 911. Once inside, he heard a single shot, so he left off dialing and went back to the patio. (RT-I 63) Velasquez thought Barrera had been shot, but on reaching the patio, no one was there. So Velasquez ran back out into the back yard, passed the dog-pen and out the [right] front gate. (RT-I 63-64) At that point he the saw the white man back and drive off in his card. (RT-I 64)

On cross examination, Velasquez said that the white male had been wearing a hooded sweater with the hood up over his head. Velasquez could not tell if he had a shaved head or long hair, but thought his hair was brown because his beard was. (RT-I 65)

### 3. Deputy Dick Clark

Deputy Dick Clark testified that upon arriving at the Humboldt Hill address he spoke to Velasquez who told him that the man standing near the back of the garage had been an adult black male wearing a blue sweatshirt and the man who had pointed the gun as being a white male adult, late 20's wearing a blue sweatshirt with the hood pulled over his head and face (RT-I 72-73) Clark also stated that he later located Velasquez's car and that the T.V. and stereo had been left inside. (RT-I 75)

30

### 4.    Deputy Justin Braud

Deputy Justin Braud testified that as he was responded to a code 3 burglary report at Barrera's house, he was redirected to another residence on account of the fact that someone had reported seeing one of the suspect flee through their back yard. (RT-I 83)   Arriving at the redirected address, Braud contacted Dana Porter and after talking to him positioned deputies around the swamp area.    After a K-9 officer arrived and threatened a dog search, Gray emerged from the swamp in a blue sweatshirt. On arrest, no weapon was found on his person. (RT-I 83-85)

Braud testified that he finally spoke with Barrera around noon. Barrera told him that the only thing missing from his residence was a .22 calibre pistol. (RT-I 89) Later in the day, Braud showed Barrera a photo-line up from which Barrera identified appellant as the person who had pointed the gun at him. (RT-I 90-92)

On cross examination, Braud admitted that he had never searched Barrera's house for a .45.  He stated that there was a bullet hole in the left side fence and that a .45 casing was found on the ground.  However, the casing was never fingerprinted. (RT-I 93-94)

### 5.    Judy Taylor

Judy Taylor, a Sheriff's Office technician was called to identify and explain various photographs taken of the scene. (RT-I 96-111)  She testified that the .45

31

casing was found at a distance of nine feet from the hole in the fence. (RT-I 137) Taylor testified that the interior of Velasquez's vehicle, had yielded fingerprints which did not match appellant's or Gray's. (RT-I 96-111) Taylor stated she could not recall if the shell casing had been dusted for prints, but that in any case it had not been tested to see if Barrera's fingerprints were on it. (RT-I 129) Taylor testified that no test had been conducted to verify if the alleged "soot" surrounding the bullet hole was really gunpowder residue. (RT-I 131-132)

### 6. David Gray

David Gray testified that he had known appellant for a long time and that they used to get high together every so often. (RT-I 141) He could not recall if he was with appellant on March 26th, or going to the Humboldt Hill area or whether or not he had a gun. (RT-I 141-142) He could not recall walking past Barrera's Humboldt Hill residence or hearing gun shots at the time. (RT-I 142-143) Gray stated that if he had once told the police that he jumped over a fence to avoid gunshots, he could not recall so now. He could also recall running into a swamp or telling a police officer that had arrived at the Humboldt Hill scene in a car. (RT-I 143-144) Gray admitted to pleading guilty to burglarizing Barrera's house in exchange for which he was placed on felony probation. (RT-I 144-147)

### 7. Dana Porter

Dana Porter testified that he was Barrera's neighbor and that on the

32

morning of March 26th he suddenly heard gunshots which caused his dogs to start barking. (RT-I 148-149)  After peeking outside and seeing someone crossing his yard, he grabbed his gun and stepped outside.  The intruder was a black man wearing a hooded sweater and frantically running "back and forth"  (RT-I 150) Porter stated that he didn't know what was behind him but it appeared that the man was "in fear for his life." (RT-I 157)  It also looked to Porter than the man had a bulge in his waistband, so Porter got his deer hunting  rifle and ordered him to the ground. (RT-I 151)  The man was still in the yard because Porter's fence was hot-wired. (Ibid)  As he Porter tried to get his dogs off him  the man muttered "I did something I shouldn't have, please let me go." (RT-I 152)  At some point the man managed to get over the fence  and so Porter called the police from his cell phone (RT-I 153)  When the police arrived, the coaxed the intruder out of the pond with their dogs. (RT-I  153-154)

On cross-examination and redirect, Porter stated that he asked the man what he had done wrong and the man replied that somebody owed him money. (RT-I 156-157)

### 8.    Sgt. Wayne Hanson

Sergeant Wayne Hanson testified to finding Velasquez's vehicle near the P.G.& E.  plant in the King Salmon Area. (RT-I 160)  Sixty yards from the vehicle he also found a suitcase with some keys tucked under the brush.  On searching

the car, he did not find any firearms. (RT-I 160-162)

### 9.    Tamara Hansen

Appellant's probation officer, Tamara Hansen, testified that in March 2003, appellant was living his girl-friend Nickee Shaw. On March 26th Hansen was contacted by the Sheriff's Office and was asked to try to locate appellant. Hansen called Nickee Shaw and told her to tell appellant to turn himself in. Hansen testified that she told Nickee "she would take [appellant] to talk to the sheriff or whoever and try to explain what happened." (RT-I 163-164) Hansen gave appellant until Monday to turn himself in for violating the terms of his probation. (RT-I 167) Appellant did not do so, and she violated him on April 1st. (RT-I 168) Later, in December 2003, when appellant turned himself in, she met up with him at intake and advised appellant of his *Miranda* rights. She asked appellant if anyone was after him and he said "possibly" which was the reason he turned himself in. (RT-I 172) On cross-examination, Hansen stated she had arrest powers and that appellant had turned himself in voluntarily. (RT-I 173)

### 10.    Deputy Matthew Helm

Deputy Matthew Helm testified that on March 27th he gathered up search parties to look for appellant without success. (RT-I 177)

### 11.    Sgt. Marvin Kirkpatrick

Sergeant Marvin Kirkpatrick testified that on March 26th he reported to

the Humboldt Hill address and impounded and inventoried Shaw's Toyota Corolla.    During the search he found various papers, including permits, registration, receipts and the car's installment contract. (RT-I 180-183)  In the trunk of the car he found an insurance policy in appellant's name, and various jewelry appraisals . (RT-I 183-185)

On cross-examination, Kirkpatrick stated that he did not find any burglar tools or ammunition in the vehicle. (RT-I 185)  He also testified that he had never received any report of cash being taken from Barrera's house.(RT-I 187)

### 12.    Appellant's  June 2nd  Testimony

The entire transcript of appellant's testimony at the first trial was read to the jury.

### 13.    Elmary Claybon

Elmary Claybon testified that she was Barrera's "fiancé" and that they had been living together for six years and had a boy and a girl. (RT-I 263)  She stated that when she arrived home on March 26th her clothes were all over the bedroom.  She told Barrera it looked as if it had been ransacked and she asked him what had happened. (RT-I 264)  She later discovered that money in her purse was missing. At Barrera's suggestion she called the Sheriff's business number and reported the alleged theft. (RT-I 264-265)

On cross-examination, Claybon testified that Barrera was not in present

when she returned home between 3.00 and 4.00 p.m. on the 26th.

### 14.   Marlon Barrera.

Recalled to the stand, Barrera admitted that he had entered the United States illegally and that he had used false identification and that he had given false statements under oath to obtain a driver's license. (RT-I 271-274)

### 15.   Eric Carr

Eric Carr testified that he was a friend of appellant's and that the two had shared an apartment for several years. He stated that at the time of the alleged incident he was in jail and he and appellant were not roommates. (RT-II 278-279) He admitted to being convicted of possession of an unregistered firearm and maintaining a place for distribution of a controlled substance. (RT-II 279)   On cross examination, Carr stated that appellant had never asked him to lie and that appellant had dated Larissa Longholm for "quite some time." (RT-II 279)

### 16.   Janet Brisker

Janet Brisker, a Sheriff's Office technician stated that on May 27, 2004, the .45 shell casing had been given to her to be processed for fingerprints but none could be lifted. (RT-II 284-285)

### 17.   James Dawson

James Dawson, chief investigator for District Attorney's Office testified that the 1911 A1 (Colt .45) was developed "to fight the moral uprising in the

36

Philippines." (RT-II 301)  After explaining at length the mechanics of the weapon,

Dawson stated that it was a "general expectation" that if someone were firing a

.45 in the general vicinity of the gate (with the hole in it) the casing would land

where it was found. (RT-II 296)

Dawson testified that .45's came in various models with the barrel lengths

ranging from 3.5 inches to 6 inches.  He stated that the amount of soot and

degree of its dispersion would be affected by the length of the firing gun's barrel.

(RT-II 299-300)  Similarly, the type of hole made would depend on the type of

bullet used. (RT-II 303)

Absent being able to test the actual weapon, Dawson was unable to offer

any solid opinion on how close the weapon may have been fired to the gate,

except to say that the firing was "fairly close" to the fence and within three feet.

Dawson was quick to add, however, "that's nothing more than a guess, frankly."

(RT-II 308)

Dawson stated that  assuming a right handed ejection port on the gun, a

disengaged safety, an approach to the fence, "a stumbling in some fashion" with

enough force to cause a finger to fall on the trigger it was a "possibility" that

such a hypothetical could have caused the hole depicted in the photographs of

the fence. (RT-311)

However,  on  cross-examination  Dawson  again  cautioned  that  this

37

conclusion was "a guess, nothing more." (RT-II 312)   He stated that it was equally possible a struggle occurred and that's how the gun went off.  312 and that during a struggle, the gun could jam if someone was holding his hand over the top. (RT-II 314)

### 18. Deputy Justin Braud (recalled)

Recalled, Deputy Justin Braud testified he showed Barrera the photo line up, at around 4.30 p.m. on March 26th and that at the time, no women were present at the house and that he did not receive any information concerning the theft of $150.00. (RT-II 319-320)    Braud also he looked for a weapon in the swamp, because Porter had told him that Gray had a "bulge" in the front pocket of his sweat shirt. (RT-II 321)

### 19. Larissa Longholm.

Larissa Longholm testified that Barrera was the father of her four year old son, Seth. (RT-II 344)  She stated that she met appellant through an former boyfriend of hers, Gordon Meyer; however she denied ever having had sex with appellant. (RT-II 344-345)

### 20. Dave Rybarczyk

Investigator Dave Rybarczyk testified that he spoke with Eric Carr on July 26,2004 and that Carr stated that appellant had stopped staying at his apartment shortly before the incident on March 26th.  Rybarczyk confirmed that Carr had

38

been lodged in jail on that date. (RT-II 349-350)

### 21.    Det. Steven Raymond Quenell

Over defense objection, Detective Steven Quenell testified that he had participated in the arrest of Gray on March 26th and that at that time, Gray said that the had gotten to the area in a vehicle which was parked over where the shots had been fired. (RT-II 353-354)

### B.    Defense Case.

### 1.    Appellant Michael Nordloff.

Appellant testified that, he and Gray had been friends since 1997 and that on March 26th, he met up with Gray who said he knew someone who was interested in buying Nickee Shaw's car. Appellant stated that he had just bought a new Corsica and that he and Nickee did not need three cars. After meeting up with Gray at his house in Cutten, the two drove to Barrera's house on Humboldt Hill. (RT-II 355-356)

On arrival, Gray went to the front door while appellant waited in the car. Gray reported back that no one was at home, and so the two decided to wait a while. When Gray went to knock on the back door, Nordloff spotted the dog in the kennel and went over to talk to it. Appellant had given Gray the key to drive the car, but left his other keys and his cell phone on the dashboard. (RT-II 357)

Barrera eventually showed up with his brother. Appellant knew Barrera

but the two were not friends. Regardless of what Longholm may have testified to, she had been his girlfriend. He was seeing her at the same time that she got pregnant and this gave rise to an animosity between appellant and Barrera even though the child was not appellant's. (RT-II 358-359)

Appellant was still playing with the dog when Barrera showed up. Appellant heard a car door close and looked up. He saw Gray peering through the fence and then just take off running. So appellant got up and also looked through the fence at which time he saw Barrera "speed walking" in his direction holding a gun. (RT-II 359)

Seeing the gun, appellant turned and ran to catch up with Gray; but seeing he wasn't going to make it over the fence, he turned around and gave himself up, saying, "Hey man, what's going on?" Barrera said something in Spanish to his brother at which point his brother ran back out the gate. Appellant began to step backwards as Barrera continued approaching him. Barrera was talking real fast but appellant wasn't paying attention to what he was saying. (RT-II 360)

Barrera got close enough for a struggle to ensue. The struggle started when Barrera's brother yelled something from the other side of the fence. Appellant thought it had something to do with not finding Gray. Taking advantage of Barrera's momentary distraction, appellant grabbed the gun and

40

pushed it away from himself.    Appellant stated that he had no training in disarming a person with a gun and that during the struggle the gun went off and burned his hand.    When he let go, the top part of the gun did not slide back leading him to believe either that the gun was jammed or that it was out of bullets. (RT-II 361)

At that point, appellant just took off running    He first ran to his the passenger side of Shaw's car. Realizing that Gray still he had the key, he ducked and ran to Velasquez's ca, jumped in and took off.    Appellant stated he just wanted to get out of there.  (RT-II 362)

Appellant testified that he first drove down to a store at the end of Humboldt Hill drive; however, the phone that had been there had been replaced with a propane tank.    Appellant did not want to be driving someone else's car and was looking for a way to call someone.    So he ended up driving to the King Salmon area where he pulled over and tried to collect himself.    He began to look around the car to see if he could find a cell phone.    At that point, he noticed Barrera's cousin, Isidro, drive by.    Appellant did not think that was a coincidence and so he grabbed the suitcase and ran into some bushes. (RT-II 363)

Appellant stated that he left the suitcase in the bushes and started walking down the railroad tracks to the Motel 6 which was near Eric Carr's house. Appellant knew that Eric's roommate was in the habit of leaving the door open

so he just walked in and stayed there until nightfall. (RT-II 364)

Appellant explained that he did not seek to call the police because he was on probation and knew he would be violated no matter what since "you can't really win those hearings." (RT-II 365)   He did tell Nickee Shaw to contact his probation officer and Shaw reported that Hansen would not violate him if he turned himself in by Monday.  However, the next day, Saturday, he saw in the paper that he had been violated anyway.  So he stayed in Eureka for two weeks and then went to Nevada after selling off everything he owned.  (RT-II 365-366) Appellant denied ever entering Barrera's house and stated that he took the car only to get away. (RT-II 367)

On cross examination, appellant stated that on earlier in the morning of the 26th he took Shaw's daughter to day care and was busy packing things at his business to be moved into storage. (RT-II 372)   Gray had not mentioned Barrera by name but had said only that he knew a "dude" who was interested in buying the car. (RT-II 368-370)  Appellant was asking $4000.00 for the vehicle.  He put his keys on the dashboard because he was wearing sweat pants and the keys were heavy and made the sweats fall down. (RT-II 378-379)

Appellant stated that he hadn't heard Gray say anything to try to calm Barrera down.  All he noticed was that Gray had taken off running. (RT-II 382) After the struggle, appellant resumed his flight because he felt that the gun had

probably jammed and could not be cleared very quickly. (RT-II 388)  On reaching

the front, he did not see Velasquez and had no idea where he had gone to.

Appellant did not know if Velasquez might not have had a gun as well, and all he

knew was that he had to get away quickly. (RT-II 389)

### C.    Prosecution Case Re-Opened.

During a recess, a juror informed the court that she had inadvertently been

told by the owner of a gun shop [Mike Marcelli] that Barrera's girlfriend had

bought a gun for him in her name. (RT-II 435-436)  Marcelli asked the juror if the

alleged victim in the case was  who owned a restaurant and an audio store.

When the juror replied affirmatively, Marcelli said "You need to stay away from

the family" "That's all I can tell you.  You need to stay away from the family."

(RT-II 438 )  According to the juror, who did not want "them" knowing she was

in chambers, Marcelli told her that Claybon had purchased a .45 because Barrera

did not want any guns in his name. (RT-II 439)

By agreement of the parties, the juror was excused, and the case was

recessed pending additional investigation (RT-II 440-442) whereafter the

following testimony was taken.

### 1.    Marlon Barrera.

Recalled, Barrera testified that after the incident on  March 26th, he went

Marcelli's and bought a Glok.  He told Marcelli that he "didn't know too much"

43

about firearms but needed a gun. Marcelli said that Gloks were reliable. (RT-III 460) Barrera stated that after buying the gun he did not take any training on how to use it other than "tak[ing] the clip in and ut and then loading it." (RT-III 461) According to Barrera this Glok was the first gun he had purchased, although he did admit to "finding" a .22 in his back yard. (RT-III 461-462)

At first, Barrera could not recall having testified previously that the .22 had been given to him as a gift; however on further recollection Barrera stated that the .22 was found in his yard by his landscaper who then "gave" it to him. Barrera kept it in his bedroom drawer. (RT-III 463)

After purchasing the Glok, he and Claybon purchased other pistols. Barrera was going away on a two or three day trip and he so he felt Claybon needed a gun.. They put the gun in her name "because she was gonna be the one left with it when" Barrera was gone. (RT-III 464)

## 2.    Mike Marcelli

Mike Marcell owned an indoor pistol range and gunshop. (RT-III 465) He explained the waiting period and background checks applicable to gun sales. (RT-III 465-466) and testified that on March 27th, Barrera purchased a Glok 9 millimeter in his name. (RT-III 468)   Marcelli also testified that registered aliens can legally purchase firearms in the United States and that Barrera's purchase form had not filled in the box for the alien registration number. (RT-III 470)

44

Marcelli also testified that, subsequently, in August 2003, Elmary Claybon bought a Springfield Armory 1911 .45 in her name. (RT-III 469) Marcelli stated that the S.A. 1911 .45 jams all the time. A trained person could un-jam the weapon in seconds; for someone who was not trained it "could take days" to un-jam it. (RT-III 470) According to Marcelli, Claybon bought the .45 because "she thought the gun was pretty." (RT-III 471)

### D.   Bifurcated Proceedings on Prior Conviction Allegations.

In a bifurcated trial to the court, the allegations of a prior serious/violent felony conviction (Pen. Code, §§ 667.4, subd. (c)(a)/1192.7, subds (c)(8) & (c)(23). for assault resulting in serious bodily injury   (Pen. Code, §§ 245, subd.(a)(1)/12022.7)  were found true with respect to the offenses of conviction. (RT-III 638)