## ARGUMENT

I.  **THE PROSECUTION'S SUPPRESSION OF FAVORABLE & MATERIAL EVIDENCE PREJUDICED APPELLANT'S DUE PROCESS RIGHTS TO A FAIR TRIAL AND TO EFFECTIVE COLLABORATION & ASSISTANCE OF COUNSEL.**

A.    **Relevant Facts.**

It was attested at both trials that, on March 26th, Deputy Marvin Kirkpatrick searched Nickee Shaw's Toyota Corolla (Lic. 3DHK017) located to the right of Barrera's garage, that he removed from the vehicle the items and documents contained in People's Exhibit 2, and that he did not find any guns, ammunition or burglar tools. (RT-B 102; RT-I 181-185)

Following the jury's verdict at the second trial, during the hearings on appellant's *Marsden*[8] request and his *pro se* motion for new trial (Pen. Code, § 1181), it was revealed that the police had failed to disclose their discovery of a "For Sale" sign recovered from Nickee Shaw's car upon investigation of the alleged incidents. (RT-C 257, 262; RT- Marsden[9] [9/27/04], 658)[10]

--------

[8] *People v. Marsden* (1970) 2 Cal.3d 118

[9] There are duplicate transcripts for the 9/27/04 *Marsden* hearing. The second one is paginated 232 to 246.

[10] On 31 October 2005, appellant sent the court a letter accompanied by exhibits in which he presented grounds for a new trial, including ineffective assistance of counsel. (CT 288-315) The court refused to accept the document for filing on the ground that it "doesn't accept ex parte communications." (RT-C 258) However, on 10

At both hearings, defense counsel represented that he had read the police reports and that no mention of any recovered "For Sale" sign was contained in the discovery provided to the defense. (RT [9/27/04], 661; RT-C 258,292) Counsel stated that he felt the non-disclosure "might be an issue for a new trial because the whole trial turned on [ ] credibility." (RT [9/27/04], 662) Counsel stated, "It would have been very easy to have asked one of the officers who looked in his car, if it was there. But there was nothing in the police report to that effect, and I didn't know about it, so that's why I never asked about it." (RT-C 292)

Counsel also stated that, although appellant claimed to have told him about the signs, he had no recollection of his doing so. (RT-C 258)

In his written motion for a new trial, appellant represented that the "For Sale" signs were taken off the windows and placed inside the car when he and Gray had driven to Barrera's house. (CT 299) Appellant also stated that he "couldn't get any of the officers to even say that they looked into the car much less admit they left that [the sign] out of their reports." (CT 299; RT 262)

The motion included a letter from appellant's probation officer, Tamara Hansen, stating that Nickee Shaw had told her about the signs,  that she had

November 2005, when appellant orally moved for a new trial and for appointment of substitute counsel, copies were made and the letter was ultimately treated as a written motion with exhibits. (RT-C 267-270)

"verified" their existence from the officers and that Officer Quinnel "verified that he also saw the signs in the backseat [and] floorboard area of Nickee's car." (CT 315)

**B.**    **General Rule & Standard of Review.**

A defendant's right to due process is violated when the prosecution fails to disclose evidence favorable to the accused that is material to the issue of guilt or punishment. The violation occurs even when the prosecution has not acted in bad faith and the favorable evidence has not been requested. (*Brady v. Maryland* (1963) 373 U.S. 83, 87; *Kyles v. Whitley* (1995) 514 U.S. 419, 432-433; *United States v. Bagley* (1985) 473 U.S. 667, 682; *In re Brown* (1998) 17 Cal.4th 873, 879; *In re Ferguson* (1971) 5 Cal.3d 525, 532-533.)

"The scope of this disclosure obligation extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge 'any favorable evidence known to the others acting on the government's behalf ....' Courts have thus consistently 'decline[d] "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel."'" (*In re Brown*, supra, 17 Cal.4th at p. 879.)

"Evidence is 'favorable' [under *Brady*] if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses." (*In re Sassounian*

48

(1995) 9 Cal.4th 535, 544.) "A prosecutor's duty to disclose evidence favorable to the accused extends to evidence reflecting on the credibility of a material witness.    This includes 'any inducements made to prosecution witnesses for favorable testimony ....' ." (*People v. Kasim* (1997) 56 Cal.App.4th 1360, 1380.)

"Evidence is 'material' [under *Brady*] 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result ... would have been different.' The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court." (*In re Sassounian*, supra, 9 Cal.4th at p. 544; *Strickler v Greene* (1999) 527 U.S. 263, 281-282.)

### C.    Prosecution Suppression of Evidence.

The prosecution's failure to disclose the discovery of "For Sale" signs in Nickee Shaw's car constituted suppression of material, corroborative evidence that would have supported the defense theory of the case.   The prosecution's failure to disclose the sign deprived appellant of a fair trial and also undermined his right to effective assistance of counsel in that the non-disclosure foreseeably and actually cause defense counsel to doubt any representations by his client that a sign existed.

### 1.    Favorable Corroborative Evidence.

The discovery of "For Sale" signs in Nickee Shaw's car was indisputably

49

evidence favorable to the defense because it corroborated appellant's testimony that he had gone to Barrera's house in order to discuss a possible sale of the car. Since there was no other corroboration of appellant's version of the events, the "For Sale" evidence cannot be considered cumulative. Nor can the evidence be considered inconsequential in a case which boiled down to a credibility contest between Barrera and appellant and in which the circumstantial evidence in support of the prosecution's theory was highly equivocal, at best.

To say that the "For Sale" provided corroboration for appellant's testimony is not to say simply that it "backed up" his credibility in some sort of abstract or general way. It did more. It was evidence that appellant was on Barrera's property for a lawful purpose; namely to discuss a sale. It was also evidence that strongly tended to negate appellant's possession of a weapon inasmuch as people do not usually go about armed when engaged in lawful and innocent business. It is noteworthy in this regard that although "For Sale" signs were found in the car, no ammunition or clips or firearm accessories were.

The evidence was "material" and its non-disclosure prejudicial, for the reasons stated in Section D., infra.

## 2.    Undermining of Effective Assistance of Counsel.

The non-disclosure of the evidence subverted appellant's right to effective assistance of counsel because its omission from the police reports

would cause counsel to disbelieve his client and thus forego pursuing corroboration of the defense.     Perhaps a more seasoned or cynical defense attorney would not believe anything said or implied by the police; however, the vice behind *Brady* violations is precisely that at some fundamental level the defense does and is entitled to rely on the assumption that the prosecution has complied with its obligation to disclose all material evidence.  As has been stated often enough, the prosecution's duty is not simply to hunt for convictions but to see that justice is done.  (*In re Ferguson,* supra, 5 Cal.3d, at pg. 531.) "The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation."(*U.S. v. Payne* (2d Cir. 1995) 63 F.3d 1200, 1208; *In re Brown,* supra, 17 Cal.4th, at pg. 879.)  In light of that presumption the non-disclosure of a sign could but be taken as a warranty that no such evidence existed.

It has long been recognized that effective assistance of counsel requires, *inter alia*  sufficient consultation with the accused and adequate investigated the facts and the law by counsel. (*People v. Marsden,* supra, 2 Cal.3d, at pg. 124; *Brubaker v. Dickson* (9th Cir. 1962) 310 F.2d 30, 32.)  Whether insufficient consultation is due to counsel's personal omission or, as in this case, through a from of subversion, the failing impacts the investigation of the case and ultimately the trial itself.

51

Clearly, eliciting corroborative evidence was important to the case and, as stated by defense counsel, he would have done so had he known of the sign's existence. But it goes without saying that no prudent attorney would inquire as to the existence of a "For Sale" sign on cross-examination, at trial, in front of a jury, without first ascertaining the answer to be expected. Thus, in the absence of pre-trial, party depositions, defense counsel was entitled to rely on the assumption that the prosecution had disclosed all material evidence. That assumption coupled with the absence of any mention of a sign would cause counsel to disbelieve appellant to the detriment of appellant's right to effective and full presentation of all evidence in his favor and in support of the defense case.

### D.    Materiality & Prejudice.

Under *Brady*, evidence is considered "material" when there is a reasonable probability that the outcome of his trial would have been different had defendant received the requested discovery. (*United States v Jojayan* (9th Cir 1995) 8 F3d 1315, 1322.) Put another way, petitioner must show that the excluded evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. (*Kyles v. Whitley*, supra, 514 U.S., at pg. 435.)

Such was the case here. Evidence that was critically corroborative to

appellant's version of the events was suppressed; and as the adage goes, "For want of a nail, the battle was lost."

The prosecutor opposed appellant's new trial motion on the ground that "Had the jury believed Mr. Nordloff's testimony, he wouldn't be sitting where he's sitting now. The fact that they rejected [his] testimony I think says a lot about Mr.Nordloff's credibility, and about the lengths that he's prepared to go to save his own skin." (RT-C 290.) However, the same line of reasoning says a lot about the critical materiality of the suppressed "For Sale" sign.

Considering appellant's testimony worthless, the prosecutor went on to state that he was "flabbergasted during the first trial and flabbergasted during the second trial that the jury don't [sic] drop Mr. Nordloff like a brick." (RT-C 290) But the jury didn't and despite two bites at the apple, the prosecution was still unable to prove its principal charge. In closing arguments, both sides conceded that the case was essentially a credibility contest between two witnesses. The jury evidently had serious doubts about the prosecution's star witness, Marlon Barrera and just as evidently gave serious consideration to appellant's version notwithstanding his impeachment with a prior felony conviction. In such a tightly balanced case, corroboration that appellant had in fact gone to Barrera's to discuss a car sale was indeed the nail that would tip the scales.

### 1.    First Trial.

In closing argument at the first trial, the prosecutor began by telling the jury that its task was "to decide which one -- which one is lying to you" (RT-B 129.)  The prosecutor noted that only Gray and appellant had suffered prior convictions. (RT-B122)  He then argued that "There's basically two different stories of what happened. ... It's going to come down to who you believe." (RT-B 139)   Acknowledging that the appellant's defense was based on his allegedly innocent presence at the house in order to sell a car (RT-B 147), the prosecution countered that the real reason for being on the premises was that Gray and appellant "were looking for a place to burglarize." (RT-B 153.)  The prosecution concluded by stating that appellant had put his credibility at issue and that "he is lying through his teeth." (RT-B 155)

The jury was not so sure and its deadlock indicates that it was unable to resolve the underlying question of whether appellant was on the premises for an innocent or an unlawful purpose.  While its  10:2 inclination to acquit on the burglary charge could be attributable to the lack of direct evidence of presence in the house, the jury's equally strong inclination to acquit on the subsidiary charge of attempted burglary indicated a disinclination to believe that appellant was up to anything wrong.  The jury's 11:1 inclination in favor of guilt on the charge of car theft was due in part, no doubt, to the fact that there was no

dispute that appellant had physically driven off in the car. A verdict depended on whether the jury accepted or rejected appellant's necessity defense and in turn depended on appellant's purpose in being on the premises. These splits, indicate that the jury had doubts as to the reason appellant was on Barrera's property and that they were tending to resolve these doubts inconsistently.

The same doubt necessarily enshrouded the gun possession charge in Count II. It is common sense that people do not arm themselves in order to show a car to a potential buyer whereas people who are intent on committing a burglary often do. Thus, the likelihood of being armed also depended on the purpose of the visit. The fact that the jury ended up compromising on the middle ground of gun possession, underscores how important the missing "For Sale" was in terms of resolving the case.

The prosecution's case did not simply "forget" the existence of a "For Sale" sign, the stipulation concerning the items recovered from the car during Deputy Kirkpatrick's search ruled out, by omission, the existence of such a sign, and the absence of such evidence was specifically relied upon by the prosecution.

In closing argument, the prosecution argued the absence of any testimony from Nickee Shaw to corroborate the intent to sell a car. The defense, he said, had "No corroboration. No corroboration at all on these *significant things* that

55

he [appellant] discusses." (RT-B 136 [emphasis added].)    Significantly, the foreperson informed the court, that absent "additional evidence" the jury would remain hopelessly deadlocked. (RT-A 43-44)  That additional evidence was the suppressed sign which was critically material to the outcome of the case.  Had the jury been presented with that corroborative evidence, it is reasonably probable that they would have concluded that appellant's purpose in going to the house had been to discuss a car sale and, consequently, that would have had no cause or reason to be armed.

### 2.    Second Trial.

The same dynamics operated with respect to the charges tried at the second trial. Here again, the prosecutor stated that the crime either did or did not occur depending on who lied and who was believed. (RT-III 515)  Defense counsel argued that "Barrera lied" (RT-III 531) and the prosecution rejoined that "it's Nordloff's credibility that's at issue." (RT-III 543-544)

In arguing against appellant's version of the events, the prosecutor repeatedly cited the lack of corroboration, stating that  Gray's testimony "d[id] not corroborate"  a plan to sell the car (RT-III 515) and that "[t]here's no corroboration for the defendant's version of the events" (RT-III 519; see also 528-529)

To say that there was no corroboration was, in effect, to state that there

56

was no "hard evidence" to contradict the prosecution's theory of the case which was entirely based on a guilty explanation of circumstantial evidence. There was no evidence of an entry, but *if* one believed a burglary had occurred that would be at least consistent with the arguably messy condition of the house. Similarly, *if* a appellant had gone to the house planning a burglary it would be "reasonable to be armed." (RT-II 516) Following this theory through, it would be reasonable to conclude that, being armed, it was appellant who assaulted Barrera.

Again, the purpose of the being at the house was critical to the case. Thus, in addition to scoring the lack of corroboration, the prosecution sought to argue against the plausibility of appellant's version, stating that appellant had parked the car "people passing on the road" wouldn't see it and asking rhetorically, "Wouldn't it be reasonable to put the car in a position where the person who's gonna buy the car could at least take a look at it." (RT-III 547) Perhaps the prosecution was thinking of cars bearing "For Sale" signs; for in such a case the seller would want passerby to notice a car for sale. But displaying For Sale signs and parking cars in a position visible to the general public would not be necessary when individual sale was contemplated. Nevertheless, the prosecution's "attack" against appellant's claim that he had gone to the house to sell a car demonstrates how important it was for the prosecution's case to discredit that claim. It was only by destroying that claim

that Barrera's far from sterling credibility could acquire a comparative advantage.

On its second bite, the prosecution was able to make some progress in proving up its case, although it still failed to reach the core charges of burglary and assault. The jury's refusal to convict of burglary indicated that it was not prepared to make circumstantial leaps based on degrees of domestic messiness. Its failure to convict on the assault charge or firearm allegations indicated that it simply did not credit Barrera's testimony. It evidently returned verdicts based on undisputed and admitted facts, namely: appellant *was* on Barrera's property and *had* taken his brother's car. Encompassed in those verdicts was a finding that appellant was on the property for an unlawful purpose and, by extension, that his taking of the vehicle was not excusable; in other words, they disbelieved appellant's uncorroborated claim to have gone to the house to make a sale. Given the fact that they already disbelieved Barrera, the "For Sale" sign was that additional concrete corroborative evidence that would have given them a plainly factual anchor for accepting appellant's version.

### 3. Summation.

Although a jury's *ratio decidendi* will vary in accordance with the complexion and particulars of each case, the reasoning was essentially the same at both trials. Two juries had manifested a disinclination to believe Barrera or to

make guilty circumstantial inferences. [11]    Although approaching the issues from somewhat opposite ends, both juries focused on the reason for appellant's being at the house.  In the first trial, the jury couldn't quite say it was for a guilty purpose; at the second trial, they couldn't quite say it was for an innocent one.  At both trials a large amount of time was spent examining witnesses who either testified inconclusively on forensic evidence or who bolstered or impeached some tangential or circumstantial question bearing on credibility.  But volume is not quality and through the thick and thin of trial, the seemingly small but actually critical and material evidence remained suppressed, rendering the verdict untrustworthy and depriving appellant of his right to a fair trial, effectively investigated and defended.

---

[11]    They evidently adhered in earnest to the instruction requiring adoption of any reasonable, innocent interpretation of circumstantial evidence.

**II.    THE COURT'S INSTRUCTION THAT THE JURY COULD CONSIDER APPELLANT'S SUPPRESSION OF EVIDENCE AS CONSCIOUSNESS OF GUILT WAS ERROR UNDER STATE LAW, LIGHTENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED APPELLANT'S FEDERAL DUE PROCESS RIGHTS; AND THE FAILURE OF DEFENSE COUNSEL TO OBJECT THERETO DEPRIVED APPELLANT OF HIS RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL.**

### A.    Procedural & Relevant Facts.

At both trials, per prosecution request, the court instructed per CALJIC No. 2.06, that if the jury found that appellant had suppressed evidence it could consider that fact as showing a consciousness of guilt.[12] (CT 99, 201) Defense counsel did not object to the instruction at the first trial, but objected to it at the second. (RT-II 330, 428, 431.)

### B.    General Rules & Standards of Review.

#### 1.    Court's Duty to Correctly Instruct.

The trial court must instruct on the general principles of law relevant to the issues raised by the evidence and which are necessary for the jury's understanding of the case. (*People v. St. Martin* (1970) 1 Cal.3d 524, 531; *People v. Enriquez* (1996) 42 Cal.App.4th 661, 665) In addition, the trial court should

---

12   As given, CALJIC No. 2.06 reads: "If you find that a defendant attempted to suppress evidence against himself in nay manner, such as by [strikeout] concealing evidence, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide." (CT 99, 201)

give such correct and applicable instructions as may be requested by a party (Pen. Code, § 1093, subd. (f) [upon party's request, court "shall" instruct jury "on any points of law pertinent to the issue"].) An appellate court reviews a trial court's instruction independently. The underlying question is one of law, involving determination of applicable legal principles. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217.)

### 2.    Instructions in Violation of Due Process.

An instruction which states an erroneous presumption and/or lightens the prosecution's burden of proof on a fact/element necessary to guilt violates a defendant's right to due process to a fair trial and proof beyond a reasonable doubt of all charges. (*Francis v. Franklin* (1985) 471 U.S. 307, 313.)

### 3.    Deprivation of Effective Assistance of Counsel

The state and federal constitutions guarantee an accused the right to effective assistance of counsel at trial. (*Strickland v. Washington* (1984)466U.S. 668,684-685;*People v. Pope*, (1979) 23 Cal.3d 412, 422; *People v. Ledesma* (1987) 43 Cal.3d 171, 216, 218.)   Reversible ineffective assistance of counsel is established when it is shown that trial counsel  failed to perform with reasonable competence and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings. (*Strickland*, supra, at pp.  687, 691-692; *Ledesma*, supra, at pp. 216,  217-218 .)

**C.**    **The Trial Court Erred in Instructing per CALJIC No. 2.06 because there was no Foundational and Predicate Evidence that Appellant had sought to Suppress Anything.**

The court erred in giving a suppression of evidence instruction because (1) it implicitly presumed the antecedent fact of possession which was at issue in Counts II, III and the special allegations and (2) because there was no foundational showing or evidence that a gun had been suppressed or that appellant was connected to any such suppression. As a result the instruction was an improper argumentative instruction that incorporated the prosecution's theory of the case and lightened his burden of proof.

**1.**    **No Connection of Appellant to Any Act of Suppression.**

CALJIC No. 2.06 is a specific implementation of Evidence Code section 413 which provides that, "[i]n determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's ... willful suppression of evidence relating thereto, if such be the case." However, "[i]t is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference." (*People v. Carmen* (1951) 36 Cal.2d 768, 773; *People v. Saddler* (1979) 24 Cal.3d 671, 681; *People v. Hannon* (1977) 19 Cal.3d 588, 597; *People v. Wilson* (2005) 36 Cal.4th 309, 330.) Whether particular facts constitute

62

an act or attempt at suppression such as would support an inference of consciousness of guilt is a question of law.which must be resolved by the trial court before such an instruction can be given to a jury." (*People v. Hannon, supra,* 19 Cal.3d, at pp. 597-598.)

As argued by defense counsel at the second trial (RT-II 431), there was no evidence at either trial that appellant had sought to dispose of a weapon. The fact that one could speculate that  he done so is immaterial because the law requires more than speculation. Before a suppression instruction can be given there must be facts in the record that "supply the necessary nexus between defendant and the alleged suppression of evidence." (*Hannon,* supra, at pg. 599.)  Here there was no such nexus. The cases upholding the giving of an instruction per CALJIC No. 2.06 illustrate the necessity and nature of an affirmatively appearing nexus.

A suppression instruction has been found proper where, shortly after the crime, the defendant shaves his head and beard (*People v Echevarria* (1992) 11 Cal.App.4th 444, 451; *People v. Huston* (1989) 210 Cal.App.3d 192) or where he refuses to participate in a lineup (*People v. Johnson* (1992) 3 Cal.4th 1183, 1235) or where an escaped convict ditches his prison garb into the ocean (*People v. Cooper* (1991) 53 Cal.3d 771, 797-798, 833).

In *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, the evidence showed

63

that the day after a shooting, a friend of the defendant's asked defendant's neighbor, to keep a gun for Fitzpatrick in exchange for some cocaine. The neighbor went to Fitzpatrick's apartment and was given a shotgun or rifle. She put the gun inside her pants, took it home and hid it in a closet. A day or two later, Fitzpatrick and some friends came to her apartment to get the gun. (*Id.*, at pg. 1289.)

In *People v. Rodrigues* (1994) 8 Cal.4th 1060, the victim of a kidnapping at knife point, "felt a rush of air as if the rear window had been rolled down. Although she did not see defendant throw the knife out, she did not see the knife in the car again. (*Id.*, at pp 1098, 1140.)

Similarly, in *People v. Wilson*, supra, 36 Cal.4th 309, the evidence that defendant had attempted to destroy the murder weapon was his confession to the police, that after he shot he shot the victim he threw the gun out the car window as he drove on the freeway. (*Id.*, at pg. 331.)

In each of the foregoing cases there was, at a minimum, circumstantial evidence that the defendant had engaged in an act of getting rid of something he was seen to have possessed or admitted possessing. In each of these cases, these evidenced acts of suppression were separate from and in addition to any initial act of previously possessing the thing suppressed.

In the present case, there was no such evidence of suppression even

64

assuming *arguendo* that appellant had possessed the gun based on Barrera's say so. The "mere opportunity" to suppress evidence does not provide the requisite factual foundation for the instruction. (*People v. Terry* (1962) 57 Cal.2d 538, 566.) In *Terry*, the court held that proof of a criminal defendant's "mere opportunity" to authorize a third person to attempt to influence a witness "has no value as circumstantial evidence" that the defendant did so. (*Id.*, at p. 566; cited with approval in *People v. Williams* (1997) 16 Cal.4th 153, 200-201.) Similarly, here, the fact that he possessed it and *could* have thrown it away did not legally imply that he *did in fact* throw it away.

The absence of anchored evidence leaves the issue free floating in the world of speculative inferences. It might just as easily be "inferred" that appellant took the gun with him to Nevada and left it there on his return so as not to risk a separate charge of being a felon in possession of a firearm.

Nor was the instruction "saved" by its initial conditional clause allowing the jury to determine the predicate fact of suppression because the cases cited hold that that determination must be made preliminarily by the court.

### 2. Implicit Presumption as to Fact/Element of Possession.

However, the equally serious and critical defect of the instruction was not just that it was based on speculation as to an act of suppression but that it implicitly assumed a prior act of possession which was the ultimate issue in the

65

charges of armed assault (Count II) and possession of a firearm (Count III). In this manner, the instruction created a tacit presumption which lightened the prosecution's burden of proof on an element. (*Francis v. Franklin,* supra, 471 U.S. 307, 313 [due process prohibits relieving state "of its burden of persuasion beyond a reasonable doubt of every essential element of a crime"]; *Rose v. Clark* (1986) 478 U.S. 570, 579-581; *Yates v. Evatt* (1991) 500 U.S. 391, 403 [overruled on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, footnote 4].)

The instruction's so-called "savings clause" allowing the jury to "find" an act of suppression prior to drawing an inference therefrom did not remediate the defect because the instruction still presumptively incorporated the further antecedent fact of possession. It is no counter-argument to state that, well, the jury would have understood, after all, that is was supposed to decide whether or not appellant had possessed a gun as charged. To say as much is no more than to wave away the effect of contradiction on speculation that the jury did the right thing, in the end, somehow. This sort of speculation is not allowed. As explained in *Franklin,* language that merely contradicts and does not explain an infirm instruction will not suffice to absolve the infirmity since "[a] reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." (*Francis v. Franklin,* 471 U.S, supra, at p. 322; see *United States v. Stein* (9th Cir. 1994) 37 F.3d 1407, 1410; "[w]here two

66

instructions conflict, a reviewing court cannot presume that the jury followed the correct one."], [overruled on another point in *Roy v. Gomez* (9th Cir. 1996) 81 F.3d 863, 866- 867].)

Appellant submits that CALJIC 2.06 should not be given where possession is an element of the charges to be proved, since it must necessarily presume the antecedent existence the fact/issue at trial. In this case, by tacitly assuming the truth of the prosecution's allegation and Barrera's testimony that it was appellant who held the gun, the instruction gave rise to a vicious circle in which the absence of evidence would be used to give rise to inference of suppression which would imply a bad conscience which in turn was used to bolster the initial presumption that appellant had broken the law, as alleged, by possessing and brandishing a gun.

### D.    Counsel was Ineffective for Failing to Object to the Suppression Instruction at the First Trial.

From what has been said in the preceding section, the giving of the suppression instruction was legal error and objection thereto was meritorious had counsel objected to it at the first trial. Objection to the instruction was in appellant's interests because, as discussed, the instruction implicitly assumed a critical, guilty fact: ie. that appellant *had* possessed a gun previous to disposing of it. Although the instruction concerned an optional *inference* from that fact,

67

the inference was based on the assumed existence of a fact that constituted the essential element of guilt in Counts II and III -- assault with and possession of- a gun. From a defense perspective the instruction was simply a poison pill.

Furthermore, counsel's objection to the instruction at the second trial, demonstrates that there could be no strategic purpose in not objecting to it at the first. In fact, given that Count III remained as yet unproved at the first trial, there was all the more reason for objecting to the instruction. The evident fact of the matter is that counsel failed to assert a meritorious objection and, realizing his mistake, corrected the mistake at the second trial.

Counsel's failing was prejudicial to the result in that there is a reasonable probability that, absent counsel's error, the fact finder would have had a reasonable doubt respecting guilt" (*Strickland*, at pg. 695; *Ledesma*, at pp. 217-218) for the reasons stated in Section E.1 below and incorporated herein.

**E.    This Court Should Reach the Issue Notwithstanding Lack of Objection at the First Trial and independent of Any Ineffective Assistance of Counsel Claim.**

"The fact that a party, by failing to raise an issue below, may forfeit the right to raise the issue on appeal does not mean that an appellate court is precluded from considering the issue." (6 Witkin & Epstein, *supra*, Reversible Error, § 36, p. 497.) Generally, whether or not an appellate court should excuse the lack of a trial court objection "is entrusted to its discretion." (*People v. Williams*

68

(1998) 17 Cal.4th 148, 161-162, fn. 6.)

Appellant submits that, apart from any ineffective assistance of counsel claim, this Court should reach the issue of whether the court erred in giving a suppression instruction at the first trial notwithstanding the absence of an objection.    First, the issue concerns a jury instruction error which may be reviewed, without objection below, if the error affects the substantial rights of the defendant. (Pen. Code § 1259; *People v. Harris* (1981) 28 Cal.3d 935, 956; *People v. Satchell* (1971) 6 Cal.3d 28, 33 fn. 10; *People v. Graham* (1969) 71 Cal.2d 303, 319.)    Second, the issue is preeminently a question of law on undisputed facts both with respect to the instruction per se and with regard to the court's obligation to determine the foundational pre-requisites for giving it.

## F.    Prejudice.[13]

### 1.    First Trial.

In so far as the giving of the instruction was error under state law, it was prejudicial under *People v. Watson* (1956) 46 Cal.2d 818, 836 because it is reasonably probable that absent the instruction the jury would not have

---

13    In this section, appellant separately argues *Watson* prejudice with respect to each trial.   However, with respect to the first trial, the argument is also directed to demonstrating prejudice under *Strickland.*    The contours and core-facts of the argument is the same in either case; and, while the *Strickland* standard of prejudice may not be entirely identical to the *Watson* standard they are sufficiently similar that no real purpose would be served by a wholesale repetition of the analysis.

convicted appellant of possessing a firearm.    As already discussed, before something can be discarded, it must first be possessed.    By giving the instruction, the court implicitly presumed the existence of an element of the charges.    That, the jury was swayed by this tacit presumption is shown by their deadlocks on all other allegations.    But for the court's instruction presuming the fact of possession, it is reasonably likely that the jury would not have returned a guilty finding on Count III.

In addition, as already discussed, the prosecution's case was, if anything, underwhelming depending, as it did, on the testimony of one not very credible witness.    It is precisely in such circumstances that an erroneous suppression instruction is found to be prejudicial.    (*People v. Hannon,* supra,19 Cal.3d , at pp. 602-603.)

In *Hannon,* the court held that the erroneous giving of a suppression instruction was prejudicial where the case was balanced on the credibility of two opposed witnesses.    In that case, the prosecution's "case ultimately rested on one key factor" -- namely a witness's identification of defendant as the assailant and attempted robber of a third party victim.    The defense case rested on the testimony of an opposed alibi witness.    (*Id.,* at pp. 602-603.)    Into this credibility contest, the prosecution introduced evidence that the defense alibi witness had refused to talk to the D.A. investigator. Based on the witness's refusal, without

70

more, the prosecution procured a CALJIC 2.06 instruction to the effect that the defendant had suppressed evidence by urging the witness not to talk to the prosecution's investigator. Because there was no evidence that the defendant had in fact urged such a thing, the court ruled that the instruction was improperly given and because the case was otherwise evenly balanced, the error tipped the scales and was prejudicial under *Watson*.

The balance of the present case stood in the same equipoise, so that under *Hannon* the giving of the instruction was error even without reference to the fact that it contained a hidden presumption which begged the issue at trial. Analysis of the jury's reported deadlocks shows how it was pulled in diametrically contradictory directions depending on which of two opposed witnesses were to be believed.

The jury overwhelming rejected (10:2) any verdict on Count I. To that extent it was inclined to reject not only the charge of burglary but also the existence of any intended, attempted burglary on appellant's part[14] and, by the same token the harboring of an unlawfully intended purpose. This leaning of the jury pointed to innocent presence on the property and, concomitantly, to an unarmed presence. This aspect of the jury's leaning rejected the prosecution's circumstantial arguments and was inclined to believe appellant's version of the

---

14  The jury was instructed on attempt per CALJIC No. 6.00. (CT 227)

events.

However, the jury was also inclined to accept (11:1) that appellant had at least assaulted Barrera. While it is always possible that Barrera could have pulled out a gun during a fight, on the testimony in the case it is more likely that whoever initiated the assaulted also had the gun. This aspect of the jury's leanings tended to credit Barrera and by reasonable extension would tend to reject the theory of an innocent presence on the property.

In this case not only was the jury deadlocked on specific counts, its own deadlock was deadlocked. The significance of this deadlock lies not just in the numbers but in the jury's probable reasoning process. There is no basis for assuming that the jury *began* its deliberations with the two inconsistent breakdowns. What appears far more likely is that, after deadlocking on the burglary issues, the jury then accepted the fact of appellant's gun possession and from that point of departure moved toward the 11:1 breakdown on the assault. Eleven members would have followed the logic that if appellant possessed the gun he used it to assault Barrera. The holdout followed the equal but opposite logic that if appellant had possessed a gun he wasn't on the property peddling the Second Coming.

The question of who possessed the gun was the fulcrum of the case's evidentiary see-saw, and this question in turn depended on whether appellant or

72

Barrera were believed -- not "in general" but on the core and primary question of who had the gun. As previously noted, both sides characterized the case as credibility contest and in this connection the prosecution argued in closing that appellant's suppression of the gun showed consciousness of guilt. (RT-C 205-206) It was into this equivocal state and taughtly balanced equipoise of the case that the prejudice of the erroneous instruction has to be assessed. Consciousness of guilt instructions are usually found harmless when their inference is tangential to the evidence in the case. However, as *Hannon* instructs, the case is otherwise when the evidence is so equally balanced that the outcome depends on that slight straw that tips the weight of credibility in favor of the prosecution.

For the same reasons, in so far the court's suppression instruction constituted federal due process error, it cannot be said beyond a reasonable doubt that the error did not contribute to the jury's verdict. (*Yates v. Evatt,* supra, 500 U.S., at pp. 402-403.)

Similarly, with respect to counsel's failure to object to the instruction, that omission renders the verdict reached untrustworthy so that it cannot be said that appellant was accorded a trial that was both fair in its conduct and reliable in its result. (*Strickland*, supra, at pp. 684-687.)

### 2.    Second Trial.

Essentially the same credibility contest between appellant and Barrera recurred at the second trial.  Any supposed advantage the prosecution might have gained by the emergence of Barrera's putative half-brother was offset by the disclosure of Barrera's illegal entry into the country and false statements to obtain identification.   The second jury's deadlocks and verdicts indicate that it was disinclined to believe either witness and that it sought to base it's findings on some hard, undisputed fact.

Accordingly, the jury declined to find burglary because there had been no hard proof of an entry and it evidently discredited the prosecution's circumstantial argument and Barrera's claim of missing property.   At the other end of the story, the jury found that appellant had taken Velasquez's vehicle because he admitted that act.  But between the extremes of these two *actus reus* findings, (i.e., no act of entry and an act of taking), the jury found against appellant on the mental state issues.  It's verdict on the car theft, implicitly rejected the defense of necessity and its verdict on attempted burglary evidently accepted that appellant was on the property for no good reason.   In short, the jury rejected appellant's innocent explanations.

However, this rejection of appellant's story was not at all due to the jury's acceptance of Barrera's testimony.   Far from being corroborated, Velasquez's

74

testimony actually undercut Barrera's.  So intense was the jury's  distrust of

Barrera's credibility that notwithstanding their non-acceptance of appellant's

story they refrained from finding an assault, as Barrera claimed.  Thus, the jury

cannot be said to have disbelieved appellant's version on the basis of believing

Barrera.  The question then arises why the jury disbelieved appellant?  The

answer is that the court's consciousness of guilt instruction, which related

directly to appellant's mental state, was the factor that led the jury to conclude

that whatever appellant did or did not do, he was up to doing something guilty.

As previously discussed, the instruction tacitly presumed the fact of gun

possession and this fact was consistent with and supportive of being on the

property for an unlawful or at least nefarious purpose.  Under the instruction, the

jury was allowed to find that because no gun was ever found, appellant had

disposed of it.  As pointed out, that inference of suppression, was unfounded

and speculative.  But it was that inference which supported the key finding that-

- by conduct -- appellant admitted being on the property for an unlawful purpose.

That finding made, there could be no legitimate excuse of necessity to flee in the

vehicle.

In sum, but for the instruction, it is reasonably probable that the result of

the second trial would have been otherwise.  (*People v. Watson,* supra,46 Cal.2d,

at pg. 836.)  For the same reasons, it cannot be said beyond a reasonable doubt

that the error did not lighten the prosecution's burden or contribute to the verdicts rendered. (*Yates v. Evatt,* supra, 500 U.S., at pp. 402-403.)

## III. THE COURT ERRED IN FAILING TO GIVE APPROPRIATE ACCOMPLICE INSTRUCTIONS.

### A. Procedural & Relevant Facts.

#### 1. First Trial.

In limine, the prosecution sought to call appellant's alleged accomplice, David Gray, in order to impeach him with prior statements. (RT-B 48, 53) Gray, who had been caught after fleeing through a neighboring yard, subsequently pled guilty to burglarizing Barrera's house in exchange for a grant of probation. (RT-B 48)    According to the prosecution, Gray previously admitted to sheriff investigators that he had arrived at Barrera's house in the car "parked over by where the shots were fired" from and that he did not have a gun. (RT-B 55)

Called to the stand, at a 402 Hearing (Evid. Code, § 402) Gray testified that he had been taking drugs and binge drinking on March 26th and that he could not recall anything except that he awoke in jail and that he later changed his plea to something. (RT-B 50-53)

The trial court found that Gray's failure of recollection was willful and, over defense objection that Gray's statements did not implicate appellant,

allowed the prosecution to call Gray as a witness and to impeach him with his prior statements that he was present at the scene, that he heard gun shots and the he did not have a gun. (RT-B 54, 58-59)

Before the jury, Gray admitted knowing appellant and Nickee Shaw; however he could not recall being with appellant on March 26th, or going to Barrera's house, or hearing gunshots, jumping over a fence, running into a swamp. He was unable to identify Nickee Shaw's car and could not remember if he told officers that he had been walking by the house and hearing shots. (RT-B 70-73) Over defense objection, Gray was allowed to admit to having pled guilty to burglary of Barrera's house (RT-B 73)

Deputy Braud testified that Deputy Quinnel told him that, upon being taken into custody, Gray stated that he did not have a gun that he was not involved "in anything like that" and that he had just been walking by in the neighborhood whereupon, hearing shots, he jumped over a fence and started running. (RT-B. 99)

### 2.    Second Trial.

At the second trial, the same motions and objections were apparently renewed[15] and the court allowed Gray to be questioned and impeached with his

---

15 There was no "402 Hearing" and the court never explicitly ruled that Gray's failure of recollection was willful and evasive. (Supp RT 35-37) However, the prospect of Gray's testimony was discussed *in limine* during which the prosecution stated that "an

prior inconsistent statements. (Supp. RT 33-37)    However, although Gray was recalled to stand, and again failed to recollect anything of substance, as before, (RT-I 140-147) Deputy Braud was not asked about Gray's prior inconsistent statements. (RT-I 80-89; RT-II 319-320.)    However, over defense objection, Detective Quennell testified that upon his arrest Gray stated that he had got to the area in a vehicle which was parked over where the shots had been fired." (RT-II 353-354) Braud testified that he searched the swamp area for a .45 because Dana Porter had told him that Gray had a bulge in the front pocket of his sweatshirt. (RT-II 321)

## B.    General Rule & Standard of Review.

The trial court's duty to correctly instruct *sua sponte* on all applicable, fundamental principles of law, as are warranted by the evidence (*People v. Barton*    (1995) 12 Cal.4th 186,194-195; Pen. Code, §§ 1093, subd. (f), 1127) includes giving instructions on the    definition of an accomplice and the rules governing accomplice testimony.  (*People v. Gordon* (1973) 10 Cal.3d 460, 470.)

---

argument" could be made that Gray's non-recollection was not candid, to which the court replied "Okay sure" (Supp RT 36)    Whether a witness's failure of recollection is willful and renders him "unavailable" is a foundational question that must be resolved by the trial court prior to admitting inconsistent statements for the truth of the matter. (*People v. Johnson,* supra, 3 Cal.4th, at pg. 1219.)    For purposes of the present argument, appellant assumes *arguendo* that the requisite foundational findings were made; but otherwise asserts that admission of Gray's inconsistent statements at the second trial was improper and prejudicial for the reasons stated in the main text.

An appellate court reviews a trial court's instruction independently. The underlying question is one of law, involving determination of applicable legal principles. (*People v. Alvarez,* supra, 14 Cal.4th, at pg. 217.)

### C.    The Court Erred in Failing to Instruct Sua Sponte that the Jury should distrust an Accomplice's testimony and not base Conviction thereon unless it was corroborated.

When the evidence at trial would warrant the jury in concluding that a witness was an accomplice of the defendant in the crime or crimes for which the defendant is on trial, the trial court must instruct the jury to determine if the witness was an accomplice. If the evidence establishes as a matter of law that the witness was an accomplice, the court must so instruct the jury, but whether a witness is an accomplice is a question of fact for the jury in all cases unless 'there is no dispute as to either the facts or the inferences to be drawn therefrom.' (*People v. Garrison* (1989) 47 Cal.3d 746, 772.) In either case a jury is to be instructed that the testimony of an accomplice is to be viewed with distrust and that the defendant may not be convicted on the basis of an accomplice's testimony unless it is corroborated. (*People v. Zapien* (1993) 4 Cal.4th 929, 982.)

On the facts of the present case, it could not be stated that Gray was an accomplice as a matter of law on undisputed facts. The essence of appellant's testimony, in this respect, was that he had gone with Gray to Barrera's house in order to sell a car and that while Gray knocked on the house doors, he sat in the

79

car and then played with a dog in the backyard kennel. The import of this testimony was that whatever burglarizing Gray might have done, it was done without the knowledge or intended assistance of appellant. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) The prosecution's case, of course, was that Gray and appellant had collaborated in burglarizing Barrera's house. Thus, the trial court ought to have instructed the jury to determine whether or not Gray and appellant had been accomplices. (*People v. Garrison,* supra, 47 Cal.3d, at pg. 772.)

Concomitantly, the court was required to instruct *sua sponte* that if the jury found that Gray and appellant were accomplices it should view Gray's testimony with distrust and not use it to convict absent independent corroboration. (*People v. Mincey* (1992) 2 Cal.4th 408, 461 [When the prosecution calls an accomplice as a witness, the trial court must instruct the jury that the witness's testimony should be viewed with distrust].)

The fact that, when called, Gray suffered a massive failure of recollection did not mean that no accomplice testimony was offered, because although he did not recall anything of substance at trial, he spoke in fact through his prior inconsistent statements, which were allowed for the truth of the matter stated upon the court's finding that his failure of recollection was in bad faith. (*People v. Sapp* (2003) 31 Cal.4th 240, 296 [statements to investigator]; *People v. Johnson,* supra, 3 Cal.4th, at pg. 1219; Evid. Code, § 770.)

80

The sum and substance of those statements was a self-serving denial, made to the police, that he had committed any burglary or that he had possessed a firearm. Gray's denial of possessing a firearm was of clear benefit to him at the very least in that it removed any firearm enhancement with respect to the burglary charge he ultimately pled to and could but serve to promote his ultimate grant of probation. The adverse consequence of Gray's denial to appellant was that it tended to implicate him in the act of possessing and assaulting with a firearm, which was, in fact, the prosecution's motivating strategy for introducing Gray's prior inconsistent statements.

The situation thus gave rise to a classic case of accomplice finger-pointing in expectation of a possible beneficial penal consequence. Accordingly it was error for the court not to give the required accomplice instructions.

### D.    The Error was Prejudicial.

#### 1.    First Trial

The court's omission of required accomplice instructions is subject to harmless error analysis under *Watson* (supra, 46 Cal.2d, at pg. 836).    The preceding  prejudice analyses are incorporated herein as relevant. The omission was prejudicial to the outcome of the first trial because the effect of  Gray's testimony was to attribute possession of the gun to appellant. This was, in fact, the primary purpose of the prosecution's strategy in calling Gray.

81

The prosecution did not need Gray's statements to prove a taking of Barrera's vehicle since that physical fact was not contested. The prosecution also did not need Gray's testimony to prove an assault on Barrera since the prosecution's own evidence was that Gray was over the fence and out of sight at the time of the alleged assault. Nor did the prosecution need Gray's testimony to prove that appellant had committed a burglary. As discussed *in limine*, Gray's plea and conviction of burglary were admitted only for impeachment purposes and the jury was so instructed. (CT 108, 210) Furthermore, as shown by the fact that the prosecution did not request aiding and abetting instructions, it is evident that it was not proceeding on the theory that appellant had indirectly aided Gray in committing a burglary. Rather, the prosecution's theory was that the alleged ransacking of the house together with appellant's flight and suppression of evidence was sufficient circumstantial evidence to show that appellant himself had burglarized Barrera's house regardless of whatever Gray might or might not have been doing. In fact, Gray was not even mentioned in this portion of the prosecution's argument. (RT-C 203-208) However, the prosecution did use Gray's testimony as proof that appellant had possessed a firearm. The sum and substance of the prosecution's argument on that count was: "But Mr Gray said to Deputy Quinnel that he didn't have a gun. No gun was found on him." (RT-B 128)

There was no dispute that a gun had been fired, although who fired it and under what circumstances were the disputed issues with respect to the assault charge. But were the jury to disbelieve or doubt that an assault had taken place, Gray's testimony would still serve to place a gun in appellant's hands, and that would prove Count III.

That prosecution strategy was exactly what ultimately played out. Although the jury evidently did not use Gray's testimony to corroborate Barrera's, it did use Gray's denial of possession to place appellant in possession of a firearm. Gray's denial of possession was critical to the charge of firearm possession because, as previously discussed, it is apparent that the jury distrusted anything Barrera said. By virtue of the same distrust the jury would not have used Barrera's testimony that appellant had a gun to corroborate Gray's testimony that he did not have one. Thus, in the absence of corroboration, had the jury been instructed that they were required to distrust anything Gray said, it is reasonably probable that they would not have credited Gray's denial and would have either deadlocked or acquitted on Count III

### 2.    Second Trial.

The instructional omission was equally prejudicial to the second trial in that the prosecution relied even more strongly on Gray's testimony to prove appellant's guilt. In closing argument the prosecution argued,

83

"There's no corroboration for the defendant's version of the
events. David Gray is the defendant's friend. ... According to the
defendant, he and Gray did nothing wrong. If that's true why
wouldn't Mr. Gray come in here and corroborate the defendant's
version of the events... Why would he be so forgetful? ..... Why
would Mr. Gray forget that Mr. Barrera was his dude? Why would
Mr. Gray forget that he and the defendant went to Mr. Barrera's
house to sell Nickee Shaw's car? Why would Mr. Gray forget that
Mr. Barrera pulled the gun on him? Why would he, Mr. Gray have
to run away in the first place? .... Why would he tell [Dana Porter]
'Please let me go. I just did something I wasn't supposed to"?
Why wouldn't Mr. Gray be glad to see the police.... These people
are his protectors. Why would he tell them that he was just walking
by the house when he hears shots and jumped over the fence and
down into the swamp to get away? .... *And why would he plead
guilty to the first degree burglary of Marlon Barrera's house* and
run the risk that he'll go to prison for six years...? If the defendant
and Mr. Gray had done nothing wrong, why wouldn't Mr. Gray
come in here and provide you with testimony that would exonerate
his friend?" (RT-III 520)

This line of argument simply used "Gray" as a stand-in for appellant
rhetorically attributing his "guilty" failure of recollection to appellant, and using
his inconsistent statements and guilty plea against appellant.    The essence of
the argument was that if Gray [or appellant] did nothing wrong why would Gray
[or by the same token appellant] run away. The vice of the argument is the
switcheroo which took place when the prosecution asked: if Gray [or appellant]
did nothing wrong, why did Gray [and....?] admit to doing wrong and why did
Gray [and...?] plead guilty to burglary? The clearly intended inference is that *as*
Gray admitted wrongdoing and pleaded to burglary *so* the jury should find and

84

return guilty verdicts against appellant.

The prosecutor's argument demonstrates the great reliance it placed on the "two-peas-in-a-pod" accomplice theory of the case. The argument also demonstrates the improper length to which the prosecution was prepared to go in urging the jury to consider Gray's plea as evidence of his [and by accompaniment, appellant's] guilt. That impropriety was arguably naturalized by the special instruction regard Gray's plea, but there was no cautionary instruction regarding Gray's testimony.

As previously discussed, the second jury was disinclined to believe Barrera's testimony and refused to return guilty verdicts on burglary or assault. It is not reasonable to suppose that the jury then did a *volt face* and believed Barrera so as to find appellant guilty of attempting burglary and of not taking the vehicle out of necessity. If Barrera's testimony was not sufficiently credible to support the burglary and assault counts it was equally incapable of supporting the others. The gravamen of the verdicts returned by the second jury was that whatever else may or may not have been done, appellant (and Gray) were up to no good. Absent corroboration from the "For Sale" sign, *that* conclusion indispensably relied on Gray's testimony. Had the jury been given proper accomplice definitions and instructions, it is reasonably probable they would not have returned the verdicts they did.

85

IV.    THE COURT COMMITTED PREJUDICIAL ERROR BY INSTRUC-
       TING THE JURY ON ATTEMPTED BURGLARY AND IN FAILING
       TO INSTRUCT THE JURY ON THE LAW OF INVITED PUBLIC
       ACCESS.

A.    Procedural & Relevant Facts.

At both trials, without objection from the defense, the court instructed on

attempt (CALJIC 6.0)[16] as a lesser included offense of battery. (CT 115, 227; RT-B

108-113, RT-C 147, RT-II 321-330, RT-II 428-432)  Neither side requested and the

court did not instruct on trespass as a lesser related offense or on the law

governing presence on property pursuant to an implied invitation.

B.    General Rule & Standard of Review.

A trial court is obligated to correctly instruct *sua sponte* on all applicable,

fundamental principles of law, including the prosecution's burden of proof, the

essential elements of the charged offense, as well as such theories of liability,

---

16  The instruction read: "An attempt to commit a crime consists in two elements,
anomaly a specific intent to commit the crime and a direct but ineffectual act done
toward its commission. [ ¶ ]  In determining whether this act was done, it is necessary to
distinguish between mere preparation, on the one hand, and the actual commencement
of the doing of the criminal deed on the other.  Mere preparation, which may consist of
planning the offense or of devising, obtaining or arranging the means for its
commission, is not sufficient to constitute an attempt.  However, acts of a person who
intends to commit a crimes will constitute an attempt where those acts clearly indicated
a certain, unambiguous intent to commit that specific crime.   These acts must be an
immediate step in the present execution of the criminal design, the progress of which
would be completed unless interrupted by some circumstance not intended in the
original design."

86

defenses and lesser included offenses as are warranted by the evidence. (*People v. Barton*, supra, 12 Cal.4th, at pp.1 94-195; *People v. Stewart* (1976) 16 Cal.3d 133, 140; Pen. Code, §§ 1093, subd. (f), 1127.)   The trial court's *sua sponte* duty to instruct on an applicable defense arises "when it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*Barton*, supra, at 195-196.)

Also, as a matter of fundamental fairness and federal due process, "[a] defendant is entitled to an instruction concerning his [or her] theory of the case if it is supported by law and  has some foundation in the evidence." (*United States v. Mason*, (9th Cir. 1990) 902 F.2d 1434, 1438 ; *United States v. Lopez*, (9th Cir. 1989) 885 F.2d 1428, 1434, cert. denied, 493 U.S. 1032, (1990);  *United States v. Zuniga* (9th Cir. 1993) 6 F.3d 569;  *United States v. Escobar de Bright*, (9th Cir. 1984) 742 F.2d 1196, 1201.)

An appellate court reviews a trial court's instruction independently. The underlying question is one of law, involving determination of applicable legal principles. (*People v. Alvarez,* supra, 14 Cal.4th, at pg. 217.)

**C.    The Instructions related to Burglary erroneously included Offenses not supported by Substantial Evidence, omitted the Full Range of Lesser Offense Options supported by the Evidence and failed to Instruct on the Defense Theory of the Case.**

There are three types of lesser offenses: (1) attempts to commit a charged offense; (2) lesser included offenses; and (3) lesser related offenses (*People v. Moses* (1996) 43 Cal.App.4th 462, 466) and the facts of the present case could have supported the following findings:

1.    burglary, by virtue of an inferred entry with larcenous intent,

2.    attempted burglary by virtue of an interrupted or abandoned imminent entry,

3.    trespass onto property by virtue of an unlawful presence on areas not subject to implied invitation, or

4.    innocent presence on areas subject to implied public invitee access.

The trial court erred (1) by instructing on attempt where there was no evidence to support an interrupted or abandoned imminent entry; (2) by failing to instruct on the lesser related offense of trespass and (3) by failing to instruct on the law governing the lawfulness of an implied invitee's entry onto property, without which appellant's defense could not be adequately evaluated. These instructional failures were error under state law and also deprived appellant of his federal due process right to have the jury instructed on the theory of his defense,

88

including all lesser offense options.

### 1.    The Court Erred in Giving an Instruction on Attempted Burglary.

It is settled that a trial court must instruct on any necessarily included offenses or attempts (*People v. Wickersham* (1982) 32 Cal.3d 307, 324.) " 'When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so. [Citations.]' (*People v. Webster* [(1991) 54 Cal.3d 411], 443; *People v. Melton* (1988) 44 Cal.3d 713, 746 [...].)" (*People v. Pham* (1993) 15 Cal.App.4th 61, 67.)

However, "the instruction shall not be given when there is no evidence the offense was less than that charged.(*People v. Daniels* (1991) 52 Cal.3d 815, 868 [277 Cal.Rptr. 122, 802 P.2d 906].)" (*People v. Pham*, supra, at pg. 67.)  Such lesser offense instructions must only be given when there is evidence sufficient to support a conviction on such as opposed to the charged offense, i.e, evidence deserving of consideration that such was lesser than or an attempt of that charged. (*People v. Wickersham*, supra, 32 Cal.3d at pp. 324-325; see also *People v. Bunyard* (1988) 45 Cal.3d 1189, 1232; *People v. Leach* (1985) 41 Cal.3d 92, 10.) In the present case, there was no evidence to support an attempted burglary.

89

The crime of burglary is committed when a person "enters any ... building," including a "house," "with intent to commit ... larceny or any felony." (*People v. Valencia* (2002) 28 Cal.4th 1, 7; Pen. Code, § 459.) However, an entry or some least penetration into the building is required. (*Id.*, at pg 8.)   Thus, to prove a burglary, the prosecution was required to present some evidence of an entry into Barrera's house.

No direct evidence of such an entry was presented. The prosecution's circumstantial evidence of a burglary consisted in evidence of an ordinary mess inside the bedroom plus the fact that appellant was seen in Barrera's back yard and thereafter fled.   On such scant circumstantial evidence, which led only to speculative conclusions and which were reasonably explainable by innocent interpretations, two juries refused to find appellant guilty of burglary.   In this connection, it is immaterial whether or not the prosecution proceeded on an accomplice theory because evidence of an entry by Gray was equally lacking.

However, not every failure to prove a charge automatically defaults to an attempt.   Such an interpretation of what an "attempt" is would effectively allow conviction on less than proof beyond a reasonable doubt -- or perhaps more accurately, conviction for half a loaf on half-baked proof.   In the present case, a jury could have found circumstantial proof of burglary *if* it had given credit to Barrera's ransacking and missing property allegations.   The accepted fact of a

ransacked interior would imply a larcenously intended *entry*. Were that fact accepted it would not mean that a would be intruder was jiggling the door knob; it would mean that the intruder had intruded...and ransacked.   But once that fact is rejected (as it was in this case), there was no basis for assuming an entry at all. Equally, there was no factual basis supporting an ineffectual or abandoned entry. The absence of any evidence of a penetrating entry made it improper to give an instruction on attempt.

By virtue of Penal Code sections 21a and 664, there is for every crime listed in the Penal Code a separate offense, namely, the attempt to commit that crime. The elements of each attempted crime are closely related, but not identical, to those of the corresponding completed offense: to be guilty of an attempt, a defendant must harbor the specific intent to accomplish all elements of the completed offense, and *must perform a direct but ineffectual act in furtherance of that crime.* (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 143, p. 160. [emph. added].)

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (Pen. Code, § 21a.) The act "must go beyond mere preparation, and it must show that the perpetrator is putting his or her plan into action." (*People v. Kipp* (1998) 18 Cal.4th 349, 376.)   Where the undisputed facts clearly established that

91

defendant's hand and arm were inside the house, the entry was proven and defendant was not entitled to an instruction on attempted burglary since such a theory was contrary to the evidence. (*People v. Aguilar* (1989) 214 Cal.App.3d 1434,1436; *People v. Crawford* (1968) 259 Cal.App.2d 874, 879.) On the other hand, "[w]hile trying to break into a house to steal property inside, a man sets off a burglar alarm. Frightened, he leaves without entering the residence. Absent section 664, he would have committed no crime. Under section 664, however, he is subject to prosecution for the crime of attempted burglary." (*People v. Bright* (1996) 12 Cal.4th 652, 686 (diss. Mosk, J.).)

Thus, a trespassory entry into the curtilage cannot qualify as a "preparatory act" because no ineffectual, thwarted or abandoned act of entry has taken place. In the language of CALJIC No. 6.00 there has been no "actual commencement of the doing of the criminal deed" which in this case was an alleged *entry*. The non-occurrence of an entry (and hence the absence of that element being proved) does not default to a trespass because trespass is not a lesser included offense of burglary and the crime of burglary is aimed at preventing entries. (*People v. Valencia,* supra, 28 Cal.4th, at pg. 7-8.)

Based on the foregoing, before appellant could be found appellant guilty of attempted burglary, evidence was required that he had engaged in an abandoned but direct and incipient act of entry. There was no such evidence.

92

Not only was any such inference purely speculative, it was also belied by Barrera's testimony which was that as he drove up to the house, he saw appellant peep out of the yard gate which was at a remove from any entry point to the house. While one could speculate or imagine that maybe appellant was other than where he had been seen to be, such speculation is neither evidence nor fact-based inference. (*People v. Morris* (1988) 46 Cal.3d 1, 19 [reasonable inference cannot be based on supposition, surmise, speculation, conjecture]) Thus, in the absence of substantial evidence, it was error for the court to instruct on the lesser offense of attempt.

> **2.    The Court Erred in Failing to Instruct *Sua Sponte* on the Lesser, Related Offense of Trespass.**

California decisions have long held that, even absent a request and even over the parties' objections, a trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser. (E.g., *People v. Barton,* supra,12 Cal.4th, at pp.194-195; *People v. Sedeno* (1974) 10 Cal.3d 703, 715-716; *People v. Hood* (1969) 1 Cal.3d 444, 448-450; see *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, & fn. 12.)

Although trespass is not a *necessarily* lesser included offense to burglary (*People v. Wetmore* (1978) 22 Cal.3d 318, 327, fn. 8; *People v. Lohbauer* (1981) 29

Cal.3d 364), in *People v. Geiger* (1984) 35 Cal.3d 510 the Court held that a defendant had a constitutional right to instructions on uncharged lesser related offenses. *Geiger* further held that instructions on lesser related offenses, unlike those on lesser necessarily included offenses, can only be given upon the defendant's request or consent and are immune to objection by the prosecution. (*Id.*, at pp. 514, 530-532; *People v. Birks* (1998) 19 Cal.4th 108, 119-120) However, in *Birks*, the Court overruled *Geiger* concluding that *Geiger* "was wrong to hold that a criminal defendant has a unilateral entitlement to instructions on lesser offenses which are not necessarily included in the charge." (*Birks*, at pg. 136) *Birks* therefore held, "that the defendant's request for instructions on trespass as a lesser alternative offense to the burglary charged in Count 1 of the information w[ere] properly refused" (*Birks*, at pg. 137) where there had been evidence that defendant had entered a building but no evidence that he had taken anything and therefore very weak evidence of the requisite specific intent (*id.*, supra, 19 Cal.4th, at pg. 116). In *People v. Breverman* (1998) 19 Cal.4th 142, the Court summarized *Birks* as holding "that a trial court *need not* instruct on lesser related offenses even at the defendant's request, and indeed generally may not do so." (*Id.*, at pg. 183 [emph. added].)

However, the Court's retreat from a mechanistic mandate in *Geiger* did not lead to an equally mechanistic mandate derived from *Birks*. Two years later, in

94

*People v. Waidla* (2000) 22 Cal.4th 690, on a charge of burglary, the Court assumed for purposes of analysis "[u]nder the 'accusatory pleading test' (*People v. Breverman*, supra, 19 Cal.4th at p. 182 (dis. opn. of Mosk, J.)) [that] trespass [c]ould ... be deemed a lesser included offense of the charged burglary" where an entry being conceded there was contested evidence as to whether the defendant had intended to "steal" property to which he believed he had a colorable claim. (*Waidla* , supra, 22 Cal.4th, at pg. 734.) Finding that (1) that defendant had not asserted his colorable claim argument at trial and (2) that "there was no[] substantial evidence that would absolve [defendant] of burglary ... but not trespass ...." the *Waidlaw* court concluded that neither court nor counsel erred in failing to give or request lesser related trespass instructions. (*Id.*, at pg. 736)

Had *Birks* pronounced a categorical rule limiting lesser included instructions to attempts or necessarily lesser included offenses while strictly prohibiting instructions on lesser-related crimes, there would have been no need for *Waidlaw* to expend three pages analyzing, *arguendo*, whether a trespass instruction ought to have been given.

In plain effect, *Geiger* allowed a defendant to frame his own indictment around the prosecution's accusatory pleading. In condemning that result, *Birks* did not veer from the ultimate policy of providing juries with the "full range of

verdicts options " based on crimes and principles "closely connected"with the case. (*Birks*, supra, at pg. 119.) This policy "encourages a verdict, within the charge chosen by the prosecution, that is neither "harsher [n]or more lenient than the evidence merits." (*Ibid; Wickersham*, supra, 32 Cal.3d 307, 324; see *Barton*, supra, 12 Cal.4th at p. 196). *Birks* held that that policy did not require the court to give an instruction on trespass where actual entry was conceded and the only issue was intent. On its facts, *Birks* is distinguishable from the present case and not controlling.

Here, similar to *Waidlaw*, the prosecution charged burglary with the specific intent to commit theft. Appellant conceded presence on the property but denied any entry and taking or any intent to steal. Unlike *Waidlaw*, there *was* substantial evidence that appellant was present for the purpose of trying to sell a vehicle and that was the defense relied upon at trial. "'Substantial evidence' in this context is 'evidence from which a jury composed of reasonable [persons] could ... conclude[]' that the lesser offense, but not the greater, was committed. (*Flannel*, supra, at p. 684, quoting *People v. Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513]; accord, *Barton*, supra, 12 Cal.4th 186, 201, fn. 8 ['evidence that a reasonable jury could find persuasive'].) [ ¶ ] In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. (*Flannel*, supra, 25

96

Cal.3d 668, 684; see also *Wickersham, supra*, 32 Cal.3d 307, 324.)" (*Breverman,*
*supra*, at pg. 162.)

However, precisely because this case involved a range or spectrum of
possible verdicts (as discussed below), substantial evidence that appellant was
on the property in connection with a proposed car sale was also substantial
evidence that appellant was on the property unlawfully. The issue depended on
how the jury construed appellant's purpose for being where he was. In a case
where the prosecution's evidence was circumstantial, equivocal and exceedingly
weak (given the fact that it failed to persuade two juries of the principal charges),
a reasonable jury could have adopted such findings as would have resulted in a
verdict for trespass, as for example by concluding that although there had been
no entry into a building and no actual theft therefrom, there had been an unlawful
entry onto property.

Accordingly, the court erred in not instructing *sua sponte* on the lesser
related offense of misdemeanor trespass.

### 3.    Failure to Instruct on Appellant's Defense of Being an Implied Invitee on the Premises.

It was equally erroneous for the court not to instruct *sua sponte* on the
law governing lawful implied invitee access on property because, on the unique
facts of this case, the lawfulness of appellant's presence on the property was

97

central to the defense and could not be properly considered or credited by the jury unless it was informed of the full range of possible verdicts including not a not guilty verdict based on a lawful entry onto property.

Over a century ago, the California Supreme Court explained the crime of burglary stating that "a party who enters with the intention to commit a felony enters without an invitation. He is not one of the public invited, nor is he entitled to enter." (*People v. Barry* (1892) 94 Cal. 481,483; *People v. Davis* (1998) 18 Cal.4th 712, 721.) To this day, burglary is commonly perceived to be an uninvited entry. From that concept of burglary (which is a legally correct formulation) a layperson could have concluded that, although there was no entry -- and hence no burglary -- there had still been an uninvited presence, preceding a *potential* entry, *ergo* an attempt. But, as argued above, an attempted burglary does not consist simply in being "uninvited" on property or being in a place from where an entry might be made. In so far as it may have constituted guilty conduct, appellant's presence on the property could at least as easily have been a simple trespass. Whether or not appellant's presence amounted to a trespass depended on whether appellant had been "invited" onto the property.

Assuming arguendo that attempt instructions ought to have been given at all, no unskewed assessment of guilt could be rendered without a complete description of the legal spectrum involved. On the facts of this case, the true

antipode to burglary was lawful presence as a public invitee. Between those two extremes, lay the two intermediate poles of attempt and trespass; i.e., the full range of options was:

uninvited burglary | <-----(attempted burglary | trespass)------> | implied invitee

By failing to instruct on that law which supported the defense theory of the case, the instructions created a false alternative to a "not guilty" finding of burglary thus effectively directing a guilty verdict on the attempt.

The gravamen of criminal trespass is "[e]ntering and occupying real property or structures of any kind without the consent of the owner, his agent, or the person in lawful possession thereof." (*Diamond v. Bland* (1970) 3 Cal.3d 653, 657; Pen. Code, § 602, subd. (m).) In the present case, appellant had at least entered upon Barrera's property and had apparently done so without any express consent, (at least to the extent that no pre-arranged appointment between Barrera and Gray could be inferred from the testimony).

However, the absence of express consent is not alone sufficient to decide whether an entry is trespassory or not. "An invitation or permission to enter upon land need not be express but may be implied from such circumstances as the conduct of the possessor, the arrangement of the premises or local custom." (*Popejoy v. Hannon* (1951) 37 Cal.2d 159, 167; *Oettinger v. Stewart* (1944) 24 Cal.2d 133, 136; *O'Keefe v. South End Rowing Club* (1966) 64 Cal.2d 729, 735.)

99

Thus, a person who is on property under an implied invitation is not a trespasser.

Although the concept of an "implied invitee" is a legal doctrine, the determination of whether any given person had the status of an invitee or was within the scope of the implied invitation are questions of fact for the jury, viz: "It is of course fundamental that the question whether at the time of an injury the injured person was an invitee on land in possession of another is a question of fact." (*Clawson v Stockton Golf etc. Club* (1963) 220 Cal.App.2nd 886, 897; *Popejoy v. Hannon*, supra, 37 Cal.2d, at pg. 167 ["The question as to whether the invitation, express or implied, included that part of the premises where the injury occurred is... a question of fact for the determination of the court or jury."].)

While the doctrine of implied invitation may have its genesis in tort law, it has recognized application to criminal law. (*Lorenzana v Superior Court* (1973) 9 Cal. 3d 626, 635 [implied invitation to police entry on normal access routes]; *People v. Winters* (1983) 149 Cal.App.3d 705, 707 [police trespass into areas away from normal public access]; *People v. Bradley* (1969) 1 Cal.3d 80, 92 [lawful presence including a "place where visitors might be".]; *People v. Lovelace* (1981) 116 Cal.App.3d 541, 550.) Thus, it is the rule that what constitutes a 'reasonable' expectation of privacy [and correlatively, a trespass] depends on the circumstances as measured by common habits in the use of domestic and business properties. (*North v. Superior Court* (1972) 8 Cal.3d 301, 308-312;

100

*People v. Sneed* (1973) 32 Cal.App.3d 535, 540.)

The doctrine of implied invitation constituted "general principles of law governing the case" which were "closely and openly connected with the facts before the court, and which [were] necessary for the jury's understanding of the case." (*People v. Daya* (1994) 29 Cal.App.4th 697, 712; *People v. Hood,* supra, 1 Cal.3d, at pg. 449; *People v. Wilson* (1967) 66 Cal.2d 749, 759; *People v. Bevins* (1960) 54 Cal.2d 71, 75-77; *People v. Wade* (1959) 53 Cal.2d 322, 334; *People v. Putnam* (1942) 20 Cal.2d 885, 890-891.)

Absent instruction on the doctrine of implied invitation, the jury's determination of the issues was inevitably bound to be skewed. By itself and to an uninstructed jury, the absence of express consent would suggest a trespassory entry onto *property*. Given that the jury in this case did not find sufficient evidence of an unlawful entry into Barrera's *house* and given further that it was not instructed on the lesser related offense of trespass, the jury would reasonably (albeit erroneously) conclude that the only other thing appellant's conduct could be was an attempted burglary; ie. an unconsented (and perhaps larcenously motivated) entry onto land without there being an entry into the house.

The incompleteness in the court's instructions cannot be discounted on the ground that the jury always had the option of *not* returning a verdict on the

lesser offense of attempt; that is, that if the jury had felt appellant had done *nothing* wrong they would have acquitted or at least deadlocked a second time. The problem with that view is that it essentially begs the issue. Without presenting the full range of options to the jury it simply cannot be said that the jury actually decided there was an attempt over and above a mere trespass or that it did not confuse an attempt with a trespass.

In addition to not reaching and properly considering all theories of guilt, the jury's incorrect and incomplete understanding of the law also precluded it from giving full and proper consideration to appellant's defense.

It was evident by the close of testimony that appellant's defense was that he had gone to Barrera's house, and was on his property, for an innocent purpose. His defense was not simply that he was not guilty of burglary but rather that he was innocently seeking to a buyer for his car. "Appellant was permitted to argue this theory of defense. However, instruction by the trial court would weigh more than a thousand words from the most eloquent defense counsel." (*People v. Mathews* (1994) 25 Cal.App.4th 89, 99.) "Permitting a defendant to offer a defense is of little value if the jury is not informed that the defense, if it is believed or if it helps create a reasonable doubt in the jury's mind, will entitle the defendant to a judgment of acquittal." (*United States v. Escobar De Bright,* supra, 742 F.2d, at pp. 1201-1202.)

102

Whether appellant's defense was plausible as a matter of fact was of course for the jury to determine. But a jury does not determine or find facts in a vacuum but rather in light of and in accordance with the law. Here, the legal half of the "mixed question" was missing. Appellant's defense was not just an "excuse." The law recognizes that if he went to Barrera's house either socially or for a mutual economic benefit and if he was on normal access areas, then his presence was in fact lawful and not a trespass.

A properly instructed jury will be informed as to what conduct the law recognizes to be unlawful, so that it may evaluate the prosecution's case and theory according to the law. Where a defense is interposed, a properly instructed jury must also be informed as to what conduct the law recognizes as lawful so that it may evaluated the defendant's case and theory according to law. In this case, the instructions were defective on both counts.

**D.    Prejudice and Federal Due Process Error.**

**1.    Reversible Error under State Law**

Considering the instructions as error under state law, the court's (1) giving of a factually unsupported attempt instructions and (2) its failure to instruct on the lesser related offense of trespass and (3) its failure to instruct on the law governing implied public invitation were jointly and severally prejudicial under *Watson* (supra, 46 Cal.2d, at pg. 836). (*People v. Breverman*, supra, 18

103

Cal.4th at pg. 162 [instructional error on lesser offenses subject to *Watson*]; *People v. Flood* (1998) 18 Cal.4th 470 [defenses]; *People v. Barton*, supra,12 Cal.4th, at pg. 194-195, [defenses and lesser included offenses as are warranted by the evidence].)

As already noted, this was a case where the prosecution twice failed to prove its principal charge of burglary. The first jury had pronounced doubts as to that charge and the second jury, in fact, acquitted on it. That acquittal ought to have been the end of the matter, but by making available an improper attempt alternative, the instructions in effect allowed the prosecution a third (if somewhat smaller) bite at the apple of conviction. It is more than reasonably probable that, had the improper attempt instructions not been given, appellant would have been entirely acquitted on Count I.

It is equally the case, that had a trespass instruction been given it is reasonably probable the second jury would not have opted for a guilty verdict on attempt, assuming it was proper to make an attempt-option available and assuming the jury was inclined to find some sort of guilt. In this regard it is noteworthy that the first jury did not find sufficient evidence of any attempt. It seems obvious that both juries were focusing on the fact that appellant was on the *property* and may *or* may not have been up to no good. To the extent the juries might have been disinclined to believe appellant's version of the incident,

his ill-intended, uninvited presence constituted a trespass which it is reasonably likely both juries would have found had they been given the option.

Lastly, it is reasonably probable that had a public invitee instruction been given, the jury would have acquitted  notwithstanding the giving of an attempt instruction.  The plain fact is that two juries did not trust the prosecution's star witness. Since the case was essentially a credibility contest, the more the jury was disinclined to believe Barrera, the more it would be inclined to believe appellant.   Had the instructions informed the jury that there was law which supported appellant's claim of being on the premise as an innocent, public invitee, it is reasonably probable that the jury would have so found.

## 2.    Reversible Denial of Federal Due Process.

In addition, the instructional error denied appellant his federal due process right to a fair trial in that it denied him  "' meaningful opportunity to present a complete defense'" (*Crane v. Kentucky* (1986) 476 U.S. 683, 690) including both the right to instructions on lesser included offenses and to instructions on his theory of the case.

The Ninth Circuit has long held that if the defendant's theory of the case is supported by law and evidence, the failure to give an instruction on the defense theory is reversible per se. (*U.S. v. Escobar De Bright,* supra, 742 F.2d, at pg.1206; *U.S. v. Morton* (9 th Cir. 1993) 999 F.2d 435; *U.S. v. Zuniga,*  supra, 6

F.3d 569; *U.S. v. Rodriguez* (9th Cir. 1995) 45 F.3d 302, 306.)

"The right to have the jury instructed as to the defendant's theory of the case is one of those rights 'so basic to a fair trial' that failure to instruct where there is evidence to support the instruction can never be considered harmless error." (*United States v. Escobar de Bright*, supra, 742 F.2d, at pg. 1201.) Per se reversal also applies to "a defense theory of the case" that would support a verdict on a lesser offense. (*Conde v. Henry* (9 th Cir. 1999) 198 F.3d 734.)

However, reversal is required even if the instructional errors are assessed under *Chapman* [17] since, for the reasons discussed, it cannot be said beyond a reasonable doubt that the error did not contribute to the jury's verdict. (*Yates v. Evatt*, supra, 500 U.S., at pp. 402-403 [ overruled on other grounds in *Estelle v. McGuire*, supra, 502 U.S., at pg. 72, footnote 4].)

### 3.    Summation.

The court's instructions relative to the Count I deprived the jury's verdict of any trustworthiness in producing a just result. It has been stated that "[j]ust as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250. 1271.) However, to say as

---

17 *Chapman v. California* (1967) 386 U.S. 18, 24

much does not mean that any lesser offense will do. By instructing on attempt and omitting instructions on trespass, the court -- while not quite directing a verdict -- steered the jury toward returning a verdict on a lesser offense that was not warranted by the evidence. Even assuming *arguendo* that the evidence did provide a basis for inferring the commission of an attempt, the jury's choice of that verdict cannot be trusted in light of the fact that it was not allowed to consider the at least equally warranted alternative of trespass.

Similarly, just as the prosecution stands in need of instructions which support his charges and theory of the case, so too a defendant has a right to instructions which support an *asserted* defense. Where a defendant stands silent and relies on state of the prosecution's evidence, it might perhaps be enough to simply instruct on the alleged charges and leave it to the jury to decide whether they have been proved beyond a reasonable doubt by the prosecution's evidence. But that is certainly not to case where a defendant testifies in his defense and affirmatively states an alternative theory of the case. To the extent that legal principles support his defense he is entitled to have the jury so instructed. The reason is not simply "equitable" but logical. Things are defined by their opposites. In cases such as the present, a "not guilty" verdict results not only from evidentiary deficiency on the prosecution's side but also from the weight of evidence of innocence on appellant's side. The two cases

107

were symmetrical, inverse correlatives and the jury could not properly discharge its evaluating functions without being instructed on the full range of applicable options and principles.

## V.  THE COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL AS IT RELATED TO HIS CONVICTION ON COUNT III AND DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST RETRIAL ON COUNT III AT THE START OF THE SECOND TRIAL.

### A.    Procedural & Relevant Facts.

Prior to judgement, appellant moved for a new trial (Pen. Code, §§ 1201(b) and 1181, subds. (5) and (8)[18]) on the grounds, *inter alia,* that Barrera had not been impeached, at the first trial, with his use of alias and giving false identifying information under penalty of perjury.  (CT 288-289)   Upon hearing, the court denied the motion. (RT-C 297)

The record showed that during the second trial, at the close of the prosecution's case, it became known that Marlon Barrera had used two social security numbers, had entered the United States illegally, had acquired

---

18   In pertinent part, the statute provides that a new trial may be granted  "(5) When the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial, and when the district attorney or other counsel prosecuting the case has been guilty of prejudicial misconduct during the trial thereof before a jury; ... (8) When new evidence is discovered material to the defendant, which he could not, with reasonable diligence, have discovered and produced at trial...."

identification under a false name and had, at a later date, been arrested and cited

by federal authorities in San Diego for alien smuggling. (RT-II 242-247; Supp RT,

54)[19]

The prosecution represented that it had done a criminal records check on

the name of "Marlon Barrera" and "[t]here were no crimes of moral turpitude on

the rap sheet." (Supp. RT 55) However, California DMV records showed that on

29 May 1996 Marlon Barrera had been issued identification under the name of

"Marcial Jose Torres Mendoza" listing a date of birth of 05 June 1966 and giving

a postal address of Box 8222, Eureka, CA. The expiration date was 5 June 2001.

(CT 301) The Department's records also showed that, on or about 19 June 2001,

Barrera had been issued identification under the name of "Marlon J. Barrera"

listing a birth date of 29 March 1977 and giving a postal address of Box 6401,

Eureka CA. The expiration date of this identification was 29 March 2006. (CT

300)[20]

---

19    The use of duplicate social security numbers came to light when an "investigator" reported the discovery to appellant who then passed the information on to defense counsel and, in a letter, to Barrera. (Supp RT 56)

20    The records were not introduced into evidence, but were attached to appellant's *pro se* motion for new trial. The prosecution's fingerprint expert was available to match the prints (RT-II 243) but, in light of the matching photographs and Barrera's subsequent admissions, the parties accepted that both identifications had been obtained by the same person.

A "402 Hearing" was held during which Barrera admitted to having obtained California identification under his "cousin's" name. (CT-248)  Barrera explained that when he arrived in California he was as yet a minor and could not get identification without a letter from his parents or documentation from school. (RT 248)  His cousin, who is also known as Isidro Torres Reyes (or Reyes Torres) "had that name -- I mean not a name, just a birth certificate, which he got an ID before.  And he told me, you know, 'you can use it so you can work with this' -- you know, "with my name." (RT-248)

While passing under the "Torres Mendoza" name, Barrera was detained by U.S. border agents at a checkpoint within San Diego County when it appeared that the "cousin" he was travelling with did not have any papers.  (RT 249, 253)  Barrera testified that he "wasn't formally charged" but was given a "ticket" which he is currently "going to court to clear up" in order to straighten out his immigration status and apply for citizenship. (RT-II 250-251)  Barrera denied helping his cousin get across the border and "guess[ed] he was sent back to Mexico." (RT-II 253)

Upon hearing, the court ruled that Barrera could be impeached with the fact of his obtaining false identification; however, the court disallowed impeachment on the basis of the detention and citation for alien smuggling. (RT-

II 256-257)[21]

Recalled to the stand at trial, Barrera testified that "[i]n the early 80's" Nicaragua was going through a revolution so that "whoever made it into the United States.... was allowed a work permit." (RT-II 271) Fleeing the unrest in his home country, Barrera's cousin -- Marcial Jose Torres Mendoza -- came here and was "allowed to remain." However, Marcial, did not have any identification and so "he got a birth certificate from another fellow....with the name of Isidro." Thereafter he (Marcial) continued to use the name "Isidro". (RT-II 272)

Barrera stated that, in 1994, he followed his cousin and came to the United States at age 16. Lacking his own identification, he used his cousin's birth certificate (issued to Marcial Jose Torres Mendoza) to obtain a driver's license. However, once he became old enough, he applied for his own identification and "started using my name." (RT-273)

### B.    General Rule & Standard of Review.

Prior to judgement a defendant may bring a motion for a new trial on the grounds of newly discovered evidence. (Pen. Code, § 1181, subd. 8.)

In reviewing such a motion for a new trial the trial court must weigh the

---

21    Although the court had previously indicated it would not rely on the prosecution's unilateral assertion that there were no crimes of moral turpitude on Barrera/Torres's record, (Supp RT 58) it does not appear that an *in camera* review was ever held. For present purposes, appellant assumes that no additional crimes appear on Barrera/Torres's record.

evidence independently determining the credibility of the witnesses and the probative value of the evidence. (*People v. Serrato* (1973) 9 Cal.3d 753, 761 *People v. Davis* (1995) 10 Cal.4th 463, 524.) The trial court must consider the following factors: "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." (*People v. Sutton* (1887) 73 Cal. 243, 247-248; *People v. Delgado* (1993) 5 Cal.4th 312, 328.)

On appeal a trial court's denial of the motion is deferentially reviewed for abuse of discretion.. (*People v. Beeler* (1995) 9 Cal.4th 953, 1004.)

### C.    The Discovered Impeachment Evidence was Favorable, Non Cumulative and Critical in a Case dependent on the Alleged Victim's Credibility.

A new trial motion is properly brought at any time prior to judgement so that, although appellant's motion was brought at the end of the second trial, it was directed at both trial and at all verdicts of conviction. In so far as appellant's new trial motion was based on discovery of evidence that impeached Barrera's credibility, this ground for the motion unmistakably related to the first trial given that the impeaching information had been produced at the second trial. In this

112

respect, the trial court's denial of the motion was an abuse of discretion because the evidence was clearly "material" to the outcome of the first trial.

The fact that Barrera had lied to obtain two different sets of identification was hardly a *de minimis* fact. Vehicle Code, § 12802 requires that every application for a license be signed and verified by the applicant under oath.[22] Possessing a falsely obtained license is also a criminal offense. (Veh. Code, § 14610, subd. (a)(1).)    A person who obtains a license by means of false statements commits perjury. (*People v. Molina* (1992) 5 Cal.App.4th 221, 224, 232; Pen. Code, § 118, subd. (a).)

Thus, evidence that Barrera had obtained a license by fraudulent means was proper to impeach his credibility (*People v. Sapp,* supra, 31 Cal.4th, at pp. 289-290;*People v.Ayala* (2000) 23 Cal.4th 225 [evidence witness lied to probation officer about owning a gun]; *People v. Wheeler* (1992) 4 Cal.4th 284, 295 [allowing impeachment with prior conduct involving dishonesty and/or moral turpitude]; *People v. Beagle* (1972) 6 Cal.3d 441) and as such was evidence "favorable" to appellant. (*In re Sassounian,* supra, 9 Cal.4th 535, 544.)

---

22 Viz: "Every original application shall be signed and verified by the applicant before a person authorized to administer oaths and the applicant shall submit such evidence of age as the department may require, and, if the applicant is a minor, the application shall also be signed and verified as provided in Chapter 2 (commencing with Section 17700) of Division 9." [Added 1959 ch. 3; amended 1965 ch. 622; 1993 ch. 272, effective July 30, 1993.]

113

Accordingly, just as evidence that Barrera had lied to obtain a license was properly admitted at the second trial and would have been equally relevant and admissible at the first trial, had it been known.

In addition, Barrera's *in limine* and trial explanations in mitigation were hardly very convincing. The attempt to confuse Isidro's alleged political refugee status in the early 1980's with Barrera's entry into the United States approximately 15 years later, long after a the United States had restored order and democratic institutions in Nicaragua, was transparent. Equally unconvincing, given the uncertainties surrounding Barrera's true age, was his claim he needed parental permission for a work permit.

In additional to being favorable to the defense, the evidence of Barrera's perjured statements to obtain different identities was also not cumulative, given that (at the first trial) Barrera's credibility was not impeached and inconsistencies in his testimony were chalked up to panic and the distress of (allegedly) being shot at.

For the reasons given below, the impeaching evidence was also material "such as to render a different result probable on a retrial" (*People v. Sutton, supra*, 73 Cal., at pp.247- 248.)

### D. Materiality and Prejudice.

The assessment of "materiality" under both *Brady* and a motion for new

114

trial (Pen. Code, § 1181) are essentially the same. (*In re Sassounian*, supra, 9 Cal.4th at p. 544 [reasonable probability of different result]; *People v. Sutton*, supra, 73 Cal., at pp.247- 248 [same].)

As previously discussed, the first jury manifested a disinclination to believe Barrera's testimony in so far as it was unable to agree that he had been the victim of an armed assault. The jury did, however, convict appellant of possessing a firearm which would indicate either a compromised verdict or that they believed Barrera at least to the extent of crediting his denial to having owned any weapons.

In contrast, at the second trial, after hearing the evidence impeaching Barrera, and in addition to deadlocking on the assault charge, the jury refused to return any findings on the firearm allegations. Thus, although the second jury found that appellant had attempted a burglary and had taken a vehicle, it did not find that he was armed at the time.

Moreover, the second jury had protracted doubts specifically centering around gun ownership or possession. During their deliberations the jury requested a readback of the "transcript on where and information on gun in yard" (RT-III 565). They clarified that they wanted want all of Barrera's testimony about "One, the .22 caliber that was found in the yard of Mr. Barrera's home. It was found by the lawn guy, and Mr. Barrera considered the gun as a

115

gift." "Number two, all of Mr. Barrera's testimony about the .22 caliber gun." (RT-III 567)

The jury next asked "Can we have the testimony of Mr Barrera and Mr. Nordloff about exactly what happened with the struggle of the gun, .45 in the back yard." (RT-III 578)

The jury next wanted "all of Mr. Nordloff's testimony regarding struggle over the handgun, including prior testimony" (RT-III 603) which was followed by "Can we have a yardstick?" (RT-III 604)

Finally, the jury wanted to know if it was permitted "to have a verdict on some charges and be unable to reach a verdict on other charges." (RT-III 607)

It is evident that the jury was unable to reach a verdict on the assault charges, in significant part at least, because they doubted Barrera's claim never to have owned a gun, and to have kept a .22 only because his gardener had made a gift to him of it after finding it in his back yard. Clearly a .22 is not a .45 and a person can possess one without the other; but what the jury focused on was Barrera's unreliability for speaking the truth in the specific context of gun possession and -- by implication -- who had shot at whom.

The difference between the trials' two verdicts demonstrates the materiality of the impeachment evidence. At the second trial the jury's guilty verdicts stood on evidence and inferences entirely independent of anything

116

Barrera had testified to. They disbelieved his claim to have been assaulted and they also disbelieved his claim never to have used or possessed firearms. The first jury, while also unable agree on the assault charge did believe Barrera's claim not to have possessed the gun. As discussed, the first jury's deliberations were pulled in diametrically opposite directions. Had it known of Barrera's impeachable dishonesty it is a near certainty that they too would have refused to give Barrera's testimony that he didn't possess the .45 any credence

In sum, just as Barrera's impeachment evidence played a central and material role in the second trial and it is more than reasonably probable that had it been presented at the first trial the result would have been different in that the first jury would not have convicted appellant of gun possession.

**E.    Defense Counsel Was  Ineffective in Failing to Request a Re-Trial on Count III at the start of the Second Trial.**

Because evidence impeaching Barrera was both favorable and material, defense counsel was ineffective in failing to make a specific motion for new trial on Count III and instead leaving that conviction to stand where there was justification and opportunity to obtain a different result.

There was no practical impediment to seeking such an opportunity. Without more, the prosecution was given a second bite at the apple. The case was going to be retried in all events and the impeachment evidence did not entail

117

any new witnesses or additional witnesses. It would hardly be evenhanded or fair to rule that while the prosecution should be given several days of court time to run its witnesses by a jury a second time, the defense should not be allowed to squeeze in ten minutes of newly discovered impeachment evidence.

There was no tactical reason for counsel not to seek a second bite on Count III while the prosecution was re-munching on Counts I, II and IV. Trial of the gun possession did not involve any legal issue or factual question not already entailed in the count's being retried. In fact, although Count III was legally distinct from Count II, a reasonable juror would not see much difference between alleged assault with a gun and possession of the gun assaulted with.

The question here does not concern a decision whether to use the evidence to impeach Barrera. Defense counsel had already made that decision as the trial record of the second trial demonstrates. The question here is simply whether there was any tactical reason for limiting the applicability and effect of favorable and material evidence. Since there was no downside to reopening the case as to Count III and there could be no legitimate reason for requesting a new trial as to that count during the retrial the prosecution had demanded and got.

Seeking a new trial on count is in effect a challenge to the conviction thereon so that "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting

guilt" (*Strickland*, at pg. 695; *Ledesma*, at pp. 217-218) and, for the reasons stated in Section D, supra, but for counsel's omission it is reasonably probably the result would have been more favorable to appellant. (*Strickland*, supra, at pp. 687, 691-692; *Ledesma*, supra, at pp. 216, 217-218 .)

## VI.    THERE WAS INSUFFICIENT EVIDENCE OF AN ATTEMPTED BURGLARY.

### A.    Relevant Facts.

The facts as hitherto stated are incorporated herein.

### B.    General Rule & Standard of Review.

Federal and state due process requires the prosecution to prove the elements of its case beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358; see also *People v. Coleman* (1904) 145 Cal. 609, 612.)

On appeal, the sufficiency of the evidence is evaluated to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) This standard is higher than the superseded "no evidence" rule of *Thompson v. Louisville* (1960) 362 U.S. 199 and to survive challenge the judgment must be supported by "substantial evidence --that is, evidence that is reasonable, credible, and of solid value-such that a reasonable trier of fact could

119

find the defendant guilty beyond a reasonable doubt." ( *People v. Rodriguez* (1999) 20 Cal.4th 1, 11; *People v Hatch* (2000) 22 Cal.4th 260, 272; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

### C.    There was Insufficient Evidence of an Attempted Burglary.

For the reasons stated in Part IV, Section C.1 there was no substantial evidence in support of the jury's guilty verdict of attempted burglary. The only evidence that anyone had entered Barrera's house was the alleged circumstantial fact that the house had been "ransacked" and Barrera's testimony that he was missing a .22 caliber gun and $150.00. Had the jury believed any part of that testimony they would have returned guilty verdicts of burglary. They did not.

The only other evidence was appellant's presence in and flight from the back yard. But as previously discussed, the *actus reus* of burglary is an act of entering and being present in the yard hardly shows an "actual commencement of the doing of the criminal deed" of entering. (CALJIC No. 6.00) From law school, everyone remembers the case of the boy staring into the breadshop window. He might stare with all manner of hungrily, larcenous intents at the bread inside, but without pushing against the glass pane there was no attempt and absent penetrating it, no burglary.

In the present case, one might speculate that appellant had his hand on a door knob or was lifting a screen; but speculation is not evidence. (*People v.*

*Morris*, supra, 46 Cal.3d, at pg. 19; [reasonable inference cannot be based on supposition, surmise, speculation, conjecture]; *People v. Kraft* (2000) 23 Cal.4th 978, 1035 ["[E]vidence leading only to speculative inferences is irrelevant."].)   In the present case there was "no evidence" of an attempted entry (*Thompson v. Louisville,* supra, 362 U.S. 199)   and, a fortiori there could be no "substantial evidence" (*Jackson v. Virginia,* supra, 443 U.S, at pp 318-319) in support of the jury's verdict.

## VII.   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT APPELLANT'S VIOLATION OF PROBATION.

At the conclusion of the first trial, and on the sole basis that appellant had been found guilty of possessing a firearm, the trial found that appellant had violated his probation.   No other findings were made.   (RT-A 57)   Given the invalidity of the jury's verdict on Count III, there was insufficient evidence to support the court's finding.

## VIII.   CUMULATIVE DUE PROCESS ERROR.

For the reasons heretofore stated, the individual errors complained of were cumulatively prejudicial to appellant's right to a fair trial even if they did not amount to a due process violation in isolation.   (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236).

## CONCLUSION

In the end, a defendant's interests in a fair trial and the People's interest in a reliable verdict are one and the same, since the latter cannot exist without the former and the former is what engenders the latter. In this case, neither half of the unitary ultimate purpose of trial was served. Certainly due process does not require impenetrably rock solid evidence. That the State's case was weak, depending on the impeachable testimony of an alleged victim, did not in itself render the verdict unreliable. So long as a jury may find the evidence sufficient, that is enough. But due process *does* require that the process through which a verdict is reached be free from prejudicial error. Here it was not. Appellant's defense (as much as the State's accusation) hung on the credibility of two opposed witnesses. Evidence which supported appellant or which impeached Barrera was suppressed or omited. The jury was given mis-instructions which presumed the existence of ultimate an ultimate fact and which steered the jury into making guilty inferences about appellant without warning them to view adverse evidence with caution. Separately and in the aggregate, these errors consistently tipped the credibility scales against appellant and in a one on one case, those errors prejudiced appellant's fair trial, cast doubt on the verdicts reliability and renders a different result probable on re trail free from error.

For these and the reasons stated herein, appellant requests that his

122

violation of probation and his judgement and sentence be reversed.

## Word Count Certification

The undersigned counsel certifies that the word count for this brief is: 29, 913

Dated:   6 December 2005

Respectfully Submitted

KIERAN D. C. MANJARREZ
Attorney for Appellant

123

PROOF OF SERVICE BY MAIL

**Title:**   People v. Nordloff                                    **Case No.:** A108464

The undersigned declares:

I am a citizen of the United States of America, over the age of eighteen years and counsel for appellant herein.   My business address is Post Office Box   [ x ]   (602) [      ]  (278), Middletown, CA 95461.

On  8 December 2005 , I served the attached, **APPELLANT'S OPENING BRIEF** on the parties in this action by placing a true copy thereof, in a sealed envelope with first class postage fully prepaid, in the United States Mail at Middletown, California, addressed as follows:

Attorney General, California
455 Golden Gate Avenue
San Francisco, CA 94102

Superior Court Humboldt Cty
Humboldt County Courthouse
825 Fifth Street
Eureka CA 95501

District Attorney, Humboldt
Humboldt County Courthouse
825 Fifth Street
Eureka CA 95501

First District Appllate Project
730 Harrison Street, Ste. 201
San Francisco, CA 94107

Mr. Michael R. Nordloff
V59215
CSATF
P.O.Box 5244
Corcoran CA 93212

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Sworn this 8 December2005, at Middletown, California.

[ x ]  Kieran D. C. Manjarrez
[   ]  Stephanie Merrida-Grant

124