IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION THREE

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

v.

**MICHAEL BENJAMIN NORDLOF,**

Defendant and Appellant.

A108464

ATTORNEY GENERAL-
OFFICE COPY

Humboldt County Superior Court Nos. CR983664, CR041104
The Honorable Marilyn Miles, Judge

**FILED**

MAY − 3 2006

**RESPONDENT'S BRIEF**

Court of Appeal - First App. Dist.
DIANA HERBERT
By_____
DEPUTY

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

MOONA NANDI
Supervising Deputy Attorney General

JOAN KILLEEN
Deputy Attorney General
State Bar No. 111679

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5968
Fax: (415) 703-1234

Attorneys for Respondent

ADB/uled 12/8/05

DOCKETED
SAN FRANCISCO

MAY 0 5 2006

By L. CARAMANZANA
No. SF-2005DA0168

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE ............................................. 1

STATEMENT OF FACTS ................................................. 3

    First Trial ........................................................ 3

        Prosecution's Case ...................................... 3

        Defense Case ........................................... 5

        Prosecution's Rebuttal .................................. 6

    Second Trial ...................................................... 7

        Prosecution's Case ...................................... 7

        Defense Case ........................................... 13

        Prosecution's Reopening ............................... 16

ARGUMENT ............................................................ 18

    I.    APPELLANT WAIVED HIS CLAIM THAT THE PROSECUTION SUPPRESSED EVIDENCE ........................................... 18

        A.  Background ...................................... 18

        B.  Appellant Waived His Claim That The Prosecution Suppressed Material Evidence ....... 22

    II.    THE TRIAL COURT PROPERLY INSTRUCTED THAT SUPPRESSION OF EVIDENCE COULD SHOW CONSCIOUSNESS OF GUILT ................................. 25

    III.    THE TRIAL COURT WAS NOT REQUIRED TO GIVE ACCOMPLICE INSTRUCTIONS ...................... 29

i

## TABLE OF CONTENTS  (continued)

Page

IV.  THE TRIAL COURT PROPERLY INSTRUCTED ON ATTEMPTED BURGLARY AND PROPERLY DID NOT INSTRUCT ON THE LESSER RELATED OFFENSE OF TRESPASS OR THE UNREQUESTED PINPOINT INSTRUCTION OF INVITED PUBLIC ACCESS ..... 33

    A.  The Trial Court Properly Instructed On The Lesser Offense Of Attempted Burglary ..... 33

    B.  The Court Was Not Required To Instruct On The Lesser Related Offense Of Trespass ..... 35

    C.  The Trial Court Was Not Required To Give A Pinpoint Instruction On Invited Public Access ..... 37

V.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING APPELLANT'S MOTION FOR NEW TRIAL ON COUNT THREE ..... 39

VI.  SUFFICIENT EVIDENCE SUPPORTS APPELLANT'S CONVICTION FOR ATTEMPTED BURGLARY ..... 43

VII.  SUFFICIENT EVIDENCE SUPPORTS APPELLANT'S VIOLATION OF PROBATION ..... 45

VIII.  APPELLANT FAILS TO SHOW CUMULATIVE ERROR ..... 47

CONCLUSION ..... 48

ii

# TABLE OF AUTHORITIES

Page

**Cases**

*Brady v. Maryland*
(1963) 373 U.S. 83                                                22

*Hopkins v. Reeves*
(1998) 524 U.S. 88                                               36

*People v. Barton*
(1995) 12 Cal.4th 186                                            33

*People v. Berryman*
(1993) 6 Cal.4th 1048
overruled on other grounds in
*People v. Hill*
(1998) 17 Cal.4th 800                                            37

*People v. Birks*
(1998) 19 Cal.4th 108                                          35, 36

*People v. Bloyd*
(1987) 43 Cal.3d 333                                             43

*People v. Breverman*
(1998) 19 Cal.4th 142                                            35

*People v. Brown*
(2003) 31 Cal.4th 518                                        29, 30, 32

*People v. Carpenter*
(1997) 15 Cal.4th 312                                          22-24

*People v. Davis*
(1995) 10 Cal.4th 463                                          41, 42

*People v. Echevarria*
(1992) 11 Cal.App.4th 444                                        27

# TABLE OF AUTHORITIES  (continued)

Page

*People v. Fitzpatrick*
(1992) 2 Cal.App.4th 1285                                          27

*People v. Geiger*
(1984) 35 Cal.3d 510                                              35

*People v. Johnson*
(1993) 6 Cal.4th 1                                            27, 43

*People v. Johnson*
(1992) 3 Cal.4th 1183                                         27, 28

*People v. Kegler*
(1987) 197 Cal.App.3d 72                                          38

*People v. Kraft*
(2000) 23 Cal.4th 978                                             43

*People v. Lewis*
(2004) 120 Cal.App.4th 837                                 29, 30, 32

*People v. Lewis*
(2001) 26 Cal.4th 334                                         29, 32

*People v. Marsden*
(1970) 2 Cal.3d 118                                               18

*People v. Mizchele*
(1983) 142 Cal.App.3d 686                                         28

*People v. Musselwhite*
(1998) 17 Cal.4th 1216                                            38

*People v. Overman*
(2005) 126 Cal.App.4th 1344                                       35

*People v. Provencio*
(1989) 210 Cal.App.3d 290                                         31

## TABLE OF AUTHORITIES  (continued)

|  | Page |
|---|---|
| *People v. Redmond*<br>(1969) 71 Cal.2d 745 | 43 |
| *People v. Rodrigues*<br>(1994) 8 Cal.4th 1060 | 27 |
| *People v. Rodriguez*<br>(1999) 20 Cal.4th 1 | 43 |
| *People v. Saddler*<br>(1979) 24 Cal.3d 671 | 28 |
| *People v. Sanders*<br>(1995) 11 Cal.4th 475 | 38 |
| *People v. Towler*<br>(1982) 31 Cal.3d 105 | 43 |
| *People v. Waidla*<br>(2000) 22 Cal.4th 690 | 36 |
| *People v. Wharton*<br>(1991) 53 Cal.3d 522 | 37, 38 |
| *Schmuck v. United States*<br>(1989) 489 U.S. 705 | 36 |

## TABLE OF AUTHORITIES  (continued)

Page

**Statutes**

Evidence Code
    § 352                               40
    § 413                               26

Penal Code
    § 245, subd. (a)(2)       2
    § 459                               2
    § 460, subd. (a)           2
    § 667, subd. (a), (d) & (e)   2
    § 1170.12, subds. (c) & (d)   2
    § 12021, subd. (a)(1)      2
    § 12022.5, subd. (a)(1)     2

Vehicle Code
    § 10851, subd. (a)       2

**Other Authorities**

California Jury Instructions, Criminal
    No. 2.06                25-28
    No. 2.15                27

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION THREE

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,** | |
| Plaintiff and Respondent, | A108464 |
| **v.** | |
| **MICHAEL BENJAMIN NORDLOF,** | |
| Defendant and Appellant. | |

## STATEMENT OF THE CASE

On March 12, 1999, appellant pleaded guilty to assault with a deadly weapon and admitted an enhancement for great bodily injury in case no. CR983664. As part of the negotiated disposition, appellant agreed to a seven-year term with execution suspended and placement on probation on various terms and conditions. (3/12/99 RT 1-18.) On April 21, 1999, the trial court imposed the seven-year term, suspended execution of sentence, and placed appellant on probation for five years. (4/21/99 RT 29-33.)

On April 1, 2003, appellant's probation officer filed a notice of probation violation, based in part on his involvement in a burglary on March 26, 2003. (CT 1-2 [CR983664].)[1] On December 16, 2003, a probation hearing was held in CR983664 and a preliminary hearing was held in CR031562. (CT 8 [CR983664]; 12/16/03 RT 4-47.) The court held appellant to answer on the new charges and found the probation violation to be true. (CT 9 [CR983664]; 12/16/03 RT 46.)

---

1. There is one volume of clerk's transcripts for the probation violation case (CR983664) and one volume for the new charges (CR041104).

On March 23, 2004, a second preliminary hearing was held in CR041104. (3/23/04 RT 5-78.)[2/] Appellant was again held to answer. (3/23/04 RT 75.)

On April 1, 2004, the Humboldt County District Attorney filed an information charging appellant with burglary (Pen. Code, §§ 459/460, subd. (a), count one), with use of a firearm (Pen. Code, § 12022.5, subd. (a)(1)), assault with a firearm (Pen. Code, § 245, subd. (a)(2), count two), felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1), count three), and vehicle theft (Veh. Code, § 10851, subd. (a), count four), with use of a firearm (Pen. Code, § 12022.5, subd. (a)(1)). (CT 23-25 [CR041104].) In a first amended information filed on June 2, 2004, the district attorney added prior serious felony and prior strike allegations (Pen. Code, §§ 667, subd. (a), (d) & (e), 1170.12, subds. (c) & (d)). (CT 62-65 [CR041104].)

On June 7, 2004, a jury found appellant guilty of the crime of felon in possession of a firearm. The jury deadlocked on the remaining counts and the court declared a mistrial. (CT 85-86, 142-144 [CR041104].) The court found appellant in violation of probation based on the jury's finding on count three and ordered appellant's probation revoked. (RT 226.)[3/]

On July 27, 2004, the district attorney filed a second amended information to restate the special allegations. (CT 152-154 [CR041104]; 7/28/04 RT 47.) On August 11, 2004, a second jury found appellant guilty of attempted first degree burglary, a lesser included offense to that charged in count one, and vehicle theft. The jury deadlocked on the firearm use allegations and on count two, assault with a firearm. The court found true the prior

---

2.  The prosecution apparently did not timely file the information following the first preliminary hearing.

3.  "RT" and "Aug. RT" refer to the proceedings at the first trial.

conviction allegations. (CT 251-258 [CR041104].) On August 31, 2004, the court dismissed count two on the prosecution's motion. (CT 259 [CR041104].)

On November 10, 2004, the court sentenced appellant to the previously suspended term of seven years in case no. CR983664 and to nine years on the new offenses for a total term of 16 years. (CT 80-84 [CR983664]; CT 281-283 [CR041104]; 3 RT 728-729.)[4]

On November 19, 2004, appellant filed a notice of appeal. (CT 85 [CR983664]; CT 284 [CR041104].)

## STATEMENT OF FACTS

### First Trial

#### Prosecution's Case

Marlon Barrera lived at 5971 Humboldt Hill Road with his girlfriend and his two children. He owned a stereo store in McKinleyville and worked at a restaurant. (RT 4-6, 20.) Barrera and his brother, William Velasquez, returned to Barrera's home some time after 11:00 a.m. on March 26, 2003, with some stereo eqiupment. (RT 5-6.) Barrera saw a car in his driveway and parked behind it. He did not recognize the car, but thought it might be associated with a man doing landscape work for him. (RT 6-7.) He had left his door unlocked in case the landscaper showed up that day. (RT 18-19, 43.)

When Barrera entered his house, he saw that it was "torn apart." (RT 8.) He ran out to his back yard and saw one man jumping over the fence and another man attempting to do so. Barrera described the second man as a bald, white male about six feet tall. (RT 8-9.) When the man could not get over the fence, he turned toward Barrera and said, "I'm going to fucking kill you." He

---

4. "1 RT," "2 RT," and "3 RT" refer to the proceedings at the second trial.

3

was carrying a large pistol and shouting obscenities. (RT 9, 15, 20-21.) Barrera heard two shots fired as he ran back toward his house and hid behind a wooden beam that supported his covered patio. The man shooting at him ran out of the gate to the driveway and drove off in Barrera's car. Barrera called 911. (RT 9-10, 14-15.) He discovered that $150 and a .22 caliber gun were missing from his house. (RT 31.)

Barrera selected appellant's photograph from a lineup the day of the burglary, but he was unable to identify appellant at trial. (RT 10-11.) He recognized the man who escaped as David Gray. (RT 17.) Gray had never been to his house, and Barrera was not expecting him that day. (RT 17, 27.)

Deputy Sheriff Justin Braud responded to a report of a burglary in progress with shots fired. (RT 47.) With the help of a K-9 unit, officers located a black male in a swamp area near Barrera's neighbor's house. The man gave his name as David Gray; he did not have any weapons. (RT 50-51.) Gray was arrested about a half hour after the incident. (RT 33; Aug. RT 66-69.) Before his arrest, he told Barrera's neighbor that he had done something wrong. (Aug. RT 65-66.)

Barrera, who appeared to be "shook up," told Deputy Braud that the second suspect, a white male, told him, "I'm going to fucking kill you Carlos." (RT 53-54.) Barrera's house "appeared to have been ransacked." (RT 54.) Barrera positively identified appellant's photograph in a lineup the day of the burglary. (RT 55-56.)

Barrera's car was recovered near a PG & E plant later that day. (RT 34, 66.) A suitcase and keys were found hidden in the brush. (RT 67.) A .45 caliber shell casing was recovered in Barrera's back yard. A bullet hole was in the fence on the left side of the yard. (Aug. RT 81-85, 87.)

Appellant's probation officer, Tamara Hansen, learned that he was wanted in connection with the burglary. On March 28, 2003, Hansen told

appellant's girlfriend that he should turn himself in. Hansen did not see appellant until December 2, 2003, after he surrendered, and did not know where he was in the intervening time. (RT 71-76, 102.)

David Gray admitted that he knew appellant. (Aug. RT 70.) He could not recall if he saw appellant on March 26, 2003, whether he had a gun, and what they might have been doing. (Aug. RT 70-73.) He "apparently" had been arrested that day, but claimed he did not recall it. (Aug. RT 71.) On September 23, 2003, Gray pleaded guilty to the burglary of 5971 Humboldt Hill Road. (Aug. RT 73.)

Deputy Braud testified that Gray initially denied any involvement in the burglary and said he had jumped over a fence after hearing gunshots. (Aug. RT 99.) Gray indicated he had arrived in a vehicle that was parked at Barrera's house. (Aug. RT 99-100.)

**Defense Case**

Appellant admitted he had been convicted of a felony involving moral turpitude on March 12, 1999. (RT 99, 110.)

On March 26, 2003, Gray contacted appellant and said he knew someone who wanted to buy appellant's girlfriend's car. They drove to the house on Humboldt Hill Road, arriving about 11:00 a.m. (RT 99-100.) After finding that no one was home, they decided to wait in the back yard. Five to ten minutes later, Barrera arrived. (RT 101.) Gray, who had been peeking through the fence, "took off running." (RT 101-102.) He did not say anything to appellant. (RT 125.) Appellant looked through the gate and saw that Barrera was approaching with a gun. He ran in the direction Gray had gone, but Barrera stopped him. Appellant turned and put his hands up as Barrera approached him with the gun. Barrera was saying something to him, but appellant was not paying attention to what he said. (RT 102-103, 133.)

Appellant said he knew Barrera because Barrera's girlfriend used to be his girlfriend. (RT 103.) When appellant was backed up by the fence, Barrera's brother yelled something, causing Barrera to turn away. Appellant grabbed for the gun, causing it to discharge. He ran back through the gate and left in Barrera's car. He did not know what happened to Barrera. (RT 104-105, 128-130, 136-138.)[5] He later abandoned Barrera's car and walked to a friend's house. (RT 105-106, 119.) He was not carrying a gun that day. (RT 109.)

Appellant did not contact his probation officer or the police because he was afraid he would get in trouble. (RT 106-107, 116, 140-141.) He left the area, but later returned and surrendered in December. (RT 107-108.) Appellant speculated that Barrera came after him with a gun because he was upset about appellant's prior relationship with Barrera's girlfriend.    (RT 108-109.) Appellant thought Gray had done nothing wrong, and said he may have pleaded guilty to burglary because he spent two days in jail and did not want to serve any more time. (RT 118.) He tried to get Gray to tell the truth after the incident but Gray said it would not be consistent with what he had said. (RT 134-135.)

### Prosecution's Rebuttal

Larissa Longholm had been Barrera's girlfriend. Barrera was the father of her older son, Seth. (RT 149.) She knew appellant through a prior boyfriend, but had never dated him. (RT 150-151.) She had last spoken to appellant about three years before trial; she had never given him any gifts. (RT 151-152.) .

---

5.  Appellant said he was about six feet three and a half inches and weighed 220 to 230 pounds. Barrera was "quite a bit shorter" than appellant. (RT 130-131.) Appellant was not really afraid of Barrera. (RT 132.)

Appellant's probation officer had given him an ultimatum, through his girlfriend, to surrender by a certain date or she would seek a warrant for his arrest. When appellant did not surrender, she filed a petition to revoke his probation. The court issued a warrant for appellant's arrest on April 1, 2003. (RT 153-154.)

Based on the gunshot residue on the fence and angle of the bullet hole, district attorney investigator James Dawson opined that the gun was fired from three to eight inches away in an upward trajectory. (RT 168-169.) The gun could have been discharged when the person carrying it was approaching the gate to go over or through it. (RT 169.) He could not rule out the possibility of a struggle. (RT 172.)

### Second Trial

### Prosecution's Case

Marlon Barrera lived at 5971 Humboldt Hill Road with his girlfriend, Elmary Claybon, and his two children, Nathan and Seth. He owned a stereo store in McKinleyville and a restaurant in Eureka. (1 RT 5-6.)[6]

On March 26, 2003, Barrera and his brother, William Velasquez, returned to Barrera's home about 11:00 a.m. with some stereo equipment. Barrera was driving his brother's Toyota Corolla. (1 RT 6-8.) His girlfriend and children were not at home. (1 RT 20.)

Barrera saw a strange car parked in his driveway. (1 RT 9.) Velasquez told Barrera that he saw someone peeking out from Barrera's gate to the back yard. As Barrera ran toward the gate, he saw a black man jump over the fence to his neighbor's property. A white man with a shaved head and

---

6. Larissa Longholm was the mother of Seth, who was three and a half years old. Barrera and Longholm shared custody. (2 RT 275.)

baggy clothes was trying to jump over the fence. When the second man failed to jump the fence, he turned toward Barrera. (1 RT 10, 15-17, 26, 40-41.) Barrera had been "cussing" the second man, but then the man turned around with a gun pointed at Barrera's chest and said, "I'm going to kill you, Carlos." (1 RT 17; see 1 RT 41-42.) Barrera had not expected to see a gun and was "really scared." (1 RT 18-19.) He looked for cover and tried to hide behind a large beam holding up the patio awning. As he ran into his garage with the second man after him, he heard two gunshots. (1 RT 17-18.) He ran into his house and called 911. (1 RT 18-19.) When he was on the phone, he saw the gunman drive off in his brother's car, the keys of which he had left in the ignition. (1 RT 19-20.) Barrera told the 911 operator that the man had a gun "like a .45, I don't know." (1 RT 47-48.)

The police arrived in about five minutes. (1 RT 20.) They found one of the suspects in a swamp on his neighbor's property and took him into custody. (1 RT 20-21.) Barrera did not know his name at the time, but he had seen him at a local club before that day. (1 RT 23-24, 48-50.) He had never seen the man with the gun before. (1 RT 24.)

Barrera was "really nervous" and "in shock" when he spoke to the police that day. "All I was thinking was the flashback of the gun being pointed right at me." (1 RT 22.) When he went through his house with the police, it was in disarray, with drawers pulled out and belongings strewn about. A .22 caliber weapon was missing. (1 RT 22-23, 89; see 1 RT 133.)[7] The door from the back yard to the garage and from the garage into the kitchen were open; he usually left them closed, but unlocked. (1 RT 27-28, 53, 60.)

---

7. Barrera's girlfriend later called the police to tell them she was missing some money from her purse. (1 RT 45.) Barrera said he did not have a .45 caliber weapon and did not point a gun at appellant. (2 RT 274.)

About 30 to 45 minutes after the incident, Barrera was taken to see his brother's car, which officers found near a power plant surrounded by thick brush and tall trees. A suitcase and keys from the car were hidden nearby. (1 RT 24-25, 73-75, 159-161.) Later that day, Barrera positively identified the man with the gun from a photo lineup. (1 RT 26, 41.)[8/]

William Velasquez testified that he saw a black man peeking from the gate at the corner of Barrera's house after they had parked in the driveway. He followed his brother into the yard and saw a white man aiming a gun at him. When the man pointed the gun at Velasquez and told him to stand next to Barrera, Velasquez ran into the house through the back door. He was going to call 911 but went back outside when he heard a gunshot, because he thought his brother had been shot. (1 RT 62-63.) He did not see anyone in the yard so he went around the house to the front. He then saw the man with the pistol drive off in his car. (1 RT 63-64.) He said the man was wearing a black, hooded sweatshirt and had a beard. (1 RT 65.) He next saw the black man when he was arrested in Barrera's neighbor's yard. (1 RT 69.)

Deputy Sheriff Justin Braud contacted Dana Porter, Barrera's neighbor, who had reported seeing a man run through his yard. (1 RT 83-84.) With the help of a K-9 unit, police officers located a black male, David Gray, in the swamp on Porter's property and arrested him. (1 RT 84-86.) Gray told Deputy Sheriff Steven Quenell that he came to the area in a vehicle that was parked where the shots had been fired. (2 RT 354.) Later that afternoon, Braud showed Barrera a photo lineup containing appellant's photograph. (1 RT 90-91.) Barrera positively identified appellant as the second suspect. (1 RT 92-

---

8. Barrera later testified that he used his cousin's birth certificate to obtain a work permit and a driver's license because he was a minor from Nicaragua and he did not have the necessary documentation. He later applied for a work permit and driver's license in his own name. (2 RT 271-275.)

93.) A .45 caliber shell casing was found in Barrera's back yard about nine feet from a bullet hole surrounded by gunpowder residue that was in the fence bordering the property. (1 RT 94, 100-102, 131, 137.)

Porter testified that he heard a "few gunshots" that morning. (1 RT 149.) When he looked outside, he saw a black man frantically running back and forth in his yard. The man appeared to have something under his sweatshirt, possibly a weapon, and was wearing gloves. (1 RT 150-151.) Porter went outside with his deer rifle and told the man to get down on the ground. The man asked Porter to let him go and said something to the effect that he had just done something he should not have done. (1 RT 151-152.) Porter called 911. When the police arrived, he showed them where the man had been. Porter explained that when he went out to the front of his property to meet the police officers, the man disappeared into the swamp. With the help of a police dog, the officers coaxed the man out of the swamp. (1 RT 152-155.) The man was no longer wearing gloves. (1 RT 156.) Porter helped an officer search the swamp area, but they did not find anything. (1 RT 155-156.)

David Gray had known appellant for a few years; they used to "get high together." (1 RT 141.) Gray was arrested on March 26, 2003. He did not recall whether appellant was with him that day and did not recall going to 5971 Humboldt Hill Road. (1 RT 141-142.) He did not recall hearing any gunshots. Indeed, he did not recall any of the events on the day of his arrest. (1 RT 142-145.) On September 23, 2003, Gray pleaded guilty to the first degree burglary of 5971 Humboldt Hill Road, and was placed on probation. (1 RT 144-146.)

Appellant's probation officer, Tamara Hansen, said that appellant was living with his girlfriend, Nickee Shaw, in March 2003. (1 RT 164.) When she learned that appellant was wanted in connection with the March 26, 2003, incident, she tried to locate him. She told Shaw to tell appellant that he had until the Monday following the incident to turn himself in, after which she

10

would seek an arrest warrant. (1 RT 165-166.) Hansen filed a petition to revoke appellant's probation on April 1, 2003, after he failed to turn himself in. (1 RT 167.) Appellant eventually surrendered, on December 2, 2003. (1 RT 167-169.) After his arrest, Hansen asked appellant if anyone was after him and that was why he turned himself in. (1 RT 169-172.) Appellant responded, "Possibly." (1 RT 172.)

Sergeant Kirkpatrick impounded a Toyota Corolla that was left at Barrera's house on March 26, 2003. (1 RT 180-181, 185.) When he did an inventory search of the car before having it towed, he found various papers in the names of Nickee Shaw, who was the registered owner, and Vinnie Miles. (1 RT 182-183, 186.) In the trunk he found various papers with the names of appellant and Benny Miles, including receipts and appraisals for a watch and jewelry, and a handwritten list of jewelry items and dollar amounts. He also found a cell phone in the car and stereo equipment in the car and trunk. (1 RT 184-185, 187-189.) When Kirkpatrick obtained photographs of the individuals whose indicia was found in the car, he saw that appellant matched the description of one of the suspects in the burglary. He gave the photograph to Deputy Braud. (1 RT 185-186.)

Appellant's June 2, 2004, testimony from the first trial was read into the record. (1 RT 190-237.)

Elmary Claybon was engaged to Marlon Barrera. She had been with him about six years and had a four-year-old son, Nathan, with him. They had lived at 5971 Humboldt Hill Road for about two and a half years. (2 RT 262-263.)

When she arrived home between 3:30 and 4:00 p.m. on March 26, 2003, Claybon saw clothing all over the bedroom; the kitchen and laundry room also were in disarray. She called Barrera to ask what had happened and learned of the burglary. (2 RT 263-264, 267.) When she discovered that $200 was

11

missing from her purse, she called the sheriff's office to report it. (2 RT 265-266, 269.) She left the house again some time after 4:00 p.m. to pick up her son from daycare. (2 RT 270.) She was not aware of any firearms in the house. (2 RT 266.)

Larissa Longholm and Barrera had a son, Seth, together. They shared custody and had a good relationship as parents. Longholm thought Seth looked a lot like his father. (2 RT 343-345.) Longholm met appellant through another ex-boyfriend. They were friends, but had never dated. (2 RT 344-345.) She had not spoken to appellant for a "long time." (2 RT 345.) She had never given him any gifts. (2 RT 345-346.)

Eric Carr had been friends with appellant for several years and had shared an apartment with him at one time. On March 26, 2003, Carr was in jail. Appellant was not living at Carr's apartment at the time, but he may have had a key. (2 RT 276-278.)[9] Carr said that appellant and Longholm had dated "on and off for quite a long time." (2 RT 279.) He said he had seen them "hanging out several times" and appellant had "mentioned a few things about her." (2 RT 281.) Carr acknowledged that he had visited appellant in jail and that appellant told him about his prior testimony and expressed his dissatisfaction with the outcome of a prior hearing in the case. (2 RT 281.)

District Attorney investigator James Dawson testified that a .45 caliber pistol had two safety mechanisms that had to be released before it could fire. (2 RT 292.) If the slide was depressed backward, it also would prevent the gun from firing. (2 RT 309-311.) When a bullet is fired, gunpowder is ejected with it. (2 RT 296-297.) If a person tried to grab the gun away from someone holding it, and the gun discharged, the person probably would be burned by the gunpowder and his hand would be pinched by the slide. (2 RT 307-308.) After

---

9. Carr told a district attorney investigator that appellant should not have had a key to his apartment. (2 RT 348.)

looking at photographs of the bullet hole in the fence and the location of the shell casing found on the ground, Dawson opined that the shell casing was where he would expect it to be in relation to the bullet hole. (2 RT 296.) Dawson could not tell how far the weapon was from the fence when it was fired, other than to say it was "fairly close." He would need the weapon to do a comparison. (2 RT 308.) He guessed that the weapon had been fired from no more than three feet away. (2 RT 308-309.) It was possible that, if the safeties were disengaged and a person had his finger on the trigger and stumbled with enough force, the gun could discharge and go through the fence, consistent with the photographs of the crime scene. (2 RT 311-312.)

### Defense Case

Deputy Braud showed Barrera a photo lineup about 4:30 p.m. on March 26, 2003. Claybon was not there at the time. Braud did not receive any information about missing money. (2 RT 319-320.) He did not find a weapon or gloves when he searched the swamp after Gray's arrest. (2 RT 320-321.) Gray denied that he had a weapon and claimed he was just walking by when he heard gunshots. He went into the swamp to get away. (2 RT 321-322.)

Appellant admitted that he had suffered a felony conviction involving moral turpitude in 1999. He was on probation for that offense in March 2003. He lived with his girlfriend, Nickee Shaw, at the time. He had been friends with David Gray for several years and talked with him on a regular basis. (2 RT 355-356, 366, 368-369.) Appellant was about six feet three inches tall and weighed 220 to 230 pounds. (2 RT 371-372.)

On March 26, appellant went to Gray's house because Gray said he knew someone who was interested in buying Shaw's car. Gray drove Shaw's car to Humboldt Hill to meet with the potential buyer. When no one answered the door, he and appellant decided to wait. (2 RT 355-357.) Eventually Barrera

13

and his brother arrived. (2 RT 258.) Appellant said that he knew Barrera through Longholm, who he insisted was his girlfriend after she broke up with Barrera. He said there were rumors concerning his relationship with Longholm because she became pregnant during the time he was seeing her, and that Barrera bore animosity toward him because of the rumors. (2 RT 358-359.) Appellant later said "it wasn't really a big issue" and "wasn't like enough to try to shoot somebody about." (2 RT 379.) He used to hang out at Barrera's cousin's restaurant, where he would see Barrera. At the time, he did not think Barrera's animosity was "really a big deal." (2 RT 381; see 2 RT 412-413.)

Appellant and Gray were in the back yard when Barrera arrived. Gray, who had been looking through the fence, "took off running." Appellant became "suspicious" and also looked through the fence. He saw Barrera "kinda hunched over speed-walking" with a gun in his hand. (2 RT 359.) Appellant ran after Gray in an effort to get away, but was unsuccessful. (2 RT 359-360.)[10] Because Barrera was right behind him, he "just gave up." Appellant turned and said, "Hey man, what's going on?" Barrera said something to his brother in Spanish. After his brother ran back through the gate, Barrera started "talking real rapidly" to appellant, but appellant "wasn't really paying attention." As he backed up, Barrera approached him with the gun. (2 RT 360.) Barrera's brother yelled something from the other side of the fence, which distracted Barrera. At that moment, appellant grabbed the top of the gun and pushed it away from him. During the struggle, a shot was fired. Appellant burned his hand on the gun, which he thought jammed after the first shot. (2

---

10. On cross-examination, appellant said that Gray knew Barrera, whom appellant referred to as one of Gray's "dudes." However, Gray did not come out and speak to Barrera and instead ran off. (2 RT 382.) Even though appellant allegedly knew Barrera, he also did not identify himself and instead tried to flee. (2 RT 383.)

RT 360-361, 385-386.)[11] He ran even though he "knew [Barrera] couldn't fire it." (2 RT 386.)

Appellant ran out to his girlfriend's car and opened the door. When he realized he did not have the key, he ran to the car behind it. Seeing the keys in that car, he "just jumped in the car and took off." He "just wanted to get up out of there." (2 RT 362.) He drove to a gas station in search of a pay phone. (2 RT 362-363.) He was hoping to call someone because he was driving someone else's car and "didn't want anything to do with that." After failing to find a pay phone, appellant kept driving, but eventually "pulled over to get [his] senses." As he sat in the car, "that's when [he] realized [he] didn't have [his] phone, because [he] wasn't really paying attention." He started looking through the car in search of a phone and found a backpack. At that point he thought he saw Barrera's cousin drive by, so he jumped out of the car and ran into the bushes. (2 RT 363; see 2 RT 409.) He had the backpack and keys with him. He said he was scared and did not think about taking the items.[12] He went into the bushy area, then walked back to Eureka along the railroad tracks. He went to Eric Carr's house, which was unlocked. Carr's roommate was not at home. (2 RT 364.)

Appellant stayed at Carr's house the rest of the day, then called a friend and drove around with him.[13] He did not realize the "police were even

_____

11. Although appellant had earlier stated he did not think the animosity on Barrera's part was a big issue, he later testified that he thought Barrera pulled a gun on him because of Longholm. (2 RT 410.)

12. On cross-examination, appellant acknowledged that he pulled over in a very secluded area. (2 RT 392.) He denied that he hid the suitcase and keys in the brush. He just left them there. (2 RT 393.)

13. Carr's house was not far from the apartment appellant shared with Shaw. Appellant did not go home because he did not have his keys. At the time, he did not think he had done anything wrong and did not think anyone

involved" in the earlier shooting. He did not call the police himself because he was on probation and thought he would be violated because he took the car. (2 RT 365.) Also, he did not "associate with the police too much." (2 RT 390.) Shaw told him that his probation officer said she would not violate his probation if he turned himself in before Monday. However, when he read in the paper that he was wanted for a probation violation, he decided he was already in trouble. After staying in Eureka for two weeks and selling everything he had, he went to Las Vegas. (2 RT 365-366, 397-398, 407.) Appellant came back to Eureka in November and turned himself in because he "didn't do anything wrong." (2 RT 367.) However, he admitted that leaving the state was a violation of his probation. (2 RT 368.)

On cross-examination, appellant said that Longholm, Barrera, Velasquez, and Claybon had all lied in their testimony. (2 RT 395.)

### Prosecution's Reopening

Barrera testified that after the incident on March 26, 2003, he purchased a Glok firearm from Marcelli's Shootery. He was concerned because the second suspect had not been captured. (3 RT 460-461.) He also purchased a gun for his girlfriend's protection when he was not at home. (3 RT 463-464.) The only gun he had owned before was the .22 caliber weapon that his landscaper found in his back yard a few years earlier. (3 RT 461-463.)

Mike Marcelli testified that Barrera came in to purchase a nine-millimeter Glok on March 27, 2003. He completed the required forms and

---

was after him. (2 RT 399.) He called Shaw at some point, but did not go home, even after she was finished with school. (2 RT 400.) When he was driving around with his friend, he did not think there was a "big ... issue" and did not think the police were looking for him. (2 RT 401.) Later that evening, he heard that he had been mentioned on the news. (2 RT 403-405.)

picked up the gun on April 9, 2003, after the ten-day waiting period. (3 RT 467-468.) He sold a .45 caliber gun to Claybon on August 22, 2003. (3 RT 468-469.)

# ARGUMENT

## I.

## APPELLANT WAIVED HIS CLAIM THAT THE PROSECUTION SUPPRESSED EVIDENCE

Appellant contends the prosecution suppressed favorable, material evidence and thus denied him a fair trial. Specifically, he contends the prosecution suppressed evidence that "For Sale" signs were found in the car he and Gray drove to Barrera's home, and that evidence of the signs would have supported his claim that he went there to meet a potential buyer. His claim is waived. It is also without merit.

### A. Background

At the first trial, the parties stipulated that Deputy Kirkpatrick searched the car left at Barrera's house and removed the materials and documents contained in People's Exhibits 1 and 2. He did not find any firearms, ammunition, or burglar tools in the vehicle. (Aug. RT 101-102.) At the second trial, Kirkpatrick testified that he recovered numerous documents and other items from the car. He did not find burglar tools or ammunition. He did not say whether or not he found any "For Sale" signs. The inventory form documented the presence of valuable items in the vehicle. (1 RT 182-189.)

After the second trial, appellant brought a *Marsden* motion.[14] (3 RT 652-666 [Sealed Transcript].)[15] He contended that trial counsel failed to adequately represent him in numerous respects. (3 RT 654-659.) One of his contentions was that counsel did not file a suppression motion. He argued that

---

14. *People v. Marsden* (1970) 2 Cal.3d 118.

15. The same transcript can also be found at RT 232-246 [Sealed Transcript].)

if counsel had filed a suppression motion, he would have learned that the officers had found "For Sale" signs when they searched his girlfriend's car. He said his probation officer told him that an officer told her that they had found "For Sale" signs, although they were not mentioned in court. (3 RT 657-658.) In responding to appellant's various contentions, trial counsel stated, "As for the officer saying he found the for-sale sign, I don't recall reading that in the discovery. If it turns out that they withheld it, I think that might be an issue for a new trial, because this whole trial turned on the [sic] credibility." (3 RT 661-662.)

After listening to counsel's explanations and appellant's argument, the court stated it had not heard anything to support appellant's contention that counsel failed to provide adequate representation. The court noted that appellant had not been found guilty of the most serious charges. (3 RT 665-666.)

On November 10, 2004, the date set for sentencing, appellant indicated that he wanted to bring an oral motion for new trial. Defense counsel stated the motion was based on ineffective assistance of counsel. (3 RT 677.) Counsel continued:

> Well, Mr. Nordlof had mentioned that a for-sale sign was found in his vehicle. I did not know that during the trial. And, he claims that he told me. I have no recollection of him telling me. But he claims he told me, and that I did not investigate or ask any questions about the for-sale sign which he says would be evidence to bolster his credibility at the trial.
>
> That Mr. Dikeman argued in closing that he had no corroborating witnesses or evidence to support his side of the story, and the for-sale sign would support his side of the story. And again, I did not know about that while I was doing the trial. It was not in any of the police reports anywhere.

(3 RT 677-678.)

The court asked if appellant's motion for new trial was "based upon ineffective assistance of counsel, because you failed at the trial to present evidence regarding the existence of a for-sale sign relative to his vehicle?" Counsel responded that was correct. (3 RT 678.) Appellant said he had some additional issues that were reflected in a letter he had written to the court. The court noted the letter had been returned and that it was up to counsel to determine what issues to raise. (3 RT 678-679.) Counsel stated he was not going to argue his own ineffectiveness, but that he would get appellant's letter for the court. (3 RT 680.) After obtaining the letter, counsel said the remaining grounds appellant wished to raise were the same grounds he had raised in a previous *Marsden* hearing. (3 RT 681-682; see 3 RT 691-693 [court's summary of issues].) Appellant stated the issues all involved ineffective assistance of counsel. (3 RT 694.)

When discussing the merits of appellant's motion for new trial, the court again reiterated the grounds, including counsel's failure to present evidence of the "For Sale" sign. (3 RT 707-708.) The prosecutor stated that appellant's motion included a reference to the probation officer having seen signs in appellant's car, but that it was not clear when that occurred. (3 RT 710.) After the prosecutor argued there was no basis to grant a new trial, defense counsel stated, "Well, I would just add, I did not find out about the for-sale sign until after the trial was over. Whether that would change the outcome or not, I don't know." He said he did not ask the officer about a "For Sale" sign because he did not know about it. (3 RT 712.)

The court denied appellant's motion for new trial as follows:

Sure. I don't think, having heard the whole trial, that if the for-sale sign had been presented, should one exist—I don't know if one exists or not—but should one exist, that that would have made any difference in the outcome of the case.

To the extent of them believing that the reason Mr. Nordlof went up there was not knowing where he was going, being told by this

other person that someone wanted to buy his car, that they would have found that story to be credible, even though his car could have been for sale, that's almost kind of a collateral.

I don't think that that arises [*sic*] to the level of denying him a defense, or in any way denying him due process in this case, about not getting a fair trial.

As to some of the other issues about not calling, presenting hearsay evidence, you know, I think the Record will speak for itself. Mr. Marcelli actually came in and testified, the jury was well aware of any inconsistencies between what Mr. Barrera and his wife said on the stand, and what Mr. Marcelli said.

So, they had all of that to consider. It wasn't evidence regarding what the alternate juror had said somebody had told her, that somebody came into court and told the jury that. That was all before them.

So having considered all of this, I don't see any basis to grant a new trial in the matter. I think Mr. Nordlof received a fair trial.

I think [defense counsel] cross-examined the witnesses, you know, put on the defense, Mr. Nordlof testified, had an additional witness, there was rebuttal evidence put on by the People relative to the juror that was excused with information that she had, and actually they did not convict him on the serious, serious charge here, the 245(a)(1) with the allegation of personally using a firearm. They hung, and that charge was dismissed by the People, rather than trying it a third time on.

So, I don't find that [defense counsel] acted below reasonable competence or anything here, that resulted in a withdrawal of a potential meritorious defense, nor would any more favorable determination have been made by the jury if—what was raised in your letter here could have been brought in, a lot of it is not admissible evidence to begin with, sort of hearsay things.

But in any event, is there anything further on the motion, the oral motion for a new trial from either Counsel? This is all in the Record, and I—you know, did indicate that we did make Court's Exhibit No. 1 [appellant's pro se new trial motion] a part of the Record, as you had requested, Mr. Nordlof.

(3 RT 712-714.)

**B.    Appellant Waived His Claim That The Prosecution Suppressed Material Evidence**

As the record shows, the only time appellant made any motion with respect to the alleged "For Sale" signs in his car was in the context of his claim that counsel failed to adequately represent him. In the *Marsden* hearing, appellant claimed that he learned from his probation officer that a police officer found the signs when his car was searched. In his new trial motion, appellant claimed that he told his counsel about the signs before trial and that counsel was ineffective for failing to ask about them in his cross-examination. In both contexts, appellant claimed his counsel was ineffective for failing to present evidence of the signs to bolster his credibility. Although defense counsel suggested at the *Marsden* hearing that if evidence of the signs had been suppressed, it might be grounds for a new trial motion, he never brought any such motion at the time of sentencing. The only basis for the new trial motion, which appellant brought on his own, was ineffective assistance of counsel.

"Defendant argues that the prosecution knew or should have known the evidence was false and failed to disclose material evidence favorable to a defendant in violation of *Brady v. Maryland* (1963) 373 U.S. 83. We disagree. Because the claim of false evidence is based on information available to defendant at trial, and he did not object on this basis, the claim is not cognizable on appeal." (*People v. Carpenter* (1997) 15 Cal.4th 312, 411.)

Appellant's failure to object or make any motion arguing that the prosecution failed to disclose material, favorable evidence waives his claim. The evidence plainly was "available to defendant at trial," since appellant claims he drove his girlfriend's car and that it contained the "For Sale" signs. In his new trial motion, he even claimed he told his counsel about the evidence before trial and argued that counsel was ineffective for failing to ask about the

22

signs.[16] Appellant's contention below was not that the prosecution suppressed any evidence, but that counsel was ineffective for failing to use the evidence in his defense. On this record, appellant's claim that the prosecution suppressed material, favorable evidence has been waived.

Even if appellant's claim had not been waived, or if he had argued his counsel was ineffective for failing to bring a *Brady* motion (see *People v. Carpenter, supra,* 15 Cal.4th at p. 411), his claim would be without merit. As the trial court observed, it was not clear there were any "For Sale" signs found in the vehicle. Appellant's contention at the *Marsden* hearing was that his probation officer told him that she had heard the officers found signs when they inventoried the car. In his new trial motion, appellant claimed he already knew about the signs, which, since he claimed he was attempting to sell the car for his girlfriend, made more sense. In any event, there is no evidence the prosecution suppressed evidence. The hearsay statement attributed to the officer was never explored, nor were any signs produced, even after the issue had been raised by appellant. Later, appellant said he knew about the signs before trial, but there still was no evidence that the signs actually existed. The fact that counsel chose not to bring a *Brady* motion after learning of the alleged existence of the signs suggests that he found no basis for such a motion. And, as noted, appellant was in the best position to know if there were any "For Sale" signs in the car. Accordingly, the record does not support appellant's *Brady* claim, nor would it support any claim of ineffective assistance of counsel for failure to bring a *Brady* motion. (See *People v. Carpenter, supra,* 15 Cal.4th at p. 411.)

Moreover, as the court observed in denying appellant's new trial motion, the existence of any "For Sale" signs was a collateral matter. Even if the jury believed appellant's girlfriend's car was for sale, that would not

---

16. Appellant also told his probation officer that his counsel had failed to bring the signs to the jury's attention. (CT 74 [CR983664].)

prohibit it from concluding that appellant and Gray had decided to commit a burglary. As appellant stated in his new trial motion, he had removed the signs from the windows and placed them inside the car. (CT 299 [CR041104].) Accordingly, the signs, assuming they existed, were far from exonerating. The jury might have believed appellant hid the signs to render the car less conspicuous, or that he and Gray decided to burglarize Barrera's house after discovering no one was at home and the doors were unlocked.

Further, the first jury convicted appellant of felon in possession of a firearm, and the second jury convicted him of vehicle theft, which he essentially admitted, and attempted burglary, which was supported by the physical evidence. None of the verdicts were inconsistent with the possibility that appellant was driving a car that was for sale, as he claimed. Thus, had the jury learned of any additional evidence that the car was for sale, it is not reasonably probable the outcome would have been different. (See *People v. Carpenter, supra,* 15 Cal.4th at p. 411.) Accordingly, the absence of any evidence that the car contained "For Sale" signs could not have been prejudicial. (*Ibid.*)

## II.

## THE TRIAL COURT PROPERLY INSTRUCTED THAT SUPPRESSION OF EVIDENCE COULD SHOW CONSCIOUSNESS OF GUILT

During the second trial, defense counsel stated he had objected to the "suppression instruction" at the first trial on grounds that there was no evidence appellant had suppressed anything. He noted the prosecutor had asked for the instruction "in reference to the .22." (2 RT 330.) Later, when the court and parties were discussing the instructions for the second trial, counsel objected to CALJIC No. 2.06 because appellant had denied that he took a weapon or cash, the items were never found, and there was thus no evidence that appellant suppressed the items. (2 RT 431.) The prosecutor argued there was no requirement that the items be found before the instruction could be given. "That would seem to reward the successful suppressor and penalize the unsuccessful one." (*Ibid.*) The court responded,

> Okay. I think there is sufficient evidence to give 2.06 in this matter. And, again, the way it's written, it's up to the jury to determine whether this even applies. They're also told when that instruction is given it's up to them to decide whether it applies or not. So I think there's enough here for 2.06. So that will be given.

(2 RT 431-432.)

When instructing the jury, the court gave CALJIC No. 2.06 as follows:

> If you find that the defendant attempted to suppress evidence against himself in any manner, such as by concealing evidence, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide.

(3 RT 480; see CT 201 [CR041104].)[17]

Appellant contends it was error to give this instruction because there was no evidence that he sought to suppress anything. He also claims the instruction created a presumption that lightened the prosecution's burden of proof. His contentions are without merit.

During closing argument at the second trial, the prosecutor reviewed the evidence that showed appellant had sought to suppress or conceal his involvement in the crime.

> And was there evidence of that here? Yes. He abandoned the victim's car. He hid the keys and the suitcase that might link him to the car in the—in the woods where they were found by Sergeant Hanson. The money's gone. The .22 caliber pistol is gone. The .45 caliber pistol is gone. And he changed his appearance to make identification more difficult when he finally came in some eight months later and surrendered.

(3 RT 504.)[18] The prosecutor added that "suppression evidence standing all by itself would not be enough to support a conviction." (*Ibid.*) The prosecutor's argument was based on testimony at the trial as well as the exhibits submitted, such as photographs that showed appellant's appearance in March 2003 and at the time of his surrender. (*Ibid.*)

CALJIC No. 2.06 is properly given where the jury could reasonably infer from the evidence that the defendant attempted to suppress evidence.

---

17. CALJIC No. 2.06 is derived from Evidence Code section 413, which provides: "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."

18. In the first trial, the prosecutor observed in closing argument that the .45 caliber weapon was never recovered, property from the burglary was never recovered, appellant fled from the area and concealed himself for eight months, and altered his appearance before surrendering to the police. (RT 205-208.)

(*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140.) Here, appellant admitted that he took Barrera's car and later abandoned it in a remote area because he did not want to be seen in a stolen car. He denied that he hid the suitcase and keys, but an officer testified that the items were secreted in the bushes nearby. Barrera testified that he was missing a .22 caliber handgun and money after the incident, and that appellant wielded a .45 caliber handgun when they confronted each other in the back yard. None of the these items were ever recovered. Photographic evidence showed that appellant had changed his appearance by growing hair and a beard before he surrendered to the police. Barrera was able to pick appellant's photograph out of a lineup the day of the burglary, but he was unable to identify appellant at trial. Based on this evidence, CALJIC No. 2.06 was properly given. (See, e.g., *People v. Echevarria* (1992) 11 Cal.App.4th 444, 451 [instruction properly given where defendant shaved off his beard and moustache and cut his hair after the murder; witness was able to identify the defendant from a photo lineup, but was unable to recognize him at trial]; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1296 [instruction properly given where defendant attempted to get rid of a gun].)

Contrary to appellant's argument, the instruction does not create a presumption that the defendant attempted to suppress evidence. It simply states that, if the jury finds the defendant attempted to suppress evidence against him, it can consider that as a circumstance tending to show consciousness of guilt. The instruction was "beneficial to defendant, to the extent that it made clear the refusal [to participate in a lineup] did not, in itself, suffice to establish his guilt." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1235; see also *People v. Johnson* (1993) 6 Cal.4th 1, 37 [CALJIC No. 2.15 reflects the proposition that a burglary may not be presumed from mere possession of stolen property unless the commission of the offense is corroborated; ultimate question whether or not charged offense occurred was left to the jury through the usual instructions

27

regarding the elements of that offense].) CALJIC No. 2.06 "simply allowed the jury to infer consciousness of guilt if it found that defendant attempted to suppress evidence against himself." (*People v. Johnson, supra,* 3 Cal.4th at p. 1235.) So long as the trial court makes the preliminary determination that there is evidence in the record which, if believed, would support the desired inference of consciousness of guilt, the instruction may properly be given. (*Id.* at p. 1236.) Here, the trial court expressly found sufficient evidence to warrant the instruction. Accordingly, the instruction was properly given. (See *ibid.*; *People v. Mizchele* (1983) 142 Cal.App.3d 686, 692.)

Appellant fails to show the instruction should not have been given. He also fails to show a reasonable probability that the result would have been more favorable in the absence of the instruction. (See *People v. Saddler* (1979) 24 Cal.3d 671, 683.) Appellant admitted that he took Barrera's car and later abandoned it. The car keys and a suitcase were found hidden in some bushes nearby. Photographic evidence showed appellant had changed his appearance before surrendering. Using common sense, the jury could have inferred appellant hoped to evade identification, regardless whether the instruction was given. In addition, Barrera and his brother testified that appellant pointed a gun at them, and Barrera testified that appellant shot at him. He also testified that his home was in disarray and a gun and money were missing. Accordingly, substantial evidence supported appellant's convictions for felon in possession of a firearm, attempted burglary, and vehicle theft. Any instructional error was thus manifestly harmless.

28

## III.

## THE TRIAL COURT WAS NOT REQUIRED TO GIVE ACCOMPLICE INSTRUCTIONS

Appellant contends the trial court erred by failing to give accomplice instructions with respect to the testimony of David Gray. The record does not support his claim.

The trial court did not give accomplice instructions in this case. The court did instruct as to Gray's testimony as follows:

> There has been evidence in this case indicating that David Gray pled guilty to the burglary for which the defendant is currently on trial. Such evidence does not necessarily mean that the defendant is also guilty of that offense, but was admitted only for the limited purpose of evaluating Mr. Gray's credibility. It may not be considered by you for any other purpose.

(RT 184 [first trial]; 3 RT 483 [second trial].) Defense counsel had requested the special instruction at both trials. (2 RT 326-327.)

"Under [Penal Code] section 1111, an accomplice is 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.'" (*People v. Lewis* (2001) 26 Cal.4th 334, 368.) "'If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony. [Citation.] But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony. [Citation.]' [Citation.]" (*Id.* at p. 369.) Where sufficient evidence warranting accomplice instructions exists, the trial court must so instruct, even in the absence of a request. (*People v. Brown* (2003) 31 Cal.4th 518, 182; *People v. Lewis* (2004) 120 Cal.App.4th 837, 848.) "[A]n accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts; accordingly, the

law requires an accomplice's testimony be viewed with caution to the extent it incriminates others." (*People v. Brown, supra,* 31 Cal.4th at p. 183; see *People v. Lewis, supra,* 120 Cal.App.4th at pp. 848-849.) "Moreover, an accomplice's testimony must be corroborated before a jury may consider it." (*People v. Brown, supra,* 31 Cal.4th at p. 183.)

The rule regarding accomplice testimony also applies to out-of-court statements used as substantive evidence of guilt where the statements are made under suspect circumstances, such as during a police interrogation. (*Ibid.*) However, if the out-of-court statements are declarations against penal interest, the rule regarding accomplice testimony does not apply. "'The usual problem with accomplice testimony—that it is consciously self-interested and calculated—is not present in an out-of-court statement that is *itself sufficiently reliable* to be allowed in evidence.' [Citation.]" (*Ibid.,* original italics.) In *Brown,* the statements at issue were "themselves made under conditions sufficiently trustworthy to permit their admission into evidence despite the hearsay rule; namely, they were declarations against [the declarant's] penal interest. Therefore, no corroboration was necessary, and the court was not required to instruct the jury to view [the declarant's] statements with caution and to require corroboration." (*Ibid.*)

Here, Gray testified at both trials that he did not recall whether he saw appellant on the day of the crimes and did not recall any of the events that day. He admitted that he had pleaded guilty to first degree burglary and been placed on probation. Officers testified that Gray initially told them he had heard gunshots and jumped over a fence. He also told officers that he arrived in a vehicle parked at Barrera's house. Barrera's neighbor testified that Gray said something to the effect that he had done something wrong.

None of these statements implicated appellant. On the contrary, they were statements against Gray's penal interest and were thus independently

30

reliable. Gray said nothing that indicated appellant was even present, let alone that he participated in the crimes to which Gray pleaded guilty. In these circumstances, accomplice instructions were not required.

Moreover, although Gray was called as a witness by the prosecution, his testimony was akin to that of a defense witness. If a witness is called by the defense, accomplice instructions should be given only at the defendant's request. (*People v. Provencio* (1989) 210 Cal.App.3d 290, 308.) When the witness is called by both parties, the instructions should be tailored to relate only to his testimony on behalf of the prosecution. (*Ibid.*)

In this case, Gray's testimony showed he was clearly allied with the defense. (Cf. *id*. at p. 309.) "Even where a sua sponte duty to instruct exists, it is inappropriate to so instruct where such instructions would potentially prejudice a defendant." (*Ibid.*) In *Provencio*, the defendant denied participation in the burglaries, and the witness testified on his behalf consistent with that defense. In that circumstance, the accomplice instructions could have raised a reasonable inference that all of the witness's testimony was suspect, resulting in prejudice to the defense. "Any instruction concerning accomplice testimony in this case would have had to have been carefully tailored to mesh with the defense, a task inappropriate for sua sponte instruction." (*Ibid.*) Accordingly, there was no sua sponte duty to give accomplice instructions. (*Id*. at pp. 309-310.) Here, too, sua sponte instructions would have been inappropriate because they would have cast Gray's testimony as suspect, including his testimony that tended to exonerate appellant.

Finally, even if the trial court should have given accomplice instructions, their absence was harmless. "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record. [Citation.] Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish

31

every element of the charged offense. [Citations.] . . . The evidence is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth. [Citation.]" (*People v. Brown, supra,* 31 Cal.4th at pp. 183-184, internal quotation marks omitted; see *People v. Lewis, supra,* 26 Cal.4th at p. 370.) The California Supreme Court has observed that "'[n]o cases have held failure to instruct on the law of accomplices to be reversible error per se.' [Citation.]" (*People v. Lewis, supra,* 26 Cal.4th at p. 371.)

·    Here, as in *Lewis, supra,* the trial court gave other instructions, "including '[a] witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others' (CALJIC No. 2.21.2), along with instructions on a witness's credibility (CALJIC No. 2.20) and the character of a witness for honesty or truthfulness or their opposites (CALJIC No. 2.24)," which "were sufficient to inform the jury to view [the witness's] testimony with care and caution," in line with the accomplice instructions. (*People v. Lewis, supra,* 26 Cal.4th at p. 371; see RT 182-184; 3 RT 481-483.) And, as in *People v. Lewis, supra,* 120 Cal.App.4th at p. 850, the challenged witness's "testimony supplied no crucial element of the prosecution's case." Further, "counsel argued the matter at length and the jurors were told, if any telling was necessary, in judging credibility they could consider the existence of a witness's motives, bias and interests." (*Ibid.*)

In light of the absence of any crucial information supplied by Gray, the corroborating evidence tending to show appellant's involvement in the crimes supplied by other witnesses and evidence, and the instructions as a whole that informed the jury how to view a witness's testimony, appellant cannot show a reasonable probability that, had the accomplice instructions been given, the result of the proceeding would have been different. (See *People v. Lewis, supra,* 26 Cal.4th at pp. 370-371.)

32

IV.

**THE TRIAL COURT PROPERLY INSTRUCTED ON
ATTEMPTED BURGLARY AND PROPERLY DID
NOT INSTRUCT ON THE LESSER RELATED
OFFENSE OF TRESPASS OR THE UNREQUESTED
PINPOINT INSTRUCTION OF INVITED PUBLIC
ACCESS**

Appellant contends the trial court erred by instructing on attempted
burglary, although he acknowledges he did not object to the instruction. He
also acknowledges that he did not request instructions on trespass or invited
public access, which he now claims should have been given. We disagree.

A. **The Trial Court Properly Instructed On The Lesser Offense Of
Attempted Burglary**

The trial court instructed the jury on the elements of first degree
burglary, as charged in count one. (3 RT 487-490.) The court also instructed
on attempt to commit a crime with respect to count one. (3 RT 490.)

A trial court must instruct on lesser included offenses when the
evidence raises a question as to whether all of the elements of the charged
offense were present, but not when there is no evidence that the offense was
less than that charged. (*People v. Barton* (1995) 12 Cal.4th 186, 194-195.) The
court must instruct on an applicable lesser included offense even if the
defendant expressly objects to it being given. A defendant has no right to an
acquittal when the evidence is sufficient to establish a lesser offense. (*Id.* at p.
195.)

Appellant contends the trial court's instruction on attempted burglary
was error because there was no evidence that the offense was less than that
charged. Specifically, he contends there was no evidence to support an
interrupted or abandoned entry into Barrera's home. He claims if the jury had
believed Barrera's testimony that his house was in disarray and items were

33

missing, it would have convicted him of burglary. If the jury had believed appellant's testimony that he went to Barrera's house to sell a car, it would not have convicted him of burglary. Since the evidence did not support an attempt to commit the crime, appellant contends, the attempted burglary instruction was error.

The record does not support appellant's claim. The evidence showed that Gray and appellant went to Barrera's house, where they were discovered in the back yard. Both men fled as soon as Barrera and his brother arrived. Barrera testified that his house was in disarray and a gun was missing. He said that he usually left the doors to the garage and back yard closed but unlocked. When he arrived home that day, the doors were open. Barrera's girlfriend confirmed that the house was in disarray and said money was missing from her purse. Photographs of the house were shown to the jury. Barrera's neighbor, Dana Porter, testified that he saw Gray in his back yard soon after hearing gunshots. Gray was wearing gloves and appeared to have something under his sweatshirt. When Gray was taken from the swamp, he was no longer wearing gloves. Porter searched the swamp with an officer, but they did not find anything.

The evidence was plainly sufficient to support a completed burglary. However, there were two suspects on Barrera's property. It was possible that both men entered Barrera's home or that only one did so. The jury may have been unsure whether appellant was the one who took Barrera's property, since Gray was the one wearing gloves and appeared to have something under his shirt. It was also possible that the men were in the process of entering when Barrera arrived home, since two doors had been opened. The jury may have disbelieved Barrera's testimony that property was missing, but believed that an attempted entry had been made. In that case, it could have found that appellant attempted to commit a burglary by opening one of the doors. It also could have

34

found an attempt based on appellant's intent to aid Gray in the commission of the burglary. On this record, the court did not err by instructing on attempted burglary.

### B. The Court Was Not Required To Instruct On The Lesser Related Offense Of Trespass

Appellant contends the court should have instructed on the lesser related offense of trespass, although he acknowledges he did not request such an instruction below.

In *People v. Birks* (1998) 19 Cal.4th 108, the court held that a criminal defendant does not have "a unilateral entitlement to instructions on lesser offenses which are not necessarily included in the charge." (*Id.* at p. 136.) In so holding, the court overruled *People v. Geiger* (1984) 35 Cal.3d 510, which had "held that in certain circumstances, the defendant has a state constitutional right to instructions on lesser offenses that are *not* necessarily included in the stated charge, but merely bear some conceptual and evidentiary 'relationship' thereto." (*People v. Birks, supra,* 19 Cal.4th at p. 112, original italics.) The parties may nevertheless agree to instructions on lesser related offenses, but such instructions should not be given if one party objects. (*Id.* at p. 136, fn. 19; *People v. Overman* (2005) 126 Cal.App.4th 1344, 1359 ["[O]ur state Supreme Court has held that instructions on lesser related offenses must not be given over the People's objection."].)

There also is no entitlement to lesser related instructions under federal law. "[T]he United States Supreme Court has expressly refrained from recognizing a federal constitutional right to instructions on lesser included offenses in noncapital cases." (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) Accordingly, the California Supreme Court has held that the rule requiring sua sponte instruction on lesser included offenses supported by the

35

evidence derives exclusively from California law. (*Id*. at p. 169.) If the federal constitution does not require instruction on lesser included offenses in noncapital cases, it surely does not require instruction on lesser related offenses. The *Birks* court so found, concluding that "*Geiger*'s rationale has since been expressly repudiated for federal purposes by the United States Supreme Court, and it continues to find little support in other jurisdictions." (*People v. Birks, supra*, 19 Cal.4th at p. 112.) The court later reiterated that "all arguable federal support for [*Geiger*'s] conclusions has been withdrawn." (*Id*. at p. 123.) Citing and discussing two post-*Geiger* cases, *Hopkins v. Reeves* (1998) 524 U.S. 88 and *Schmuck v. United States* (1989) 489 U.S. 705, the *Birks* court concluded that there was no federal constitutional basis for a claim that instruction on lesser related offenses was required. (*People v. Birks, supra,* 19 Cal.4th at pp. 123-133.)

"It appears well settled that trespass is not a lesser necessarily included offense of burglary, because burglary, the entry of specified places with intent to steal or commit a felony (§ 459), can be perpetrated without committing any form of criminal trespass (see § 602)." (*People v. Birks, supra,* 19 Cal.4th at p. 118, fn. 8.) Since trespass is a lesser related, not lesser included, offense of burglary, the court had no sua sponte duty to instruct on that crime. Moreover, appellant's failure to request any instruction on trespass below belies his contention on appeal that the instruction should have been given.

Appellant suggests that instruction on lesser related offenses is required where the instruction reflects the defense theory of the case. He does not explain how his analysis differs from the arguments previously rejected in *Birks* and the cases cited therein. His reliance on *People v. Waidla* (2000) 22 Cal.4th 690 is misplaced. In that capital case, the court rejected the defendant's contention that he could have been found guilty only of trespass, rather than burglary. (*Id*. at pp. 732-736.) "As explained, there was not substantial

36

evidence that would absolve him of burglary and robbery but not trespass and assault. Indeed, the People's evidence was in sum that he was guilty as charged, whereas his evidence was in sum that he was not guilty at all. It is not reasonably probable that his counsel's failure to request instructions on trespass and assault, even if professionally unreasonable, adversely affected the outcome. That is because it is not reasonably probable that any such request would have resulted in the giving of such instructions by the superior court and in the returning of verdicts in accordance therewith by the jury." (*Id.* at p. 735.) The analysis in *Waidla* does not change the general rule stated in *Birks* that trespass is not a necessarily included offense of burglary. Here, the trial court did not err by failing to instruct on trespass, particularly since appellant never raised the issue.

## C. The Trial Court Was Not Required To Give A Pinpoint Instruction On Invited Public Access

Appellant contends the court should have instructed on the law "governing lawful implied invitee access on property." (AOB 97.) He contends that he was lawfully on Barrera's property to sell a car, but the jury could not have credited his defense without appropriate instructions. We disagree.

A defendant "is entitled, on request, to an instruction 'pinpointing' the theory of the defense," but "instructions that attempt to relate particular facts to a legal issue are generally objectionable as argumentative [citation], and the effects of certain facts on identified theories 'is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate.'" (*People v. Wharton* (1991) 53 Cal.3d 522, 570.) A trial court has no obligation to give special instructions, even if legally correct, that are repetitious of other properly given instructions. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1079-

1080, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) That is, a trial court is not required to give defense-requested pinpoint instructions that simply repeat or paraphrase the applicable CALJIC instructions, making them superfluous. (*People v. Sanders* (1995) 11 Cal.4th 475, 560-561.)

A reviewing court must consider the instructions as a whole and in light of the record in determining whether error has been committed. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248; see *People v. Kegler* (1987) 197 Cal.App.3d 72, 79-80 [pinpoint instruction properly refused where other instructions adequately explained the issue].) Even if the trial court erroneously fails to give a pinpoint instruction, reversal is not required unless it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*People v. Wharton, supra,* 53 Cal.3d at p. 571.)

Appellant never requested any instruction pinpointing the particular defense he now asserts. Accordingly, the trial court did not err by failing to instruct on the defense he now raises. Moreover, appellant's analysis suggests that even if he had requested a pinpoint instruction, the court could have refused it because appellant attempts to relate particular facts to a legal issue, making the (belated) proposed instruction argumentative. In any event, had the jury believed appellant's claim that he was lawfully on Barrera's property to sell a car, it would not have convicted him of attempted burglary. Its verdict, based on findings beyond a reasonable doubt, necessarily rejected any claim that appellant was lawfully on Barrera's property. It is thus not reasonably probable that instruction on invited public access would have resulted in a more favorable outcome.

# V.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING APPELLANT'S MOTION FOR NEW TRIAL ON COUNT THREE

Appellant contends the trial court should have granted his motion for new trial on count three, felon in possession of a firearm. He also contends his counsel was ineffective for failing to move for a new trial on that count at the start of the second trial. He bases his claim on the evidence, revealed at the outset of the second trial, that Barrera had used his cousin's identification information to obtain a work permit and driver's license, and so had two social security numbers in his name. Appellant claims that had this impeaching information been known to the first jury, he would not have been convicted of count three. The record shows the trial court did not abuse its discretion by denying appellant's motion.

At the start of the second trial, the prosecutor noted that defense counsel had talked about questioning Barrera about two social security numbers and said he objected to any such questioning. (7/28/04 RT 53-54.) At the time, the parties were attempting to discover whether Barrera had in fact used two social security numbers. The prosecutor said he had run a rap sheet on Barrera earlier and had not found any crimes of moral turpitude. (7/28/04 RT 54-55.) Defense counsel had since come across information to the effect that Barrera had two social security numbers, and the prosecutor was attempting to look into it. (7/28/04 RT 55-58.)

The next day, the prosecutor provided the information he had thus far discovered regarding Barrera's social security numbers. (1 RT 1-2.) Later, the prosecutor was able to confirm that Barrera had two social security numbers. One of the numbers showed an arrest in San Diego in February 1999 for

attempted alien smuggling and attempted illegal entry. He was attempting to contact Barrera and arrange for his return. (1 RT 118.)

During the trial, the court held an Evidence Code section 402 hearing in which Barrera explained the circumstances of having two social security numbers and the incident in San Diego. (2 RT 242-257.) The court ruled that the parties could examine Barrera regarding why he had two social security numbers, but, under Evidence Code section 352, they could not examine him regarding the incident in San Diego. (2 RT 255-257.) When recalled, Barrera testified that he had used his cousin's birth certificate to obtain a work permit and a driver's license because he was a minor from Nicaragua and he did not have the necessary documentation. He later applied for a work permit and driver's license in his own name. (2 RT 271-275.)

At the time of sentencing, appellant brought a pro se motion for new trial alleging ineffective assistance of counsel in numerous respects, intermingled with some other issues. (3 RT 677-694.) One of his contentions appeared to be that the defense did not "get the FBI record on Mr. Barrera." (3 RT 708.) The court denied appellant's motion for new trial without specifically referencing the information regarding Barrera. (3 RT 712-716.)

Although appellant now claims he specifically sought a new trial on count three because he did not have the impeaching information on Barrera at the first trial, the record provides little support for his claim. Other than the brief reference to an "FBI record," neither appellant, his counsel, nor the court made any reference to the lack of impeaching information at the first trial with respect to count three, nor was there any discussion regarding a new trial on that count, or on grounds of newly discovered evidence. Accordingly, appellant's claim that the trial court abused its discretion by denying his motion on that ground is waived, and without merit, since it does not appear he specifically made that contention.

In any event, even assuming the court understood appellant had moved for a new trial on count three on the grounds now stated, the court did not abuse its discretion by denying the motion.

> In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court "should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict." [Citation.]
>
> A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. "'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'" [Citation.]

(*People v. Davis* (1995) 10 Cal.4th 463, 523-524.)

Appellant's contention that the court should have granted him a new trial on count three is without merit. Although he did not have the specific impeachment information on Barrera at the first trial, his counsel thoroughly cross-examined Barrera's account of the incident and highlighted the inconsistencies in Barrera's testimony and his statements to the police. Indeed, counsel succeeded in obtaining a deadlocked jury on all counts and allegations with the exception of the felon in possession of a firearm charge. Thus, it is not reasonably probable the additional impeachment information would have made any difference.

Appellant's comparison of the jury's verdicts at the second trial is irrelevant, since the first jury rejected the charges the second jury later found proved. Obviously, the jury's verdicts at the two trials were inconsistent, but that does not establish that the impeachment evidence at issue was a determining factor. On the contrary, even with the additional impeachment

information, the second jury returned verdicts on two additional counts rejected by the first jury.

Implicit in the court's discussion at the hearing on the new trial motion was its consideration of "'the proper weight to be accorded the evidence'" and its finding that there was "'sufficient credible evidence to support the verdict.'" (*People v. Davis, supra*, 10 Cal.4th at p. 524.) In light of the evidence presented at the first trial that appellant had a .45 caliber gun when Barrera encountered him, the trial court could properly find that sufficient credible evidence supported the verdict. Appellant's contention that the trial court abused its discretion by denying his new trial motion is not supported by the record. For the same reasons, counsel was not ineffective for failing to seek a new trial on count three.

## VI.

## SUFFICIENT EVIDENCE SUPPORTS APPELLANT'S CONVICTION FOR ATTEMPTED BURGLARY

Appellant contends insufficient evidence supports his conviction for attempted burglary. The record does not support his claim.

The applicable standard of review is well established.

To determine sufficiency of the evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole.

(*People v. Johnson, supra,* 6 Cal.4th at p. 38.) Substantial evidence is evidence that is reasonable, credible, and of solid value, upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) The standard of review is the same in cases where the People rely primarily on circumstantial evidence. (*People v. Bloyd* (1987) 43 Cal.3d 333, 346.) Even if the reviewing court believes that the evidence might also reasonably be reconciled with the innocence of the defendant, this view "does not warrant interference with the determination of the trier of fact." (*People v. Towler* (1982) 31 Cal.3d 105, 118.) Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Appellant repeats his earlier contention that there was no evidence of an attempted burglary, as opposed to a completed burglary. As previously explained, appellant's contention is without merit. Barrera testified that his

43

house was in disarray when he arrived home and that items were missing. He also testified that he left his doors closed, but unlocked, and that when he returned home the doors were open. Both appellant and Gray attempted to flee from the house when Barrera arrived. Gray was wearing gloves and may have had something under his sweatshirt.[19]  The jury thus could have found that Gray entered the house, but appellant only attempted to do so. Accordingly, the jury had more than sufficient evidence upon which to find appellant guilty of attempted burglary.

---

19.    Although Porter thought Gray might have a gun under his sweatshirt, Gray also could have been hiding burglary tools or items from Barrera's home.

## VII.

## SUFFICIENT EVIDENCE SUPPORTS APPELLANT'S VIOLATION OF PROBATION

Appellant claims his probation was violated solely on the basis of his conviction on count three at the first trial. Since that conviction was invalid, he claims, his probation violation also was invalid. The record does not support his claim.

At the preliminary examination held on December 16, 2003, appellant's probation officer testified that appellant had been photographed with known gang members in January 2003, that he failed to keep an appointment on March 29, 2003, and that she did not know where appellant was residing after March 28, 2003. Appellant had told his girlfriend that he did not plan to return to his former residence. (12/16/03 RT 39-43.) In addition to the probation officer's testimony, the court heard testimony regarding the new charges against appellant. (12/16/03 RT 6-38.) After holding appellant to answer on the new charges, the court asked if appellant had any further defense with respect to the probation violation. (12/16/03 RT 46.) When defense counsel declined to present additional evidence at that time, the court found the notice of probation violation true based on the probation officer's testimony as well as that of the other witnesses. (*Ibid.*) After the first trial, the trial court found appellant in violation of his probation based on the jury's verdict on count three. (RT 226.)

At sentencing after the second trial, the court reviewed appellant's new trial motion, including his claim that he had been sentenced on his probation violation without a hearing. (3 RT 703-704.) The court noted that appellant had been found in violation of his probation both at the preliminary hearing and after the first trial. (3 RT 704.) Although the court stated that appellant could challenge aspects of the probation report prepared for

45

sentencing (3 RT 704-705), "there is no question that this Defendant has been found in violation of probation, and he was set for sentencing on that, following two hearings. And then, of course, this Court heard a jury trial, and can make findings in that regard, too." (3 RT 705.) Later, the court reiterated that appellant had twice been found in violation of probation, and had since suffered two additional convictions. (3 RT 719-720.)

Based on the probation officer's testimony regarding appellant's probation violations, as well as his conviction for felon in possession of a firearm, ample evidence supports the courts' findings that he was in violation of probation. Appellant's claim to the contrary is without merit.

## VIII.

## APPELLANT FAILS TO SHOW CUMULATIVE ERROR

Appellant contends that even if no single error warrants reversal, the cumulative effect of the errors warrants reversal. We disagree. Because appellant fails to establish any error, there is no error to cumulate. Moreover, even if he established error, any error was harmless, whether considered individually or cumulatively.

## CONCLUSION

Accordingly, respondent respectfully requests that the judgment be affirmed.

Dated: May 2, 2006

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

MOONA NANDI
Supervising Deputy Attorney General

*Joan Killeen*

JOAN KILLEEN
Deputy Attorney General

Attorneys for Respondent

SF2005DA0168
20044851.wpd

48

## CERTIFICATE OF COMPLIANCE

I certify that the attached RESPONDENT'S BRIEF uses a 13 point Times New Roman font and contains 13748 words.

Dated:  May 2, 2006

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of
California

JOAN KILLEEN
Deputy Attorney General

Attorneys for Respondent

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:  **People v. Michael Benjamin Nordlof**                    No.:**A108464**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On May 2, 2006, I served the attached **RESPONDENT'S BRIEF** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

Kieran D.C. Manjarrez
P. O. Box 602
Middletown, CA 95461

First District Appellate Project
730 Harrison Street, Suite 201
San Francisco, CA 94107

Honorable Paul Gallegos
District Attorney
825 Fifth Street
Eureka, CA 95501

Clerk of the Superior Court
825 Fifth Street, Room 226
Eureka, CA 95501-1153

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on May 2, 2006, at San Francisco, California.

| L. SORENSEN | _L. _____ |
|---|---|
| Declarant | Signature |

20046540.wpd